# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**DAS NOBEL, Individually, and on behalf of all other similarly situated,**

     **Plaintiff,**

v.

**SOUTH FLORIDA STADIUM LLC D/B/A HARD ROCK STADIUM, CONFEDERACION SUDAMERICANA DE FUTBOL D/B/A CONMEBOL, CONFEDERATION OF NORTH, CENTRAL AMERICA AND CARIBBEAN ASSOCIATION FOOTBALL D/B/A CONCACAF, AND BEST CROWD MANAGEMENT, INC.,**

     **Defendants.**

**Case No.: 1:24-cv-22751**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff, Das Nobel ("Plaintiff" or "Nobel"), individually, and on behalf of all others similarly situated (the "Putative Class"), files this Class Action Complaint against Defendants, South Florida Stadium LLC d/b/a Hard Rock Stadium ("Hard Rock"), Confederacion Sudamericana De Futbol d/b/a CONMEBOL ("CONMEBOL"), Confederation of North, Central America and Caribbean Association Football d/b/a Concacaf ("Concacaf"), and BEST Crowd Management, Inc. ("BEST"), (together as "Defendants"), as follows:

## INTRODUCTION

> It was a life-or-death situation. Let the people get crushed or open the gates. Then it became total mayhem in there. It was a calamity of errors on all levels.
>
> — Steadman Stahl, Police Union President of the South Florida Police Benevolent Association.

1.      This Complaint seeks redress for a class of invitee fans who paid money to attend the Copa America Final football match between Argentine and Columbia ("Final Match") at Hard Rock Stadium but were denied entry because of Defendants' failure to implement adequate security protocols that resulted in mass chaos, injuries, and ultimately, the Defendants' decision to open the stadium to thousands of unticketed fans and to exclude ticketed invitee fans like Plaintiff and the Class Members.

2.      Plaintiff and the Class Members paid thousands of dollars for tickets and travel accommodations to attend the Final Match.

3.      This class action does not seek damages related to any personal injuries.

4.      The Copa America Final Match was held at Hard Rock Stadium on July 14, 2024. Defendants sold over 65,000 tickets to invitees like Plaintiff to attend the Final Match at Hard Rock Stadium in Miami Gardens, Florida.[1]

5.      Following the Defendants selling out every seat at the Hard Rock Stadium for the Final Match, Defendants' decisions caused or allowed civil unrest through the following actions or inactions: (1) failure to implement an adequate and reasonable security and safety plan; (2) failure to hire an adequate number of security persons; (3) failure to predict scope and scale of unticketed attendees present for the Final Match; (4) failure to establish a permitter; (5) failure to establish ticketed checkpoints, barriers and fences; (6) permitting parking for ticketed and unticketed invitees around Hard Rock Stadium; (7) permitting watch parties and gatherings for unticketed invitees outside of Hard Rock Stadium; (8) willfully and knowingly permitting unticketed fans to enter Hard Rock Stadium; (9) willfully and knowingly denying ticketed fans

---

[1] https://www.theguardian.com/football/article/2024/jul/15/fans-receive-medical-treatment-at-copa-america-final-after-issues-outside-ground#:~:text=We%20are%20actively%20working%20with,of%20the%20South%20American%20tournament.

entrance to the Hard Rock Stadium; (10) failure to cancel the Final Match to ensure the safety, security, and attendance of ticketed fans; and (11) other security and safety protocol failures that will come to light during discovery.

6.     As a direct result of Defendants' failures to implement appropriate security and safety measures and the decision to open the gates to unticketed fans that invaded the Hard Rock Stadium, Defendants permitted unticketed fans to steal the seats paid for by Plaintiff and the Class. Specifically, Defendants admitted thousands of unticketed fans and as a result, denied entry to thousands of ticketed fans, including Plaintiff and the Class.

7.     Plaintiff seeks to represent all ticketed persons that Defendants denied entry into the Final Match. Plaintiff and the proposed Class were damaged as a result of Defendants' negligent conduct and seek redress by way of a full refund of their ticket purchases, plus interest, and damages incurred as a result of their corresponding travel expenses. In the alternative, Plaintiff seeks disgorgement of all profits that Defendants generated from the sale of the Class Members' tickets, as allowing Defendants to retain profits from Plaintiff and Class Members' purchases would unjustly enrich the Defendants.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d) of the Class Action Fairness Act because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and it is a class action in which the parties are minimally diverse.

9.     Minimal Diversity exists. The Defendants are incorporated in the Bahamas, Paraguay, Missouri, and Florida, and Hard Rock and Concacaf maintain their principal place of business in Florida. Hard Rock's membership is comprised of citizens of Florida and New York for diversity purposes. BEST is a citizen of Missouri. Plaintiff is a citizen of Texas.

10.     This Court has personal jurisdiction over Defendants. Hard Rock and Concacaf maintain their principal places of business in this District, conduct substantial business in this District, maintain registered agents in this state, have sufficient contacts with this District, and otherwise avail themselves of the markets in this District. Moreover, this Court has personal jurisdiction over CONMEBOL because it conducts substantial business in this District, has sufficient contacts with this District, and otherwise avails itself of the markets in this District. Furthermore, BEST conducts substantial business in this District, maintains a registered agent in this District, has sufficient contacts with this District, and otherwise avails itself of the markets in this District.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c). Specifically, because Hard Rock Stadium and the actions giving rise to this lawsuit occurred in Miami-Dade County, Florida.

## **PARTIES**

12.     Plaintiff Das Nobel is a natural person living in Dallas, Texas. At all times material hereto, Mr. Nobel was a citizen of Texas.

13.     Defendant South Florida Stadium LLC d/b/a Hard Rock Stadium is a Florida Limited Liability Company. Its principal place of business is 347 Don Shula Drive Miami Gardens, Florida 33056. Stephen Ross and the family of Wayne Huizenga are the sole owners and members of South Florida Stadium LLC. For citizenship purposes, Ross and the Huizenga family are citizens of the State of Florida. At all times material hereto, Hard Rock owned and operated the Hard Rock Stadium located Miami-Dade County, Florida and availed itself of Florida law, and routinely profited from doing business in Miami-Dade County and under the laws of the State of Florida. Accordingly, the Hard Rock Stadium is subject to general jurisdiction in this District.

4

14.     Defendant Confederacion Sudamericana De Futbol d/b/a CONMEBOL is an association of ten national soccer associations from Argentina, Brazil, Bolivia, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela. CONMEBOL is organized under the laws of Paraguay as a non-profit and non-governmental entity. At all times material hereto, CONMEBOL conducted business in the State of Florida and Miami-Dade County, availed itself to Florida law, and profited from its business in Miami-Dade County and under the laws of the State of Florida. Because CONMEBOL was doing business in Florida for the specific purpose of presenting the Final Match, it is subject to specific jurisdiction within this District.

15.     Defendant Confederation of North, Central America and Caribbean Association Football d/b/a Concacaf is an association of forty-one national soccer associations from North America, Central America, and the Caribbean Islands. Specifically, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bonaire, British Virgin Islands, Canada, Caymen Islands Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Puerto Rico, Saint Kitts and Nevis, Saint Lucia, Saint Martin, Saint Vincent and the Grenadines, Sint Maarten, Suriname, Trinidad and Tobago, Turks and Caicos Islands, United States of America and U.S. Virgin Islands. Concacaf is organized under the laws of the Bahamas as a non-profit and non-governmental entity. At all times material hereto, Concacaf conducted business in the State of Florida and in Miami-Dade County, maintained a principal place of business and registered agent within the State of Florida, availed itself to Florida law, and profited from its business in Miami-Dade County and under the laws of the State of Florida. Because Concacaf was doing business in Florida for the specific purpose of presenting the Final Match, it is subject to specific jurisdiction within this District.

16.     Defendant BEST Crowd Management, Inc. is incorporated in Missouri and maintains its principal place of business in Missouri. At all times material hereto, BEST was hired by the other Defendants to secure and protect ticketed fans like Plaintiff and the Class at Hard Rock Stadium located in the State of Florida and Miami-Dade County, availed itself to Florida law, and profited from doing business in Miami-Dade County and under the laws of the State of Florida.

## GENERAL FACTUAL ALLEGATIONS

### I.     FIFA CONFEDERATIONS

17.     Founded in 1904, FIFA is football's world governing body and was created to unite national soccer associations.[2]

18.     Under FIFA's governance, football (soccer) has become the world's most popular sport, with 150 million registered athletes and viewed regularly by billions of fans in stadiums and on televisions worldwide.[3]

19.     As football's administrative authority, FIFA governs all facets of the game: regulating the rules of play, transfers of players internationally, organizing international competitions such as the FIFA World Cup[4], establishing standards for referees, coaching and sporting medicine, and encouraging soccer's development around the world.[5]

20.     FIFA's members are split geographically into six regional confederations: (1) Africa (CAF), Asia (AFC), Europe (UEFA), South America (CONMEBOL), Oceania (OFC), and North America, Central America and the Caribbean (CONCACAF).

---

[2] https://www.ussoccer.com/history/organizational-structure/fifa
[3] *Id.*
[4] Prior to the Mayhem at the Final Match, Hard Rock Stadium was selected to host the FIFA World Cup in 2026.
[5] https://www.ussoccer.com/history/organizational-structure/fifa

## II.      CONMEBOL

21.     CONMEBOL is the continental governing body of soccer in South America and is the oldest confederation in the world.[6]

22.     CONMEBOL is made up of ten national soccer associations from Argentina, Brazil, Bolivia, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela.

## III.     Concacaf

23.     Concacaf formed in 1961 through the merger of the Football Confederation of Central America and the Caribbean and the North American Football Confederation and consists of three sub-regions: North America, Central America, and the Caribbean.

24.     Concacaf is made up of forty-one national soccer associations from North America, Central America, and the Caribbean Islands. Specifically, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bonaire, British Virgin Islands, Canada, Caymen Islands Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Puerto Rico, Saint Kitts and Nevis, Saint Lucia, Saint Martin, Saint Vincent and the Grenadines, Sint Maarten, Suriname, Trinidad and Tobago, Turks and Caicos Islands, United States of America and U.S. Virgin Islands.

## IV.      THE COPA AMERICA TOURNAMENT

25.     The Copa America Tournament is the top football tournament among national teams from South America. The first Copa America Tournament was held in 1916 to honor the 100-year anniversary of Argentina's independence. The tournament took place every one to four years until it adopted its quadrennial format in 2007.

---

[6] https://analyisport.com/insights/what-is-conmebol-south-america/

26.     In 2016, the Copa America Tournament was played for the first time in the United States.[7]

27.     The 2016 Copa America Tournament set the benchmark for attendance and revenue setting new records for total and average attendance, television viewership in the United States and throughout the world, and digital and social media engagement.[8]

28.     In 2016, the Copa America Tournament was structured and run by Concacaf.

29.     As a result of the revenue and viewership received in 2016, the Copa America Tournament returned to the United States in 2024.[9]

30.     In 2024, the Copa America Tournament was held at various locations across the United States from June 20 to July 14, 2024 bringing together 16 nations – 10 from South America and Six qualifiers from Concacaf.[10]

31.     The Copa America 2024 Tournament was comprised of 32 matches in 14 different cities/stadiums spanning both coasts of the United States.[11]

32.     The Copa America 2024 Final Match was scheduled to be played at the Hard Rock Stadium in Miami, the same venue that has been chosen to host the 2026 FIFA World Cup.[12]

33.     Notably, instead of Concacaf hosting the Copa America 2024 Tournament, CONMEBOL, with a fraction of the resources of its U.S. based counterpart, took over the planning, scheduling, structure and coordination of the Copa America Tournament in 2024.

34.

---

[7] https://www.prnewswire.com/news-releases/historic-2016-copa-america-centenario-delivers-record-breaking-event-300289950.html

[8] *Id.*

[9] https://copaamerica.com/en/match-schedule

[10] https://www.mlssoccer.com/news/2024-copa-america-host-cities-stadiums-schedule

[11] *Id.*

[12] https://www.hardrockstadium.com/events/fifa-world-cup-2026/

**V.      Defendant CONMEBOL's Contract with Defendant Concacaf**

35.     CONMEBOL and Concacaf executed a strategic collaboration agreement in 2023, in which the United States was selected to host the 2024 Copa America Tournament at Hard Rock Stadium.[13]

36.     The purpose of the collaboration agreement was to strengthen and develop football in both regions.[14]

37.     The one difference between the 2016 Copa America Tournament and the 2024 Copa America Tournament is that in 2016, Concacaf hosted and planned the entire tournament. As a result, Concacaf set new revenue and viewership records. CONMEBOL witnessed the revenue achieved from the 2016 Copa America and decided to seize its opportunity in 2024 with a plan to take the Copa America Tournament back in the United States, but this time it would plan and control the event itself and also retain a larger share of the revenue generated.

38.     CONMEBOL and Concacaf's joint decision to let CONMEBOL's confederation host, plan, organize and control one of the largest football events in world, including its limited resources and experience, placed profits over the safety and security of its fans.

39.     Hard Rock was awarded the Copa America Final Match and several games within the Tournament. The Copa America Tournament being held at the Hard Rock was only the second time that this 100-year-old tournament was held outside of South America..

40.     Adding to the excitement of holding the Copa America Tournament at the Hard Rock, is the surgency of Lionel Messi fandom as he joined the Inter Miami football team for the 2023-2024 season. Lionel Messi also plays for Argentina, a team competing in the Copa America

---

[13] https://www.concacaf.com/news/conmebol-and-concacaf-sign-strategic-collaboration-agreement/
[14] https://www.concacaf.com/news/conmebol-and-concacaf-sign-strategic-collaboration-agreement/

Tournament. Argentina would go on to advance to the Copa America championship, attempting to win a record, 16th Copa America Title.

41.     Opposite Lionel Messi and Argentina in the Copa America championship was Columbia who was attempting to secure its first Copa America Title since 2001.

42.     Ahead of the Copa America Tournament, Hard Rock Stadium President and Chief Executive Officer, Tom Garfinkel acknowledged the large crowds expected for the Final Match stating "Obviously, with a large Colombian and Argentinean population here in South Florida, the demand for this event has been huge."

43.     Consistent with this level of excitement, Defendants took the opportunity to increase profits dramatically. Ticket prices surged to $7,377 for the most expensive ticket and the least expensive ticket still a whopping $1,995.[15]

44.     Despite being aware of the momentous occasion to take place at the Hard Rock, Hard Rock and CONMEBOL failed to devise an adequate security plan to control the tens of thousands of loyal fans that descended upon the Hard Rock Stadium. In particular, unticketed fans attended in droves.

45.     In 2023, CONMEBOL announced that Miami and the Hard Rock stadium had been awarded the Copa America Championship match. The awarding of the Copa America Final Match to the Hard Rock was no coincidence, as CONMEBOL quickly identified the growing contingent of Lionel Messi fans in Miami, where Messi plays for the MLS team, Inter Pool. It was thought that Messi may be playing in his final Copa America Tournament on behalf of Argentina in front of his home crowd.

---

[15] https://www.nbcmiami.com/news/sports/soccer/copa-america-final-times-ticket-prices-halftime-performance-and-more/3358622/

46.    When announcing the Hard Rock Stadium as the site of the Copa America Final Match, CONMEBOL stated that it expected "stadiums filled with the passion of the entire American continent for the inauguration and the final."

47.    The Hard Rock Stadium is a multi-purpose stadium located in Miami Gardens, Florida with a capacity of 65,326.[16] Hard Rock is the home stadium for the Miami Dolphins and the Miami Hurricanes and regularly holds sporting events, concerts, racing, and other events.

## VI.    Hard Rock Stadium and BEST Security

48.    Defendants CONMEBOL, Concacaf, Hard Rock, and BEST are no strangers to violence at football matches. All are aware of the world-wide history of violence that is possible at football matches when stadiums and tournament organizers fail to provide adequate security. In the 1989 Hillsborough Disaster, 97 Liverpool fans died as the result of a spectator crush. In 1996 more than 80 fans died at a World Cup qualifier between Guatemala and Costa Rica.

49.    Just three days before the chaos at the Hard Rock Stadium during the Final Match, CONMEBOL had opened an investigation into a bleacher brawl involving Uruguay players and Columbian fans at the Copa America Semi-Final Match ("Semi-Final Match") held at Bank of America Stadium in Charlotte, North Carolina. The Semi-Final brawl involved dozens of fans, players and security. Following the Semi-Final brawl, CONMEBOL released the following statement:

> On the eve of the final of Copa América, we want to reaffirm and warn that no action will be tolerated that tarnishes this global football celebration, which involves both the players and the fans present in the stadium, and which will be watched by hundreds of millions of viewers worldwide.
> It is unacceptable that an incident like this turns passion into violence. Therefore, no behavior that harms the sporting

---

[16] http://stadiumdb.com/stadiums/usa/dolphins_stadium

competition and the most beautiful spectacle in the world, which belongs to the entire football family, will be tolerated.[17]

50.     Rather than increasing security to control the violence, Defendants opened the doors to the general public and invited them to be part of the Final Match, regardless of whether they had purchased tickets. Upon information and belief, Hard Rock and BEST security allowed thousands of fans without tickets to park on Hard Rock Stadium property increasing the volume on non-ticket holders on Hard Rock property.

51.     Upon information and belief, Defendants failed to establish a perimeter outside of the stadium (barricades, fences, metal detectors, ticket scanners, block parking lots, funnel fans to checkpoints, etc.) as is typical for major football matches around the world, including the European championship.

52.     Upon information and belief, CONMEBOL was responsible for organizing the 2024 Copa America Tournament, selected Hard Rock as the site for the final, and approved Hard Rock's security plan. Concacaf contracted with CONMEBOL and was involved through its own actions or inactions and knew or should have known that the security plan was inadequate.

53.     CONMEBOL entered into a contract with Hard Rock Stadium to host the 2024 Copa America Final Match and spent over a year marketing and selling tickets for the events.

54.     Upon information and belief, Hard Rock Stadium was responsible for implementing the security plans negotiated with CONMEBOL and Concacaf and implementing protocols designed for fan safety. Hard Rock Stadium hired BEST security for additional assistance. On information and belief, BEST Security assisted in the development and implementation of the security plans developed and agreed upon by Hard Rock Stadium, CONMEBOL and Concacaf.

---

[17] https://www.nytimes.com/athletic/5632635/2024/07/11/colombia-uruguay-copa-america-nunez-clash/

## VII.    Plaintiff's Facts

55.     Plaintiff Das Nobel is a football fan living in Dallas, Texas. Plaintiff Nobel, his wife, and his two children are longtime football fans, supporting the Argentinian National Team and the meteoric rise of Messi.

56.     On June 26, 2024, Plaintiff Nobel and his family traveled to New Jersey to see Messi and to support Argentina's sold-out match against Chile. Plaintiff Nobel and his family, like millions of other Messi and Argentina fans, celebrated when Argentina prevailed against Chile, a redemption for Argentina's 2016 loss to Chile in the Copa America Centenario final.

57.     On July 9, 2024, Plaintiff Nobel visited the popular ticketing website Seat Geek, where the prices of tickets for the Copa America Final had soared to almost $2,000 for the cheapest ticket. Plaintiff Nobel purchased four tickets for his family in Section 131, Row 1, Seats 19-22—the perfect seats to enjoy Messi's final Copa America Tournament.

58.     In total, these four tickets cost Plaintiff Nobel $9,948.96. A copy of Plaintiff Nobel's receipt for his July 9, 2024 Seat Geek purchase is attached as **Exhibit 1**.

59.     In addition to the cost of the tickets, Plaintiff Nobel, like thousands of other football fans, purchased flights to travel from his home in Dallas, Texas to Miami, Florida. He paid for hotels, and ground transportation to attend the Copa America Tournament. Plaintiff Nobel's lodging cost $4,587.87 and his flights totaled $10,000.

60.     On July 14, 2024 at 5:30 p.m., Plaintiff Nobel and his entire family put on their Argentina number 10 Messi jerseys and made their way to the Hard Rock Stadium.

61.     When Plaintiff Nobel arrived at Hard Rock Stadium , he was surprised to find that the area surrounding the stadium was already in complete mayhem. There was no order to foot

traffic or automobile traffic, the parking lots were scattered with dozens of "vendors" selling alcohol out of rolling coolers.

62.     Defendants had allowed what appeared to be a complete free-for-all block party surrounding the stadium.

63.     As he approached the stadium entrance, stepping over broken glass bottles with his family in tow, Plaintiff Nobel saw no security guards or police officers controlling the crowd.

64.     The Hard Rock Stadium websites states that the following with respect to the Copa America Final:[18]

> Fans MUST have game tickets to enter the Hard Rock Stadium parking lots on match day. **There will be no watch parties outside the stadium or in the parking lots.** Fans with tickets are encouraged to come early.

65.     However, as Plaintiff Nobel approached the Southeast gate to enter the Hard Rock, he found a different scene—tens of thousands of fans were gathering tailgating and preparing watch parties, including a large screen placed in the parking lot by Defendants.

66.     At no point during his walk from a nearby fast-food restaurant to the entrance to the stadium was Plaintiff Nobel asked to show his ticket to enter the stadium grounds. Neither was anyone else.

67.     There were no barricades protecting the perimeter surrounding the various entrances to the Hard Rock Stadium.

68.     Plaintiff Nobel and his family approached the Southeast entrance shortly after 7:00 p.m., almost an hour before the game was slated to start.

---

[18] https://www.hardrockstadium.com/parking/copa-america/

69.     When Plaintiff Nobel approached the entrance, he did not find Defendants scanning tickets or controlling the crowd of thousands that had gathered at the Southeast entrance. Instead, he found the gates shut and locked.

70.     Plaintiff Nobel received a message stating that the match had been delayed by 45-minutes, which gave him hope that Defendants would quell the crowds and start allowing ticketed fans to enter. So, he waited in the heat with thousands of other frustrated ticket holders, including many families.

71.     Plaintiff Nobel began conversing with other ticketed fans near the gate as he kept his family close. Plaintiff Nobel found that the majority of fans who were being denied entry to the Hard Rock were families with small children trying to avoid the chaos and stay together.

72.     During his wait, Plaintiff Nobel witnessed dozens of fans climbing onto a store front and breaking into the stadium, scaling fences, and throwing backpacks over.

73.     Plaintiff Nobel pleaded with Defendants' employees through the locked gates to look at his tickets, but received no response.

74.     As kick off approached, with temperatures well into the 90's, Plaintiff Nobel purchased waters for his family and other families around him while he waited to be let into the game.

75.     Plaintiff Nobel was shocked to find that the Defendants, who were locking their paying guests out of the stadium, refused to open the gates to provide water and first-aid to those in need who had not prepared for standing in a massive crowd for hours in the extreme heat.

76.     After kick off, Plaintiff Nobel and his family remained together at the Southeast gate hoping to be let in to see at least the end of the game. Defendants' employees refused to tell

them whether they would be let in or not. So, Plaintiff, his family and thousands of other loyal football fans waited.

77.     By 9:50 p.m., Plaintiff Nobel and his family accepted that the Defendants would not ever re-open the gates and made their way back to their ground transportation. At Plaintiff Nobel's request, his driver brought cases of water, which Plaintiff Nobel and his family distributed to other fans in need.

78.     Plaintiff Nobel and his family returned to their hotel where they watched the final minutes of Argentina's victory over Columbia on television.

79.     As a direct result of Defendants negligence, Plaintiff Nobel suffered economic damages, including the $9,948.96 in tickets and $14,587.87 in travel costs.

80.     After the match, the media reported on the chaos at the stadium. Although the game was not to start until evening, tens of thousands of fans were allowed into the Hard Rock Stadium area to attend watch parties, and tailgate. There was no security checkpoints surrounding the stadium to keep unticketed individuals from gathering on stadium grounds.

81.     The area surrounding the stadium was filled with unticketed fans whom Defendants permitted to gather at the entrances to the Hard Rock Stadium.

82.     At some point, the ticketed and unticketed fans amassed to the point where Defendants were concerned that fans would be severely injured. As a result, the Defendants decided to open the stadium gates and permitted unticketed fans to avoid metal detectors and to enter the stadium without tickets.

83.     The scene that unfolded was on television and social media was astonishing, bloodied fans, parents protecting children from criminal acts, fans assaulting each other, stadium staff and local police.

84. Ultimately, the Defendants' failure to have a proper security plan allowed unticketed fans to enter the stadium.

85. At some point, in an effort to regain control, Defendants closed all gates and locked out thousands of properly ticketed fans.

According to Hard Rock these decisions were made to "avoid a stampede." However, a stampede was only made possible by Hard Rock's failure to implement reasonable and adequate security measures throughout the day and within the surrounding area of the stadium. The gate closures only led to more problems as some fans began breaking down walls and barricades. The scene was exceedingly dangerous.

86. Although Hard Rock attempted to "strategically" reopen some entrances, it was soon forced to close the entrances again because the stadium was at capacity due to unticketed individuals being allowed in, leaving thousands of paying customers, including Plaintiff and the Putative Class, wrongfully excluded from the stadium.

87. CONMEBOL officials have stated that it was "subject to the decisions made by the Hard Rock Stadium authorities, according to the contractual responsibilities established for security operations" and that CONMEBOL's recommended security measures "were NOT taken into account" by Hard Rock and BEST. This statement shows that all Defendants were involved in designing and implementing the security plan which was wholly inadequate and caused the mayhem, violence and damaged Plaintiff and the Class.

## VIII.  CLASS ACTION ALLEGATIONS

88. Plaintiff brings this case on behalf of himself and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed Class (the

"Class") is defined as follows:

> All natural persons who purchased a ticket to the Copa America Final Match and were prohibited from entering Hard Rock Stadium.

89.      The class period is four (4) years before the date this Complaint is filed through the date the Court certifies the Class.

90.      Membership in the class can be determined from the electronic scanners used by the Stadium and which register which tickets have been scanned in order to prevent fraud.

91.      Expressly excluded from the Class are:

(a)      Any Judge or Magistrate Judge presiding over this action and members of their immediate families;

(b)      Defendants and any entities in which Defendants have a controlling interest, or which has a controlling interest in Defendants and its legal representatives, assigns and successors; and

(c)      All persons who properly execute and file a timely request for exclusion from the Class.

92.      Plaintiff reserves the right to amend the Class definition at the Class Certification stage of the litigation if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

### Fed. R. Civ. P. 23(a) Criteria

93.      Numerosity. The exact number of Class Members is unknown as such information is in the exclusive control of Defendants. However, due to the nature of the trade and commerce involved, and the number of tickets sold by Defendants, Plaintiff reasonably believes the Class consists of easily thousands of consumers making joinder of all Class Members impracticable.

94.      Commonality. Common questions of law and fact affect the right of each Class

Member and common relief by way of damages is sought for Plaintiff and Class Members. The harm that Defendants have caused by their negligent conduct is substantially uniform with respect to all Class Members. Defendants' negligent conduct in orchestrating an appropriate security plan caused the fans to riot and the gates to eventually be locked which prevented entry into Hard Rock Stadium for Plaintiff and all Class Members. Common questions of law and fact that affect Plaintiff and the Class include, but are not limited to:

a.      Whether CONMEBOL owed Plaintiffs and the Putative Class a duty care;

b.      Whether Hard Rock owed Plaintiffs and the Putative Class a duty of care;

c.      Whether it was foreseeable that large crowds would gather at the Hard Rock Stadium;

d.      Whether it was foreseeable that the failure to provide adequate security would result in paying fans, including Plaintiffs and the Putative Class not being permitted to enter the Hard Rock;

e.      Whether CONMEBOL breached its duty of care when it contracted with the Hard Rock to host the Copa America final when Hard Rock failed to provide an adequate security plan;

f.      Whether Hard Rock, together with its employees, and subcontractors, breached the standard of care when it negligently failed to provide security and manage the growing crowd to prevent the breach of its entrances.

g.      Whether Hard Rock, together with its employees, and subcontractors, breached the standard of care when it negligently opened the entrances to allow thousands of persons into the Hard Rock without tickets and prevented paying fans from entering.

h.      Whether Hard Rock, together with its employees, and subcontractors, breached the standard of care when it negligently closed the entrances to the Hard Rock;

i.      Whether Defendants were unjustly enriched by generating tens of millions of dollars of revenue from Plaintiffs and the Putative classes purchase of tickets.

j.      Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class are entitled to damages, restitution and/or other remedies to which Class and Subclasses members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief.

k.      Whether Defendants owed a duty to Plaintiff and Class Members to safeguard their ticketed seats;

l.      Whether Defendants owed a duty to provide reasonable and adequate security protocols for the Copa America Final Match;

m.      Whether Defendants denied ticketed fans like Plaintiff and the Class Members entry to the Copa America Final Match;

n.      Whether the Defendants were negligent in failing to adequately secure the Hard Rock Stadium;

o.      Whether Defendants breached their duty to Plaintiff and the Class;

p.      Whether Defendants failed to take reasonable and prudent security measures;

q.      Whether Defendants' security and safety protocols and systems prior to and during the Final Match were consistent with industry standards;

r.      Whether Defendants knew or should have known that its security protocols were deficient;

s.     Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

t.     Whether Defendants' conduct, including its alleged failure to act, resulted in or was the proximate cause of the monetary harm suffered by Plaintiff and the Class Members; and

u.     Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or declaratory relief.

95.     In the alternative, Plaintiff seeks certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

96.     Typicality. The claims and defenses of Plaintiff are typical of the claims and defenses of the Class because Defendants denied entry of ticketed fans into the Hard Rock Stadium, controlled the gates and seats, permitted unticketed fans to enter the Hard Rock Stadium and surrounding area, and Plaintiff and the Class Members' tickets were compromised as a result of Defendants actions or inaction. Plaintiff sustained damages akin to damages sustained by Class Members arising out of and caused by Defendants' common course of conduct in violation of laws and standards as alleged herein.

97.     Adequacy of Representation. Plaintiff will fairly and adequately assert and protect the interests of the Class. First, Plaintiff has hired attorneys who are experienced in prosecuting class action claims within the State of Florida and across the United States, and who will adequately represent the interests of the Class. Second, Plaintiff has no conflict of interest that will interfere with the maintenance of this class action as his claims are the same as the Class Members he seeks to represent. Further, Plaintiff understands his obligations to the Class, is committed to vigorously litigating this matter, and will fairly and adequately protect and represent the interests

of the Class.

## Rule 23 (b)(3) Criteria

98.     The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. A class action provides a fair and efficient method for the adjudication of this controversy for these reasons and is superior to the alternative methods involved in individual litigation. The events that took place during the Final Match all occurred on one day and were all caused by the actions or inactions of Defendants. Common questions predominate regarding the conduct that lead up to the Final Match and after.

99.     Although the Class is numerous enough to meet the numerosity requirement, the proposed Class does not create manageability problems because the claims turn on common legal determinations. Either Defendants' were negligent or they were not. Either Defendants collected money from Plaintiff and the Class in exchange for Final Match tickets and then denied entry to the Hard Rock Stadium which resulted in Defendants 'unjust enrichment or it did not. There are no unusual legal or factual issues that would create manageability problems as the issues turn on a single interpretation of Defendants' security measures, actions and/or inaction, and its standards and reasonableness of its conduct leading up to the Final Match in relation to others in similar instances.

100.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct.

101.    Despite the sizeable sum of money unlawfully collected and retained by the Defendants, the claims of the individual Class Members are, nevertheless, small in relation to the expenses of individual litigation, making a class action the only procedural method of redress in

which Class Members can, as a practical matter, recover their damages and stop the illegal practices at issue.

102.    Class Members are readily identifiable and ascertainable given the nature of Defendants' business practices and using its business records and ticket technology.

### IX.    CAUSES OF ACTION

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

103.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-102, as if set forth fully herein.

104.    Defendants collected payments from Plaintiff and the Class Members' in exchange for tickets to the Final Match as part of the entertainment business they agreed to jointly operate, which affects commerce.

105.    Plaintiff and Class Members entrusted Defendants with the understanding that the money they paid to Defendants would permit them to enter the Hard Rock Stadium for the Final Match and that their tickets would be safeguarded.

106.    Defendants had full knowledge of the expense and sensitivity of the tickets and the types of harm that Plaintiff and Class Members could and would suffer if their seats were stolen or it they were prevented them from using the tickets or accessing the stadium.

107.    It was reasonably foreseeable to Defendants that Plaintiff and the Class Members would suffer such harms in light of similar chaos experienced at other similar football events, such as the mayhem experienced at semi-final match and the Final Match.

108.    Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting access to the stadium and protecting

their tickets and seating in from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

109.    Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, consistent with industry standards and requirements, and to ensure that its security and safety protocols, and the personnel responsible for them, adequately protected Plaintiff's and Class Members' tickets and legal right to enter the Hard Rock Stadium.

110.    Defendants also had a special relationship with Plaintiff and each of the Class Members as ticketed invitees. That special relationship arose because Defendants were entrusted with their safety and security as a necessary part of the services rendered by Defendants. That special relationship provides an additional basis on which Defendants owed a duty to Plaintiff and each of the Class Members to protect against unauthorized access to, theft of, and/or disclosure of their tickets and seating and to protect their right to enter the Hard Rock Stadium.

111.    Defendants owed a duty to Plaintiff and Class Members to design, maintain, and test their safety and security systems and protocols to ensure that all tickets and entry points in their possession or control were adequately secured and protected.

112.    Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable security practices and procedures to protect all ticketed persons in their possession or control, including not compromising their tickets, seating, or access to the Hard Rock Stadium, or entrusting security to other entities who maintain substandard security systems.

113.    Defendants owed a duty to Plaintiff and Class Members to implement and maintain security processes that would immediately detect a breach of their security systems in a timely manner.

114.    Defendants owed a duty to Plaintiff and Class Members to act upon security

warnings, prevent them and/or alert them in a timely fashion.

115.   Defendants owed a duty to Plaintiff and Class Members to disclose in timely fashion of any security breach and security practices that were inadequate in any way to safeguard individuals' persons, tickets, and seating, including from theft from unticketed fans.

116.   Defendants owed a duty to Plaintiff and Class Members to reliably plan and/or implement security standards to keep Plaintiff and Class Members' safe from unticketed fans.

117.   Defendants owed a duty to Plaintiff and Class Members to monitor fan behavior and activity to identify possible threats to the security and integrity of the Hard Rock Stadium prior to and during the Final Match.

118.   Defendants owed a duty to Plaintiff and Class Members to promptly and adequately notify Plaintiff and Class Members of the Breach, and a reasonably prudent company similarly situated would have postponed the event until a later date to ensure adequate security and safety of ticketed persons.

119.   Plaintiff and the Class Members were the foreseeable invitees and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in creating, collecting, selling, protecting, planning, and the critical importance of providing adequate security to Plaintiff and the Class Members' tickets, seating, and person, and the necessity for safeguarding safe access to the Stadium.

120.   Defendants were in a position to protect against the harm suffered by Plaintiff and the Class Members as a result of their failure to provide adequate security. Defendants' duties extended to protecting Plaintiff and the Class Members from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the

risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B.

121.    Defendants failed to perform these duties by failing to reasonably and adequately secure their premises and systems against unticketed fans.

122.    But for Defendants' wrongful and negligent breaches of the duties owed to Plaintiff and the Class Members, Plaintiff and Class Members would have gained safe access to the Stadium to enjoy the Final Match that they paid to attend.

123.    There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiff's and Class Members' tickets and the harm suffered by Plaintiff and the Class Members.

124.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class Members have suffered injury by way of payment for tickets which could not be used because Defendants prohibited their use and access, the value of their tickets, travel accommodations, and other forms of monetary damages connected to attending the Final Match.

125.    Plaintiff and Class Members are entitled to actual and liquidating damages suffered as a result of the Defendants' breach of its duty.

126.    Defendants' negligent conduct is ongoing, in that Plaintiff's and Class Members' have never been fully compensated for the cost of their tickets, travel, and interest on money that Defendants borrowed.

**COUNT II**
**Negligence Failure to Warn**
**(On Behalf of Plaintiff and the Class)**

127.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-102, as if set forth fully herein.

128.    Upon information and belief, Defendants were or should have been aware for a

substantial period of time that their security plans, protocols, procedures and systems were inadequate and prone to failure .

129.    Upon information and belief, Defendants knew or should have known of its security failures including, but not limited to, failing to heed credible security warnings; failing to maintain adequate security policies and procedures; failing to detect alerts in regard to vulnerabilities affecting its security systems; failing to properly set a perimeter, barricades, fences, and ticketed areas, failing to properly use automated tools to track which fans were ticketed, failing to permit entry of ticketed persons, permitting entry of unticketed persons; and failing to implement appropriate procedures to keep security current and address vulnerabilities, including the adequacy of third parties hired to assist with security.

130.    Nevertheless, Defendants failed to warn Plaintiff and Class Members of the known security vulnerabilities, failed to effectively remedy the security flaws and problems in their systems and plans, failed to warn Plaintiff and Class Members of likely risks caused by Defendants' failure to remedy such security flaws, and failed to provide prompt notice to Plaintiff and Class Members that their security systems had been breached by unauthorized unticketed persons during the Final Match and/or failure to re-schedule the match so that ticketed persons like Plaintiff and the Class could safely use their tickets.

131.    As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff and the Class Members have suffered injury by way of payment for tickets which could not be used because Defendants prohibited their use and access, the value of their tickets, travel accommodations, and other forms of monetary damages connected to attending the Final Match.

132.    Plaintiff and Class Members are entitled to actual and liquidating damages suffered as a result of the Defendants' breach of its duties.

133.    Defendants' negligent conduct is ongoing, in that Plaintiff's and Class Members' have never been fully compensated for the cost of their tickets, travel, and interest on money that Defendants borrowed.

## COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

134.    Plaintiff re-alleges and re-incorporates paragraphs 1-102 as fully set forth herein.

135.    This count is plead in the alternative to the breach of implied contract claim above.

136.    Plaintiff and Class Members conferred a monetary benefit on Defendants in connection with obtaining its products and services, specifically providing payment to Defendants. In exchange, Plaintiff and Class Members should have received from Defendant services or products that were the subject of the transaction and should have had their Final Match tickets protected with adequate security.

137.    Defendants knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining their money.

138.    Defendants profited from Plaintiff's and Class Members' money paid in exchange for Final Match tickets.

139.    Defendants failed to take action and update their security systems and protocols to secure Plaintiff's and Class Members' tickets, seating, and entry into the Hard Rock Stadium and, therefore, did not fully compensate Plaintiff or Class Members for the value that their tickets provided when Defendants denied them entry into the Final Match.

140.    Defendants acquired Plaintiff's and Class Members' money through inequitable means as they failed to disclose the inadequate security practices previously alleged.

141.     Had Plaintiff and Class Members known that Defendants would not use adequate security practices, procedures, and protocols to adequately monitor, supervise, and secure their premises, or properly train their employees or third parties in charge of providing security, they would not have given their money to attend the Final Match.

142.     Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

143.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class Members have suffered an injury.

144.     Plaintiff and Class Members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging profits, benefits, and other compensation obtained by Defendants as a result of its wrongful conduct, as well as the return of their money related to ticket purchases, interest and related travel costs.

145.     This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and in favor of the Class, and against Defendants for:

      a.   an order certifying this case to proceed as a class action, designating Plaintiff as the Class representative, and designating the undersigned attorneys as Class Counsel;

      b.   actual damages;

      c.   interest;

      d.   liquidating damages related to travel expenses;

      e.   alternatively, disgorgement of Defendants' profits; and

f.   such further relief as this Court may deem appropriate.

### Jury Demand

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 19, 2024                Respectfully submitted,

**VARNELL & WARWICK, P.A.**

/s/ Brian W. Warwick
Jeffrey L. Newsome; FBN: 1018667
Janet R. Varnell; FBN: 0071072
Brian W. Warwick; FBN: 0605573
Christopher J. Brochu; FBN: 1013897
Pamela G. Levinson, FBN: 538345
400 N Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jnewsome@vandwlaw.com
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
cbrochu@vandwlaw.com
plevinson@vandwlaw.com
ckoerner@vandwlaw.com

*Attorneys for Plaintiff and the Proposed Class*