## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 1:24-22751-CIV-BLOOM

| |
|---|
| DAS NOBEL, Individually, and on behalf of all others similarly situated, |
| Plaintiff, |
| vs. |
| SOUTH FLORIDA STADIUM LLC D/B/A HARD ROCK STADIUM, CONFEDERACION SUDAMERICANA DE FUTBOL D/B/A CONMEBOL, CONFEDERATION OF NORTH, CENTRAL AMERICA AND CARRIBEAN ASSOCIATION FOOTBALL D/B/A CONCACAF, AND BEST CROWD MANAGEMENT, INC., |
| Defendants. |

## DEFENDANT SOUTH FLORIDA STADIUM LLC'S OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION FOR PROTECTIVE ORDER LIMITING COMMUNICATIONS WITH PUTATIVE CLASS MEMBERS

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ...................................................................................................2

III.    LEGAL STANDARD.............................................................................................6

IV.     ARGUMENT .........................................................................................................7

      A.      SFS's Communications With Putative Class Members Are Entirely Proper ..........7

            1.      References To The Ticketmaster Terms Of Use Are In No Sense
                Misleading Or Confusing..........................................................................10

            2.      The Term "Face Value" Is Not At All Misleading ...................................12

            3.      The Definitions Of Releasees And Related Persons Are Also Not
                Misleading Or Abusive ..............................................................................14

            4.      The Disclosure Of The Pending Class Actions Is Also Not
                Misleading Or Coercive.............................................................................14

            5.      Plaintiff's Cited Authorities Only Underscore The Propriety Of
                SFS's Communications..............................................................................17

      B.      Plaintiff's Motion Does Not Merit An Evidentiary Hearing ................................19

V.      CONCLUSION.....................................................................................................20

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

A.R. ex rel. Root v. Dudek,
  2013 WL 5278668 (S.D. Fla. 2013) ....................................................................... 7, 19

AT&T v. Concepcion,
  563 U.S. 333 (2011) ............................................................................................... 6

Bantam Books v. Sullivan,
  372 U.S. 58 (1963) ................................................................................................. 7

Bogle v. Rausch Strum,
  2022 WL 22824882 (S.D. Fla. 2022) .................................................................... 6

Bradford v. Brident Dental Servs.,
  2024 WL 1839458 (S.D. Tex. 2024) ..................................................................... 6

Bublitz v. E.I. DuPont de Nemours and Co.,
  196 F.R.D. 545 (S.D. Iowa 2000).................................................................... 10, 17

Burford v. Cargill,
  2007 WL 81667 (W.D. La. 2007) .......................................................................... 9

Collado v. 450 N. River Drive,
  2023 WL 3567857 (S.D. Fla. 2023) ....................................................................... 7

Cox Nuclear Med. v Gold Cup Coffee Servs.,
  214 F.R.D. 696 (S.D. Ala. 2003) .............................................................. 9, 13, 16

Cruz v. Cingular Wireless,
  648 F.3d 1205 (11th Cir. 2011) ............................................................................. 6

Doty v. ADT,
  2020 WL 9071424 (S.D. Fla. 2020) ........................................................... 9, 15, 16

Dye v. Tamko Bldg. Prods.,
  908 F.3d 675 (11th Cir. 2018) ............................................................................... 11

Eshelman v. OrthoClear,
  2007 WL 2572349 (N.D. Cal. 2007) ............................................................... 15, 17

Freeman v. Celebrity Cruises,
  1994 WL 689809 (S.D.N.Y. 1994) ........................................................................ 18

**Page(s)**

Gonzalez v. TCR Sports,
    2019 WL 2249941 (S.D. Fla. 2019) ............................................................................... 8

Gulf Oil v. Bernard,
    452 U.S. 89 (1981) ................................................................................................... 7, 19

Gunson v. BMO,
    43 F. Supp. 3d 1396 (S.D. Fla. 2014) ........................................................................ 11

Henry Schein v. Archer & White Sales,
    586 U.S. 63 (2019) ..................................................................................................... 19

In re Winchell's Donut Houses,
    1988 WL 135503 (Del. Ch. 1988) ..................................................................... 8, 9, 10

Jenifer v. Delaware Solid Waste Auth.,
    1999 WL 117762 (D. Del. 1999) ......................................................................... 9, 10

Jones v. Jeld-Wen,
    250 F.R.D. 554 (S.D. Fla. 2008) ............................................... 6, 7, 8, 15, 16, 18

Kay Co. v. Equitable Prod.,
    246 F.R.D. 260 (S.D. W.Va. 2007) ............................................................................. 9

Kelly v. Balboa Ins.,
    2014 WL 12621241 (M.D. Fla. 2014) ...................................................................... 11

Keystone Tobacco v. U.S. Tobacco,
    238 F. Supp. 2d 151 (D.D.C. 2002) .............................................................................. 9

Kleiner v. First Nat'l Bank,
    751 F.2d 1193 (11th Cir. 1985) ................................................................... 16, 17, 18

Nebraska Press Ass'n v. Stuart,
    427 U.S. 539 (1976) ...................................................................................................... 7

Noel v. MHC Heritage Plantation,
    2022 WL 18023536 (S.D. Fla. 2022) .......................................................................... 7

Noel v. MHC Heritage Plantation,
    2022 WL 3682086 (S.D. Fla. 2022) .......................................................................... 16

O'Connor v. Uber Techs.,
    904 F.3d 1087 (9th Cir. 2018) ................................................................................... 18

Peng v. Mastroianni,
    2022 WL 18465690 (S.D. Fla. 2022) ........................................................................ 19

iii

**Page(s)**

Saucedo v. NW Mgmt. & Realty Servs.,
    2013 WL 163425 (E.D. Wash. 2013) ................................................................. 18

Tolmasoff v. GM,
    2016 WL 3548219 (E.D. Mich. 2016) .......................................................... 15, 17

TransUnion v. Ramirez,
    594 U.S. 413 (2021) ....................................................................................... 6

**STATUTES**

9 U.S.C. § 1, et seq. ............................................................................................. 6

**OTHER AUTHORITIES**

Joseph O'Sullivan, High Copa América Ticket Prices Led To Many Empty Seats,
    Forbes (July 10, 2024), https://www.forbes.com/sites/josephosullivan/2024/07/10/
    crazy-copa-amrica-ticket-prices-result-in-many-empty-seats/ .................................. 13

Manual for Complex Litigation, Third § 30.21 (1995) ........................................... 7

**RULES**

Fed. R. Civ. P. 23 ............................................................................................. 6, 7

Defendant South Florida Stadium LLC ("SFS") respectfully submits this opposition to the Expedited Motion For Protective Order Limiting Communications With Putative Class Members of Plaintiff Das Nobel ("Plaintiff").[1]

## I.  <u>INTRODUCTION</u>

Plaintiff filed this putative class action in <u>direct</u> contravention of an arbitration provision and class waiver that Plaintiff expressly agreed to. Plaintiff now seeks to restrict communications with certain members of the proposed class he nevertheless seeks to represent, a proposed class that has <u>not</u> been certified and should <u>never</u> be certified for a host of reasons, not least of which being that like Plaintiff, <u>all</u> absent members of the class likewise agreed to resolve in arbitration claims such as those Plaintiff has asserted in this case <u>and</u> likewise agreed to a class waiver.

Separate from the arbitration provision and class waiver that Plaintiff already agreed to, however, Plaintiff's request is otherwise unwarranted under well-established law. SFS is well within its rights to communicate with absent members of an uncertified class and to settle the claims of persons who wish to do so. Indeed, such communications are subject to the protections of the First Amendment, such that any restriction on such communications must be based on a <u>clear</u> showing of need and be narrowly tailored.

But no such restrictions are warranted here, because the offers extended were in no sense misleading, abusive or coercive. To the contrary, all persons who received offers from SFS were explicitly advised of the pendency of this litigation (and other similar cases), were provided access to the pleadings, and were encouraged to consult counsel of their choosing. Moreover, the offers

---

[1] In responding to Plaintiff's motion, SFS <u>expressly</u> reserves the right to compel arbitration of Plaintiff's claims (as well as those of members of the proposed class). SFS will, in turn, move to compel arbitration at its earliest opportunity but is responding now to Plaintiff's motion, per the directive of the Court. <u>See</u> Order (Dkt. 17) (directing SFS to file a response by August 23, 2024).

themselves were for the <u>full</u> measure of relief everyone agreed to in the same agreement where they agreed to arbitrate disputes and agreed to a class waiver. Finally, the challenged offers were only directed to primary market purchasers who <u>affirmatively</u> contacted Ticketmaster or SFS and requested a refund. As such, the offers extended by SFS are anything but misleading, abusive or coercive, and Plaintiff's motion, which itself is based upon a series of inaccurate statements of fact and law, should be denied.

## II.   <u>BACKGROUND</u>

On July 14, 2024, the Final Match of the 2024 Copa America took place at Hard Rock Stadium. <u>See</u> Compl. (Dkt. 1) ¶ 30. Many fans purchased tickets for the Final Match on the primary market ("Primary Market Purchasers") through Ticketmaster, which served as SFS's ticketing agent for all tickets for the Final Match.[2] Others used their Ticketmaster accounts to purchase directly from SFS. All Primary Market Purchasers agreed to Ticketmaster's Terms of Use. <u>See</u> Ex. 1. Ticketmaster's Terms of Use contain an arbitration provision that includes a required informal dispute resolution process as well as a class waiver. <u>See</u> Ex. 1 at 2-3, § 17, pp. 14-19. The Terms of Use further include an all-caps heading in bold near the top that states "NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER," and reads as follows:

**NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER:**

The Terms contain an arbitration agreement and class action waiver Section 17. Specifically, you and we agree that any dispute or claim relating in <u>any</u> way to the Terms, your use of the Site, or <u>products</u> or <u>services</u> <u>sold</u>, <u>distributed</u>, <u>issued</u>, or <u>serviced</u> by us or through us, will be resolved by binding, individual arbitration, rather than in court. By agreeing to individual arbitration, you and we each <u>waive</u> any right to

---

[2] The primary market is distinguished from the secondary market. The secondary market consists of (i) primary market purchasers who seek to <u>resell</u> their tickets to <u>other</u> purchasers and (ii) secondary market purchasers who acquired their tickets from primary market purchasers and who seek to <u>resell</u> their tickets to <u>other</u> purchasers. The proposed class appears to include both purchasers on the primary market as well as purchasers on the secondary market. <u>See</u> Compl. (Dkt. 1) ¶ 88. Plaintiff purchased his tickets on the secondary market. <u>See</u> <u>id.</u> ¶ 57.

2

participate in a <u>class</u> <u>action</u> <u>lawsuit</u> or class-wide arbitration. This agreement and waiver—along with some limited exceptions—is explained in <u>Section 17</u>, below.[3]

Ex. 1 at 2-3.[4] The Terms of Use also include a delegation provision stating:

> **Delegation; Interpretation.** The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve <u>all</u> disputes arising out of or relating to the <u>interpretation</u>, <u>applicability</u>, <u>enforceability</u>, or <u>formation</u> of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable; however, in the event of a dispute about which particular version of this Agreement you agreed to, a court will decide that specific question. This arbitration agreement is intended to be broadly interpreted and will survive termination of the Terms.

Ex. 1 at § 17, p. 18. The Terms of Use also include a limitation of liability provision that states:

> IN NO EVENT WILL WE OR OUR <u>EVENT</u> <u>ORGANIZERS</u>, SUPPLIERS, ADVERTISERS, AND SPONSORS, BE RESPONSIBLE OR LIABLE TO YOU OR ANYONE ELSE FOR, AND YOU HEREBY KNOWINGLY AND EXPRESSLY <u>WAIVE</u> ALL RIGHTS TO SEEK, DIRECT, INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY TYPE, AND ANY RIGHTS TO HAVE DAMAGES MULTIPLIED OR OTHERWISE INCREASED, ARISING OUT OF OR IN CONNECTION WITH THE SITE, THE CONTENT, OR ANY PRODUCT OR SERVICE PURCHASED THROUGH THE SITE . . . .

Ex. 1 at § 15, p. 13.

In addition to Primary Market Purchasers, other purchasers bought tickets on the secondary market ("Secondary Market Purchasers") through sites (<u>e.g.</u>, SeatGeek and StubHub) where

---

[3] All emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

[4] Clicking on the blue hyperlink (or just scrolling down to Section 17), brings up the full arbitration and class action waiver provision, which provide as follows:

> **17. Mandatory Arbitration Agreement and Class Action Waiver**
>
> **YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, <u>ANY</u> DISPUTE, CLAIM, OR CONTROVERSY RELATING IN <u>ANY</u> WAY TO THE TERMS, YOUR USE OF THE SITE, OR PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY OR THROUGH US—IRRESPECTIVE OF WHEN THAT DISPUTE, CLAIM, OR CONTROVERSY AROSE—WILL BE RESOLVED SOLELY BY <u>BINDING</u>, <u>INDIVIDUAL</u> <u>ARBITRATION</u> AS SET FORTH IN THE TERMS, RATHER THAN IN COURT. YOU AND WE THEREBY EACH AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL, AND AGREE THAT YOU AND WE MAY BRING CLAIMS AGAINST EACH OTHER ONLY IN AN <u>INDIVIDUAL</u> CAPACITY, AND <u>NOT</u> AS A <u>PLAINTIFF</u> OR <u>CLASS</u> <u>MEMBER</u> IN ANY PURPORTED <u>CLASS</u> OR REPRESENTATIVE PROCEEDING.**

Ex. 1 at § 17, pp. 15-16.

Primary Market Purchasers resold their tickets. Indeed, Plaintiff Nobel alleges in his motion that he purchased his tickets on the secondary market from SeatGeek. <u>See</u> Mot. (Dkt. 10) at 10.[5]

On the day of the Final Match, there were numerous attempts by unruly fans without tickets to overpower security and law enforcement at entry points to Hard Rock Stadium. Various stadium gates were closed and re-opened strategically in an attempt to allow ticketed guests to enter safely and in a controlled manner. Certain fans continued to engage in illegal conduct, however, including fighting police officers, breaking down walls and barricades, and vandalizing the Stadium. For a short period of time, the Stadium gates were opened to all fans to prevent stampedes and serious injury. The gates were then closed once the threat was alleviated. At that time, however, the venue was at capacity, and the gates were not re-opened, meaning some fans who had purchased tickets were unable to enter to watch the Final Match. <u>See</u> Ex. 2.

After the Final Match, many ticketed fans who had been unable to enter the Stadium reached out to Ticketmaster or SFS to request refunds of their ticket purchases. As Plaintiff notes in his motion, SFS made public statements in the days following the Final Match regarding refunds, but those communications were directed <u>exclusively</u> to Primary Market Purchasers and <u>not</u> Secondary Market Purchasers like Plaintiff. <u>See</u> Mot. (Dkt. 10) at 6 (quoting SFS statement that "fans who purchased on the <u>primary market</u>" and were denied entry should contact Ticketmaster about a refund); <u>id.</u> at 7 (citing "Frequently Asked Questions" link on SFS webpage

---

[5] To obtain tickets purchased on the secondary market, <u>each</u> Secondary Market Purchaser nonetheless had to use his or her Ticketmaster account to log in in order to receive the tickets. All Secondary Market Purchasers agreed to one or another version of Ticketmaster's Terms of Use, but <u>all</u> such versions contained an agreement to arbitrate and a class waiver. Similarly, all Primary Market Purchasers agreed to one or another version of Ticketmaster's Terms of Use, all of which also contained an agreement to arbitrate and a class waiver.

that stated SFS and others were working with Ticketmaster "to reimburse fans who purchased tickets on the <u>primary</u> <u>market</u>" and were denied entry).

On August 5, 2024, SFS sent an email (the "August 5 Email") to fewer than 150 Primary Market Purchasers who had requested a refund from Ticketmaster or SFS and whose tickets to the Final Match had not been scanned.[6, 7] The August 5 Email offered the recipient "a refund for your purchase of tickets on the primary market (<u>i.e.</u>, the face value of the ticket)." <u>See</u> Ex. 3 at 1. The August 5 Email made clear the refund offer was conditioned on the recipient signing a release of claims that was being sent in a separate email (the "Release"). <u>See</u> <u>id.</u> at 1-2; <u>see also</u> Ex. 4. at 1-2. The August 5 Email also expressly stated that the Release would include a release of claims for "compensation for or in connection with the costs and expenses of the Tickets and the costs and expenses of traveling to and/or attending the [Final Match]." <u>See</u> Ex. 3 at 2.

In addition, the August 5 Email included a section prominently titled "CLASS ACTIONS" that informed the recipient a number of class actions had been filed related to the Final Match and linked to copies of the complaints filed in this case and five other putative class actions. <u>See</u> Ex. 3 at 2-3. The August 5 Email also:

1. Informed the recipient that should he or she wish to contact counsel who had filed the putative class actions, their contact information could be found at the end of the class action complaints. <u>See</u> <u>id.</u> at 3;

2. Encouraged the recipient to take his or her "time to make sure you fully understand the terms to which you are agreeing and if you wish, consult with a lawyer of your choice before signing the Declaration and Release of Claims form." <u>Id.</u> at 2; and

---

[6] Fans who never entered Hard Rock Stadium would not have had their tickets scanned.

[7] It appears that in addition to the fewer than 150 Primary Market Purchasers, the August 5 Email was inadvertently sent to one Secondary Market Purchaser who had contacted Ticketmaster for a refund. That individual, however, did not sign the Release, and once this inadvertent error was discovered, SFS promptly disabled that individual's ability to accept the offer and sign the Release.

3.  Gave the recipient 45 days to decide whether to accept the offer. See id. at 2.

As a Secondary Market Purchaser, Plaintiff was not sent the August 5 Email or Release. It is therefore not at all clear that as a Secondary Market Purchaser, Plaintiff has standing to seek relief for Primary Market Purchasers (as he otherwise purports to do in the instant motion) nor is it clear that Plaintiff could serve as an adequate representative of the proposed class if the other requirements of Rule 23 could be met, which they cannot be. See Fed. R. Civ. P. 23; see also TransUnion v. Ramirez, 594 U.S. 413, 422-423, 432-433 (2021). Moreover, having agreed to arbitrate "any dispute or claim" relating to tickets purchased through Ticketmaster and having likewise agreed to a class waiver, Plaintiff's standing to bring this motion before the Court is even less clear, as is his standing to address communications with members of a proposed class he agreed he would never be a member of or seek to represent.[8] See Ex. 1 at 2-3.

## III.  LEGAL STANDARD

No class has been certified in this case, and it is well-established that prior to class certification, absent class members are not represented by Plaintiff's counsel (or by counsel for the named plaintiffs in any of the other pending putative class cases). See, e.g., Jones v. Jeld-Wen, 250 F.R.D. 554, 563 (S.D. Fla. 2008) (defendant may communicate with absent members of a proposed class prior to class certification). A defendant is thus free to communicate with putative

---

[8] Class action waivers like the one in the Ticketmaster Terms of Use are fully enforceable under Florida law. See, e.g., Cruz v. Cingular Wireless, 648 F.3d 1205, 1212-13 (11th Cir. 2011); Bogle v. Rausch Strum, 2022 WL 22824882, *4 (S.D. Fla. 2022); see also Bradford v. Brident Dental Servs., 2024 WL 1839458, *7 (S.D. Tex. 2024) (applying Texas law and noting "[t]he Fifth Circuit has held that . . . arbitration agreements containing class waivers are enforceable."). Agreements to arbitrate are likewise fully enforceable under the Federal Arbitration Act, 9 U.S.C. § 1, et seq. See, e.g., AT&T v. Concepcion, 563 U.S. 333, 339 (2011). In other words, Plaintiff is seeking in his motion to restrict communications with a proposed class that Plaintiff previously agreed he would not be a part of as either "a plaintiff or class member," agreeing instead to only pursue such claims "in an individual capacity." See Ex. 1 at § 17, pp. 15-16.

class members prior to certification, including for purposes of making settlement offers. See id.; see also, e.g., Noel v. MHC Heritage Plantation, 2022 WL 18023536, *3 (S.D. Fla. 2022) ("Defendants ordinarily are not precluded from communications with putative class members, including discussions of settlement offers with individual class members before certification . . .") (citing Manual for Complex Litigation, Third § 30.21 at 233 (1995)).

Indeed, communications with putative class members are protected by the First Amendment and can only be limited under Federal Rule 23(d) if there is "a clear record and specific findings" of communications that are "misleading, coercive, or meant to undermine the purposes of Rule 23." Gulf Oil v. Bernard, 452 U.S. 89, 101-04 (1981); Fed. R. Civ. P. 23(d); see also, e.g., A.R. ex rel. Root v. Dudek, 2013 WL 5278668, *7-8 (S.D. Fla. 2013); Collado v. 450 N. River Drive, 2023 WL 3567857, *3-4 (S.D. Fla. 2023). There is, however, no such record here, and Plaintiff does not come close to satisfying his "heavy burden" of justifying "the imposition of [a prior] restraint" on SFS's communications with customers who themselves affirmatively reached out to Ticketmaster or SFS in order to request a refund. See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 558 (1976); see also Bantam Books v. Sullivan, 372 U.S. 58, 70 (1963); Gulf Oil, 452 U.S. at 94-95. To the contrary, the actual record of what transpired makes clear SFS went to considerable lengths to ensure that its settlement offers to Primary Market Purchasers fully complied with all applicable requirements. See disc. infra at § IV.A.

## IV.   ARGUMENT

### A.   SFS's Communications With Putative Class Members Are Entirely Proper

There is no factual or legal basis for an order restricting SFS's communications with its customers, much less the "clear record of abuse" that would be required for such an order. SFS has not pressured anyone into giving up potential legal claims nor has it made any false or misleading communications. The challenged communications are in no way abusive, misleading,

confusing or coercive. Rather, the challenged communications are proper responses to requests for refunds made by Primary Market Purchasers, which offered a <u>full</u> refund of the <u>entire</u> purchase price of the ticket.[9] <u>See</u> Ex. 3 at 1 ("You are receiving this email because you requested a refund of your tickets to the CONMEBOL Copa America USA 2024 Final Match on July 14, 2024"). In so doing, SFS has (i) openly disclosed the existence of the pending class actions, including this one, (ii) advised Primary Market Purchasers that they would be giving up their claims in this lawsuit and others by accepting the refund, (iii) provided links to copies of the complaints in this case and the other pending putative class action lawsuits, (iv) informed Primary Market Purchasers how they could contact Plaintiff's counsel and the other attorneys of record who filed the five other pending putative class actions, (v) cautioned Primary Market Purchasers that they should take time to make sure "you fully understand the terms to which you are agreeing and if you wish, consult with a lawyer of your choice," and (vi) provided an ample 45-day period for Primary Market Purchasers to consider the offers. <u>See</u> Ex. 3.

No one is being misled or asked to make a decision without the opportunity to gather information. <u>Cf.</u> <u>Jones</u>, 250 F.R.D. at 562 (holding that communications between the defendant and potential class members were misleading, because they suggested that a pending class action

---

[9] As noted above, it is well established that a defendant may communicate settlement offers to putative class members. <u>See</u> disc. <u>supra</u> at § III. The right to discuss settlement is, however, mutual, as unnamed putative class members themselves have a right to independently and directly resolve their claims. <u>See, e.g.</u>, <u>In re Winchell's Donut Houses</u>, 1988 WL 135503, *1 (Del. Ch. 1988). As one court aptly put it, putative "class members do not become wards, incompetent to deal with their own property, by reason of the <u>unilateral</u> filing of class action complaints by one of their number." <u>See</u> <u>id.</u> This is all the more true, since absent class members who reach a settlement <u>outside</u> the context of class litigation pay no legal fees to anyone, whereas settlements reached in class litigation often result in class counsel receiving one-third or more of any recovery by class members. <u>See, e.g.</u>, <u>Gonzalez v. TCR Sports</u>, 2019 WL 2249941, *6 (S.D. Fla. 2019) (noting "district courts in the Eleventh Circuit routinely approve fee awards of one-third of the common settlement fund").

was <u>preventing</u> the defendant from making needed repairs to windows); <u>see</u> <u>also</u> <u>Doty v. ADT</u>, 2020 WL 9071424, *2 (S.D. Fla. 2020) ("A defendant's failure to mention even an uncertified class action in securing settlements or releases from putative class members may be misleading."). Nor is there any evidence of coercion. <u>See</u>, <u>e.g.</u>, <u>Jenifer v. Delaware Solid Waste Auth.</u>, 1999 WL 117762, *5 (D. Del. 1999) ("The test for coercion is whether the conduct somehow <u>overpowers</u> the free will or business judgment of the potential class members. . . The communications here relate to a business proposition which potential class members are <u>free</u> to reject if they decide the costs outweigh the benefits."). In this case, Primary Market Purchasers are free to exercise their own judgment as to whether to accept the settlement offer. <u>See</u> disc. <u>infra</u> at § IV.A.1.

Plaintiff and his counsel propose to insert themselves between SFS and customers who have affirmatively reached out to request a refund and wish to resolve their claims. The relief Plaintiff requests would deprive Primary Market Purchasers the opportunity to receive immediate refunds of the face value of their tickets – a remedy that more than 80 Primary Market Purchasers have voluntarily elected to accept. In practice, Plaintiff's proposed protective order undermines consumer choice and these absent class members' right to independently and directly resolve their claims. <u>See</u> <u>In re Winchell's Donut Houses</u>, 1988 WL 135503, *1. But where, as here, there is no evidence of deception or coercion, courts routinely <u>deny</u> requests to limit a defendant's settlement offers to and communications with putative class members.[10]

_____

[10] <u>See</u>, <u>e.g.</u>, <u>Kay Co. v. Equitable Prod.</u>, 246 F.R.D. 260, 262-63 (S.D. W.Va. 2007) (denying plaintiffs' request for an order limiting communications between defendants and putative class members concerning settlement because of absence of evidence that any communication was misleading or coercive); <u>Burford v. Cargill</u>, 2007 WL 81667, *2 (W.D. La. 2007) (permitting defendants to obtain releases from putative class members so long as an appropriate notification concerning the pending litigation was given in the release documents); <u>Cox Nuclear Med. v Gold Cup Coffee Servs.</u>, 214 F.R.D. 696, 697-99 (S.D. Ala. 2003) (refusing to prevent a defendant from sending checks to putative class members that operated as releases); <u>Keystone Tobacco v. U.S. Tobacco</u>, 238 F. Supp. 2d 151, 153-59 (D.D.C. 2002) (denying motion to preclude settlement

### 1.   References To The Ticketmaster Terms Of Use
### Are In No Sense Misleading Or Confusing

In the motion, Plaintiff claims the August 5 Email is somehow misleading, because it states that the refund offer is being "made consistent with the spirit and purpose of the Informal Dispute Resolution provision included in Ticketmaster's Terms of Use, which you agreed to when purchasing your tickets to the Event." Mot. (Dkt. 10) at 9. Plaintiff claims this reference is purportedly misleading, because it would lead "a reasonable consumer [to] believe this statement to mean that they have already agreed to follow this refund process." See id. Plaintiff then claims (without citation) that Ticketmaster's Terms of Use do not apply, because Ticketmaster supposedly is not a party to this case, which according to Plaintiff renders the reference to Ticketmaster's Terms of Use misleading. See id.

Plaintiff's argument fails on several counts. First, Ticketmaster has in fact been named as a defendant in at least one of the class actions identified in the August 5 Email, namely Valderrama, et al. v. Conmebol, et al., Case No. 1:24-cv-22772 (S.D. Fla.) ("Valderrama"), and the proposed class in Valderrama overlaps substantially (if not entirely) with the proposed class here, meaning Ticketmaster is very much a party to this litigation and the reference to Ticketmaster is in no sense misleading or misplaced.[11] Compare Compl. (Valderrama Dkt. 1) ¶ 56, with Compl. (Nobel Dkt. 1) ¶ 88. Second, all Primary Market Purchasers agreed to Ticketmaster's Terms of Use, including

---

discussions with individual plaintiffs despite finding that some communications were inappropriate); Bublitz v. E.I. DuPont de Nemours and Co., 196 F.R.D. 545, 548-50 (S.D. Iowa 2000) (permitting defendant to issue settlement offers to putative class members, with limited conditions based on potential for coercion inherent in employer-employee relationship); Jenifer, 1999 WL 117762, *5-6; In re Winchell's Donut Houses, 1988 WL 135503, *1-4 (permitting defendants to communicate with unnamed class members regarding settlement).

[11] Indeed, Plaintiff and all of the persons to which the August 5 Email was sent are also members of the proposed class in Valderrama. See Compl. (Valderrama Dkt. 1) at ¶ 56 (defining proposed class as "all persons who purchased tickets to the Final but did not enter [Hard Rock Stadium]").

the referenced informal dispute resolution provision. <u>See</u> disc. <u>supra</u> at § II. <u>Third</u>, under the law of third-party beneficiary, agency and estoppel, SFS plainly has the right to enforce Ticketmaster's Terms of Use. <u>See</u>, <u>e.g.</u>, <u>Kelly v. Balboa Ins.</u>, 2014 WL 12621241, *2 (M.D. Fla. 2014) (third-party beneficiary); <u>Dye v. Tamko Bldg. Prods</u>, 908 F.3d 675, 685 (11th Cir. 2018) (agency); <u>Gunson v. BMO</u>, 43 F. Supp. 3d 1396, 1401-04 (S.D. Fla. 2014) (estoppel).[12]

But setting those merit issues aside for purposes of this motion, stating that a refund is being <u>offered</u> in the spirit of the informal dispute resolution clause in Ticketmaster's Terms of Use cannot seriously be read to "confuse and intimidate putative class members into believing that they are already contractually limited to this refund process." <u>See</u> Mot. (Dkt. 10) at 9. An offer is just that – an offer – which the August 5 Email makes clear the customer can take or leave, and recipients of the email were encouraged to consult a lawyer of their choosing if they felt the need to do so. <u>See</u> Ex. 3 at 1 ("This refund <u>offer</u> is being made . . ."); <u>id.</u> ("<u>If you choose</u> to obtain a refund . . . through this process"); <u>id.</u> at 2 ("<u>If</u> you sign the release and submit the Declaration and Release of Claims form . . ."). Moreover, everyone who received the August 5 Email agreed to "engage in [an] informal dispute resolution process" in agreeing to the Ticketmaster Terms of Use, and they likewise affirmatively contacted Ticketmaster and/or SFS in order to obtain a refund. <u>See</u> Ex. 1 at § 17, p. 15. As such, offering customers a <u>full</u> refund of the <u>entire</u> purchase price <u>after</u> they contacted Ticketmaster or SFS for a refund, as referenced in the informal dispute resolution

---

[12] For purposes of the Final Match, SFS used Ticketmaster as the ticketing agent for all tickets to the event, meaning all persons who purchased tickets (whether Primary Market Purchasers or Secondary Market Purchasers) were subject to Ticketmaster's Terms of Use. <u>See</u> disc. <u>supra</u> at § II.

provision that those customers also agreed to, would be (and is) perfectly consistent with the agreement to which all purchasers agreed.[13] See Ex. 1.

## 2.   The Term "Face Value" Is Not At All Misleading

There can be no serious argument that the term "face value" is misleading. Nonetheless, Plaintiff claims that the Release is misleading, because it does not include a value for the "specific amount of money being offered" and recipients of the Release Agreement supposedly would not "know the value of the legal claims being released." Mot. (Dkt. 10) at 11. Plaintiff further asserts recipients of the August 5 Email "have no idea how much they are actually being offered." See id. That, however, is simply wrong.

While the August 5 Email was not tailored to include the specific dollar amount a given Primary Market Purchaser paid, it was clear each recipient was being offered "the face value of the ticket." See Ex. 3 at 1. Plaintiff complains the common term "face value" itself is somehow confusing, but his own motion belies that claim. The motion asserts that Ticketmaster does not "list the face value on any of its tickets so that resellers don't have to explain why their price is so high above the face value." Mot. (Dkt. 10) at 11. The motion then cites Plaintiff as an example of someone who paid almost $10,000 for four tickets on the secondary market (SeatGeek) and says Plaintiff does not know the face value of those tickets. See id. at 12. As his motion makes clear, however, Plaintiff obviously understands that the term "face value" means the original price at which tickets to an event are sold and that some tickets are then resold on the secondary market at prices that are often well above face value, as was the case with the tickets Plaintiff purchased

---

[13] Further undermining Plaintiff's claims about Ticketmaster, the majority of the requests for refunds that were made by Primary Market Purchasers were directed to Ticketmaster and not SFS, only reinforcing the fact that purchasers understood and recognized the role of Ticketmaster in the process.

from SeatGeek. Thus, as Plaintiff's motion makes obvious, "face value" has a commonly understood and plain meaning.[14]

Plaintiff further complains that the August 5 Email failed to explain "the difference between the Face Value being offered and the amounts actually paid," implicitly suggesting offers were made to both Primary Market Purchasers (who paid face value for their tickets) and Secondary Market Purchasers (who may have paid considerably more than face value). Mot. (Dkt. 10) at 12. As noted above, however, the offers that are the subject of Plaintiff's motion were made only to Primary Market Purchasers, who only paid face value for their tickets. See disc. supra at §§ II., IV.A.1. In other words, for Primary Market Purchasers – individuals who did not buy on the secondary market at higher resale prices – face value is the amount actually paid and the only amount they paid. There is no difference. Providing a settlement offer for the full value paid for the tickets by Primary Market Purchasers is not remotely abusive, coercive or misleading. See Cox Nuclear, 214 F.R.D. at 699 (holding that the settlement communication was not misleading where "settlement offer is for the full amount" of the benefit of the bargain). This is all the more so given that the Ticketmaster Terms of Use expressly disclaim any "direct, indirect, incidental, special, or consequential damages of any type." See disc. supra at § II; see also Ex. 1 at § 17, p. 13.

---

[14] Plaintiff purports to quote a Forbes article that "reported that the 'face value' of a Copa America qualifying ticket was only $45-$60, yet the re-sale 'face value' was as much as $400." Mot. at 13, n.6. The cited article, however, does not refer to $400 as "face value." It states that tickets for a group match between Brazil and Columbia "were available at resale prices of $400 and above, certainly not around the $60 mark." See Joseph O'Sullivan, High Copa América Ticket Prices Led To Many Empty Seats, Forbes (July 10, 2024), available at https://www.forbes.com/sites/josephosullivan/2024/07/10/crazy-copa-amrica-ticket-prices-result-in-many-empty-seats/. Plaintiff's attempt, however, to manufacture confusion over the term "face value" underscores the weakness of his argument.

### 3.   The Definitions Of Releasees And Related Persons
### Are Also Not Misleading Or Abusive

Plaintiff claims that "the only Defendant in this case that is not specifically listed in the Release by name is BEST Security." Mot. (Dkt. 10) at 11. Thus, Plaintiff asserts putative "class members are unclear on whether or not they would still have a claim against BEST if they signed this release." See id. But the Release clearly states the purchaser is releasing any and all claims against various entities, including, among others, SFS "and any and all of, [its] . . . agents, . . . representatives, . . . [or] contractors" that arise out of or relate to "claims for a refund, payment, or other compensation for or in connection with the costs and expenses of the Tickets and other costs and expenses of traveling to and/or attending the [Final Match.]" See Ex. 4 at 1-2. BEST provided certain security services for SFS and thus is released as to the claims enumerated in the Release.

Plaintiff also seems to suggest the Release is somehow deceptive, because it asks the Primary Market Purchaser to list persons for whom he or she bought tickets (the "Related Persons") and asks the Primary Market Purchaser to acknowledge he or she is releasing claims "on behalf of myself and the Related Persons." Mot. (Dkt. 10) at 10. Given that the refund is being paid to the person who paid for the tickets (i.e., the Primary Market Purchaser), however, there is nothing untoward or improper about asking that person to acknowledge the release of all claims relating to those refunded tickets in order to ensure that multiple refunds to different persons are not made for the same tickets. Moreover, the Release clearly requests a list of Related Persons and expressly states their claims are being released. Ex. 4 at 1, 2. The Release cannot credibly be called misleading or deceptive in light of that express language.

### 4.   The Disclosure Of The Pending Class Actions
### Is Also Not Misleading Or Coercive

Plaintiff also claims that the August 5 Email's disclosure of the pending class action lawsuits and links to the complaints in each case is supposedly confusing. Mot. (Dkt. 10) at 12. Not so.

Courts have <u>repeatedly</u> held that a defendant may communicate settlement offers to putative class members if it discloses the existence of the pending class actions – exactly what SFS did here. <u>See, e.g.</u>, <u>Doty</u>, 2020 WL 9071424, *2 (requiring defendant to include in settlement communications "the name and case number of the" pending class case and "a <u>link</u> so that prospective class members can freely access the complaint should they so choose"); <u>Eshelman v. OrthoClear</u>, 2007 WL 2572349, *2-3 (N.D. Cal. 2007) (denying motion to restrict communications between defendant and putative class members where settlement communication included a copy of the class action complaint). And contrary to Plaintiff's assertion, a defendant is not required to explain "the status, purpose, and effects of" the pending class action nor is a defendant required to provide legal advice to putative class members. <u>See</u> Mot. (Dkt. 10) at 18; <u>see also</u> <u>Doty</u>, 2020 WL 9071424, *2 (noting settlement communication that included <u>link</u> to class action complaint would "include a neutral description of the claims, and provide notice of Plaintiff's evaluation of the claims, as all such information is contained within the linked complaint"); <u>Tolmasoff v. GM</u>, 2016 WL 3548219, *12-13 (E.D. Mich. 2016) (refusing to invalidate releases or enjoin settlement communications and rejecting Plaintiff's argument that defendant should have "summarize[d] the class action," holding it was "not necessary . . . to provide summaries of the lawsuits," because defendant had linked "copies of the complaints and advised the potential members to contact the class actions' counsel.").

In his motion, Plaintiff relies on <u>Jones</u> in suggesting a restrictive order is justified, but in <u>Jones</u>, the court held that communications between the defendant and potential class members should be subject to court-imposed guidelines, since the defendant's <u>prior</u> communication improperly suggested a pending class action was preventing the defendant from making needed repairs to windows. <u>See</u> <u>Jones</u>, 250 F.R.D. at 563. Under those circumstances, the court in <u>Jones</u>

permitted the defendant to communicate settlement offers to class members as long as "such communications provide notice to the putative class members of their right to be included in the class action." See id. at 564.

Unlike Jones, however, neither the August 5 Email nor the Release linked the pending class cases to any potential adverse consequences or contained any commentary on the impact or effect of the class cases. Further, the August 5 Email stated that "putative class action lawsuits have been filed concerning the CONMEBOL Copa America USA 2024 Final Match" and included links to the pending class action complaints, allowing individuals to read and evaluate the existing claims, arguments, and relief sought. See Ex. 3 at 2-3. SFS also told Primary Market Purchasers where they could find contact information for Plaintiffs' counsel and noted they should consider seeking legal representation before signing the Release. See id. ("consult with a lawyer of your choice before signing the Declaration and Release of Claims form . . . [s]hould you wish to contact counsel who filed these lawsuits, their contact information is provided at the end of the complaints."). The August 5 Email thus provided "accurate and impartial information regarding the status, purpose, and effects of this class action." See Kleiner v. First Nat'l Bank, 751 F.2d 1193, 1196-97 (11th Cir. 1985); see also, e.g., Noel v. MHC Heritage Plantation, 2022 WL 3682086, *1 (S.D. Fla. 2022) (vacating prior restraint on defendant's communications with putative class members because "potential class members were [made] aware of the pendency of this litigation prior to deciding whether to waive any of their legal rights under it"); Doty, 2020 WL 9071424, *2-3.[15]

---

[15] In Cox Nuclear, a case on which Plaintiff also relies, the court declined to restrict the defendant's settlement communications with putative class members even though the communications failed to "recognize the existence of a putative class action." See Cox Nuclear, 214 F.R.D. at 699. In contrast, the August 5 Email here prominently disclosed the pending putative class action cases

### 5. Plaintiff's Cited Authorities Only Underscore The Propriety Of SFS's Communications

Plaintiff fails to cite a <u>single</u> case where a court restricted a defendant's communications with putative class members based on communications similar to the August 5 Email. To the contrary, courts have routinely declined to do so in circumstances like those presented here. <u>See</u>, <u>e.g.</u>, <u>Eshelman</u>, 2007 WL 2572349, *2-3; <u>Tolmasoff</u>, 2016 WL 3548219, *12.

Plaintiff instead relies on <u>Bublitz</u>. In that case, the court entered a protective order restricting communications between the defendant and putative class members based on an at-will employer/employee relationship between absent class members and the defendant, which the court held created a risk of coercion. <u>See Bublitz</u>, 196 F.R.D. at 549. No such relationship, however, exists here. Further, the court in <u>Bublitz</u> did not preclude the defendant from making settlement offers but, instead, simply required that any such offers "must be in writing," and that Defendant "provide a copy to Plaintiffs' counsel" and "give the putative class member at least ten days to respond." <u>See id.</u> But SFS has communicated the challenged settlement offer <u>exclusively</u> in writing and provided Primary Market Purchasers with 45 days to consider the offer (35 more days than the Court deemed reasonable in <u>Bublitz</u>).

Plaintiff also relies on the Eleventh Circuit's decision in <u>Kleiner</u>. But that case is similarly distinguishable on several grounds, foremost being that a class in <u>Kleiner</u> had <u>already</u> been certified by the time the defendant communicated with class members. <u>See Kleiner</u>, 751 F.2d at 1196-97. Thus, the defendant and its counsel were communicating directly with represented parties and urging them to exclude themselves from the class, in clear violation of the applicable rules of professional conduct. <u>See id.</u> at 1198 (holding defendant's communications violated Model Rules

---

and directed recipients to the complaints and to where the contact information of class counsel could be located. <u>See</u> Ex. 3 at 2-3.

4.2 and 8.4(d) of the A.B.A. Model Rules of Professional Conduct).[16] Moreover, by communicating with class members, the defendant had violated two prior court rulings that specifically prohibited it from communicating with class members. See id. at 1198, 1200. The court also emphasized in Kleiner that the communications were coercive and abusive, because the defendant (a bank) had engaged in a secret campaign, timed to coincide with the judge's vacation, to "solicit as many exclusions [from the class] as possible before the court was alerted to the operation." Id. at 1202-07. To that end, the defendant bank had its loan officers (who personally controlled customers' lines of credit) call the class of bank borrowers, "many of whom were dependent on the Bank for future financing," in order to provide a biased view of the case and to suggest or imply that the bank would stop lending money to class members unless they opted out of the certified class. Id. at 1202.

The facts here, however, are nothing at all like those in Kleiner. Primary Market Purchasers are free to accept or reject the offer SFS made in response to their refund requests. They do not depend on SFS for their livelihood or safety or for loans to run their businesses, and therefore, there is no potential for coercion over class members that is likely to influence their decision to accept the settlement offer. See Jones, 250 F.R.D. at 563.[17] Moreover, no class has been certified in this case, and there are many reasons why a class should not be certified. See O'Connor v. Uber Techs., 904 F.3d 1087, 1095 (9th Cir. 2018) ("Because the arbitration agreements are enforceable, the district court's class certification orders . . . must also be reversed.").

---

[16] Absent members of a proposed class are not represented parties within the meaning of Rule 4.2 unless and until a class is certified. See, e.g., Saucedo v. NW Mgmt. & Realty Servs., 2013 WL 163425, *1, *3 (E.D. Wash. 2013) (holding that putative class members are not represented by counsel prior to class certification).

[17] Plaintiff also cites Freeman v. Celebrity Cruises, 1994 WL 689809 (S.D.N.Y. 1994), but the court in that case addressed guidelines for settlement communications after class certification. See Freeman, 1994 WL 689809, *4-6.

In short, the record here is entirely devoid of deception or coercion, which courts have found necessary under <u>Gulf Oil</u> to support a restriction on communications with putative class members. <u>See</u> <u>Peng v. Mastroianni</u>, 2022 WL 18465690, *1 (S.D. Fla. 2022); <u>see also</u> <u>A.R.</u>, 2013 WL 5278668, *7-8. Accordingly, there simply is no factual or legal basis for an order restricting SFS's communications with its customers, much less the "clear record of abuse" required under <u>Gulf Oil</u>. <u>See</u> <u>Gulf Oil</u>, 452 U.S. at 101-04.[18]

### B. Plaintiff's Motion Does Not Merit An Evidentiary Hearing

Plaintiff seeks expedited treatment of his motion and an evidentiary hearing, citing SFS's ability to contact large numbers of potential class members by email. <u>See</u> Mot. (Dkt. 10) at 2. But Plaintiff's proffered justification does not square with the facts of the communications he purports to challenge. The August 5 Email and Release were <u>not</u> mass emails sent to thousands of putative class members but, instead, were communications sent to fewer than 150 Primary Market Purchasers who had themselves reached out to SFS or its agent Ticketmaster to request a refund.

Because Plaintiff's motion is based on factual inaccuracies and the record is clear that SFS's communications were permissible and proper, there is no need for an evidentiary hearing. SFS further suggests that it may be more appropriate for an arbitrator to decide the issues raised in Plaintiff's motion, given the agreement to arbitrate "all disputes," including the validity of the arbitration provision. <u>See</u> Ex. 1 at § 17, p. 18 (delegation provision); <u>Henry Schein v. Archer & White Sales</u>, 586 U.S. 63, 71 (2019) (where the "contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract").

---

[18] SFS reserves the right to engage in similar communications with Secondary Market Purchasers about their potential refund options, consistent with those purchasers' right to independently and directly resolve their claims (subject, of course, to any modifications that may be necessary to reflect how their circumstances differ from those of Primary Market Purchasers).

## V.   <u>CONCLUSION</u>

For the reasons set forth above, SFS respectfully requests that Plaintiff's motion be denied.

SFS respectfully requests such other relief as the Court deems appropriate.

Dated:  August 23, 2024                    Respectfully submitted,

<div style="margin-left:40%">

<u>/s/ Melissa C. Pallett-Vasquez</u>
Melissa C. Pallett-Vasquez, Counsel for
Defendant South Florida Stadium LLC d/b/a
Hard Rock Stadium

Melissa C. Pallett-Vasquez (Fla. Bar No. 0715816)
Matthew W. Tieman (Fla. Bar No. 1044909)
BILZIN SUMBERG BAENA PRICE
& AXELROD LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida  33131-3456
Telephone: (305) 350-2393
Facsimile: (305) 374-7593
Email:   mpallett@bilzin.com
          mtieman@bilzin.com
          eservice@bilzin.com

Mark Mester (*pro hac vice* forthcoming)
Johanna Spellman (*pro hac vice* forthcoming)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois  60611
Telephone: (312) 876-7700
Email:   mark.mester@lw.com
          johanna.spellman@lw.com

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, Melissa C. Pallett-Vasquez, hereby certify that on August 23, 2024, I caused a copy of the foregoing to be filed using the Court's electronic filing system, which provides service to all counsel of record.

<div align="right">

*/s/ Melissa C. Pallett-Vasquez*
Melissa C. Pallett-Vasquez, Counsel for
Defendant South Florida Stadium LLC d/b/a
Hard Rock Stadium

Melissa C. Pallett-Vasquez (Fla. Bar No. 0715816)
BILZIN SUMBERG BAENA PRICE
& AXELROD LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida  33131-3456
Telephone: (305) 350-2393
Facsimile: (305) 374-7593
Email: mpallett@bilzin.com

</div>