**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

WILLIAM POU, individually and on behalf of all
others similarly situated,

                             Plaintiff,

        vs.

CONMEBOL, CONCACAF, MIAMI DOLPHINS,
LTD., AND SOUTH FLORIDA STADIUM LLC,

                   Defendants.

Civil Case No. 1:24-cv-22751-BB

<u>**DEFENDANT SOUTH FLORIDA STADIUM LLC'S AND MIAMI DOLPHINS, LTD's**</u>
<u>**MOTION TO COMPEL ARBITRATION**</u>

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

   A.   Ticketmaster Serves As The Ticketing Agent For <u>All</u> Tickets For The
        Final Match ...................................................................................................2

   B.   The Ticketmaster Terms Of Use Contain Arbitration And Dispute
        Resolution Procedures That Expressly Govern <u>All</u> Disputes Related To
        Ticket Purchases ...........................................................................................3

   C.   To Create A Ticketmaster Account, Sign In, Purchase Tickets Or Accept
        Transferred Tickets, Plaintiff Or His Agent Was Required To
        <u>Affirmatively</u> Agree To Ticketmaster's Terms of Use...........................4

        1.   Signing Up For An Account ...............................................................5

        2.   Sign In And Ticket Purchase And/Or Acceptance Of Transfer...........5

   D.   Plaintiff Agreed To The Terms Of Use .........................................................6

   E.   Plaintiff Files A Class Action Complaint Despite His <u>Express</u> Agreement
        To Arbitrate Such Claims On An Individual Basis .......................................7

III. LEGAL STANDARD..............................................................................................7

IV.  ARGUMENT..........................................................................................................8

   A.   The Terms Of Use Constitute A Valid, Enforceable Agreement To
        Arbitrate .........................................................................................................8

   B.   Plaintiff Agreed To Delegate Arbitrability To The Arbitrator ......................9

   C.   SFS And The Dolphins Are Fully Entitled To Compel Arbitration ...........10

        1.   SFS And The Dolphins Are Entitled To Enforce The Arbitration
             Clause On Grounds of Equitable Estoppel ...................................11

        2.   SFS Is Entitled To Enforce the Arbitration Clause On Agency
             Principles.....................................................................................13

        3.   SFS Is Entitled To Enforce The Arbitration Clause, Because It Is A
             Third-Party Beneficiary Of The Terms Of Use ............................14

V.   CONCLUSION.....................................................................................................16

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

<u>Agnew v. Honda Motor Co., Ltd.,</u>
    2009 WL 1813783 (S.D. Ind. 2009) .........................................................................12

<u>Akpele v. Pac. Life Ins.,</u>
    646 Fed. App'x 908 (11th Cir. 2016) .........................................................................8

<u>Armas v. Prudential,</u>
    842 So.2d 210 (Fla. Ct. App. 2003)..................................................................11, 12

<u>Arthur Andersen v. Carlisle,</u>
    556 U.S. 624 (2009).................................................................................................11

<u>AT&T v. Concepcion,</u>
    563 U.S. 333 (2011)...................................................................................................7

<u>Attix v. Carrington Mortg.,</u>
    35 F.4th 1284 (11th Cir. 2022) ..................................................................................8

<u>Barney v. Grand Caribbean Cruises,</u>
    2022 WL 159567 (S.D. Fla. 2022) ...........................................................................10

<u>Bazemore v. Jefferson Cap.,</u>
    827 F.3d 1325 (11th Cir. 2016) .................................................................................7

<u>Bell v. Royal Seas Cruises,</u>
    2020 WL 5742189 (S.D. Fla. 2020) ........................................................................10

<u>Bochese v. Town of Ponce Inlet,</u>
    405 F.3d 964 (11th Cir. 2005) .................................................................................15

<u>Bogle v. Rausch Strum,</u>
    2022 WL 22824882 (S.D. Fla. 2022) .........................................................................4

<u>Bolamos v. Globe Airport Sec.,</u>
    2002 WL 1839210 (S.D. Fla. 2002) ........................................................................14

<u>Bourgeois v. Live Nation,</u>
    3 F. Supp. 3d 423 (D. Md. 2014)..............................................................................13

<u>Burri Law v. Byzantine Cath.,</u>
    488 F. Supp. 3d 1185 (M.D. Fla. 2020).....................................................................9

**Page(s)**

Calderon v. Sixt,
    2021 WL 1325868 (S.D. Fla. 2021) ...........................................................9

Caley v. Gulfstream Aerospace,
    428 F.3d 1359 (11th. Cir. 2005) ...............................................................8

Capua v. Air Europa,
    2021 WL 965500 (S.D. Fla. 2021) ......................................................14, 16

Dye v. Tamko Bldg. Prods.,
    908 F.3d 675 (11th Cir. 2018) ...........................................................13, 14

Escobal v. Celebration Cruise Operator,
    482 Fed. Appx. 475 (11th Cir. 2012) .......................................................11

Falcon v. Televisaunivision,
    2024 WL 1492831 (M.D. Fla. 2024) ..........................................................9

Graulau v. Credit One,
    855 F. App'x (11th Cir. 2021) ..................................................................7

Gunson BMO,
    43 F. Supp. 3d 1396 (S.D. Fla. 2014) ............................................11, 12, 13

Henry Schein v. Archer & White,
    586 U.S. 63 (2019).........................................................................8, 9, 10

JPay v. Kobel,
    904 F.3d 923 (11th Cir. 2018) .................................................................10

Kravets v. Anthropologie,
    2022 WL 1978712 (S.D. Fla. 2022) ...........................................................9

Lambert v. Austin Ind.,
    544 F.3d 1192 (11th Cir. 2008) .................................................................8

Lawson v. Life of the South Ins.,
    648 F.3d 1166 (11th Cir. 2011) ...............................................................11

Marcus v. Fla. Bagels,
    112 So.3d 631 (Fla. Ct. App. 2013)..........................................................11

Meyer v. Uber,
    868 F.3d 66 (2d Cir. 2017)........................................................................9

Moretti v. Hertz,
    2014 WL 1410432 (N.D. Cal. 2014) .........................................................16

**Page(s)**

MS Dealer v. Franklin,
   177 F.3d 942 (11th Cir. 1999) ...........................................................................11

NRP v. Hydropress,
   2007 WL 201259 (S.D. Fla. 2007) .....................................................................14

R&R adopted,
   2020 WL 5639947 (S.D. Fla. 2020) ...................................................................10

Sands v. Ticketmaster,
   1994 WL 662956 (N.Y. Sup. Ct. 1994) ..............................................................13

Smith v. Beverly Hills Club Apts.,
   2016 WL 344975 (S.D. Fla. 2016) .....................................................................15

Tuttle v. Credit Accept.,
   2018 WL 6621374 (M.D. Fla. 2018) ..................................................................8, 9

Villazon v. Prudential,
   843 So. 2d 842 (Fla. 2003)..................................................................................13

Walthour v. Chipio Windshield,
   745 F.3d 1326 (11th Cir. 2014) ............................................................................7

**STATUTES**

9 U.S.C. § 1, et seq............................................................................................................1

9 U.S.C. § 2......................................................................................................................7

Defendants South Florida Stadium LLC ("SFS") and Miami Dolphins, Ltd. (the "Dolphins", and together with SFS, the "SFS Entities") hereby move, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., to compel arbitration of the claims of Plaintiff William Pou ("Plaintiff").[1] In support of this motion, the SFS Entities submit the following memorandum of law:

## I.   INTRODUCTION

Plaintiff claims he purchased nine tickets to the Copa America 2024 Final Match ("Final Match"). He (like all other purchasers) was required to obtain those tickets, which he attached to his Complaint, through the ticketing agent SFS used for the event, namely Ticketmaster, LLC ("Ticketmaster"). As set forth below, the Ticketmaster account to which those nine tickets were transferred (juanfsala@hotmail.com) is associated with Juan Fernando-Salazar. See Brown Decl. ¶ 13; Moon Decl. ¶ 4.[2] Whether Plaintiff logged into that Ticketmaster account himself to accept the nine tickets he claims to have purchased, or whether someone did on his behalf, Plaintiff agreed to Ticketmaster's Terms of Use (hereinafter, "Terms of Use" or "TOU"), which include an arbitration provision and class waiver. The Terms of Use also contain dispute resolution procedures requiring Plaintiff to first provide notice of any dispute to Ticketmaster. If an informal resolution cannot be reached, however, the arbitration provision in the Terms of Use expressly require Plaintiff to submit any and all unresolved claims to final and binding arbitration on an individual, non-class basis.

Plaintiff does not name Ticketmaster as a defendant in this case. But as discussed in detail below, the governing law makes clear that the SFS Entities have every right to compel arbitration and enforce the class waiver in the Terms of Use Plaintiff entered into with Ticketmaster. First, both SFS and the Dolphins are independently entitled to compel arbitration on equitable estoppel grounds. In addition, SFS is entitled to compel arbitration pursuant to agency principles and as a third-party beneficiary. Indeed, federal and state law both strongly favor arbitration in situations such as this and recognize the right of parties like the SFS Entities to compel arbitration. In

---

[1] Miami Dolphins, Ltd. is not properly named as a Defendant in this matter, and would properly be subject to dismissal; however, if properly named, Miami Dolphins, Ltd. would have the same right to compel arbitration as SFS, for the reasons discussed throughout this memorandum.

[2] Plaintiff alleges his family member, Juan Salazar, traveled from Colombia to attend the Final Match and that Plaintiff purchased tickets for Mr. Salazar and Mr. Salazar's family. See Compl. ¶¶ 29-32.

accordance with that strong policy and consistent with the procedures set forth in the Terms of Use to which Plaintiff agreed, the SFS Entities respectfully request that the Court stay or dismiss this case and compel Plaintiff to arbitrate his claims on an individual, non-class basis.

## II.    FACTUAL BACKGROUND

The pertinent factual background for this motion is set forth below. See disc. infra at § II.A-E.

### A.    Ticketmaster Serves As The Ticketing Agent For All Tickets For The Final Match

On July 14, 2024, the Final Match took place at Hard Rock Stadium. See Compl. (Dkt. 1) ("Compl.") ¶ 24. Under an agreement between SFS and Ticketmaster, Ticketmaster was the exclusive primary seller of tickets to the Final Match. See Brown Decl. ¶ 7. Indeed, SFS granted Ticketmaster the right to be the exclusive primary seller for tickets to most events at Hard Rock Stadium. Id. Specifically, Ticketmaster is (with unrelated exceptions) SFS's ticket agent for any concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at Hard Rock Stadium. Id. ¶ 5. The agreement identifies SFS as the principal and creates an agency relationship with Ticketmaster. Id. ¶ 7. Under the agreement, SFS retained the right to sell tickets to events directly to certain purchasers through Ticketmaster's AccountManager software and hosting services ("AccountManager"). Id. ¶ 11. Ticketmaster also agreed to create and operate an interface page through which AccountManager subscribers could purchase tickets directly from SFS. Id.

Many persons purchased tickets for the Final Match on the primary market ("Primary Market Purchasers") through Ticketmaster. Others used their Ticketmaster accounts to purchase directly from SFS via AccountManager. And others (like Plaintiff) bought tickets on the secondary market ("Secondary Market Purchasers") through resale sites (e.g., SeatGeek and StubHub) where Primary Market Purchasers and others resold their tickets.[3] But all Primary Market Purchasers as well as all Secondary Market Purchasers were required to obtain their tickets using their

---

[3] The primary market is properly distinguished from the secondary market. The secondary market consists of (i) primary market purchasers who seek to resell their tickets to other purchasers and (ii) secondary market purchasers who acquired their tickets from primary market purchasers and seek to resell their tickets to other purchasers. The proposed class appears to include both purchasers on the primary market as well as purchasers on the secondary market. See Compl. ¶ 57. As noted, Plaintiff purchased his tickets on the secondary market but nonetheless seeks to represent a proposed class consisting of both Primary Market Purchasers and Secondary Market Purchasers. See id.

Ticketmaster accounts. And because <u>all</u> Ticketmaster accountholders agree to Ticketmaster's Terms of Use, <u>all</u> purchasers of tickets to the Final Match agreed to Ticketmaster Terms of Use and to arbitration if informal dispute resolution is not successful.[4] <u>See</u> Tobias Decl. ¶¶ 5, 8, 12, 17.

The Terms of Use also expressly incorporate Ticketmaster's Purchase Policy and include a hyperlink to that policy. <u>See</u> Tobias Decl. Ex. 11 (the "TOU") at 2; Tobias Decl. Ex. 12 (the "Purchase Policy"). The Purchase Policy discloses Ticketmaster's role as an agent for "Event Organizers," which are defined to include venues like Hard Rock Stadium. <u>See</u> Purchase Policy § 3 ("We act as the agent to those who provide events, such as artists, venues, teams, fan clubs, promoters, and leagues (the 'Event Organizer').". Other provisions in the Purchase Policy further underscore Ticketmaster's role as an agent, stating "[w]e sell tickets on behalf of Event Organizers, which means we do not set the ticket prices or determine the seating locations." <u>Id.</u> at § 4. As described below, however, Plaintiff (or someone acting on his behalf) agreed to versions of the Terms of Use numerous times, including when he created his Ticketmaster account, signed into his Ticketmaster account and accepted the tickets for the Final Match that had been transferred to him. <u>See</u> disc. <u>infra</u> at § II.D.

**B.    The Ticketmaster Terms Of Use Contain Arbitration And Dispute Resolution Procedures That Expressly Govern <u>All</u> Disputes Related To Ticket Purchases**

The Terms of Use on Ticketmaster's desktop site and mobile site broadly govern a customer's "use" of "Ticketmaster's sites and mobile applications," and govern the "<u>purchase</u>, <u>possession</u>, or <u>use</u> of any" tickets obtained from or through Ticketmaster. TOU at 2.[5] The Terms of Use that apply to Plaintiff's purchase also include an all-caps heading in bold near the top that requires arbitration:

**NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER:**

The Terms contain an arbitration agreement and class action waiver Section 17. Specifically, you and we agree that any dispute or claim relating in <u>any</u> way to the Terms, your use of the Site, or <u>products</u> or <u>services</u> sold, <u>distributed</u>, <u>issued</u>, or <u>serviced</u> by us or through us, will be resolved by binding, individual arbitration, rather than in court. By agreeing to individual arbitration, you and we each <u>waive</u> any right to participate in a <u>class</u> <u>action</u> <u>lawsuit</u> or class-wide arbitration. This

---

[4] Depending upon the channel through which tickets were purchased, the Ticketmaster Terms of Use any particular purchaser may have agreed to at one or another step in the purchasing process may have varied to a degree. <u>All</u> Ticketmaster Terms of Use, however, require arbitration of claims and a class waiver, and the specific Terms of Use Plaintiff agreed to and are the basis of this motion are attached as Exhibit 11 to the Declaration of Kimberly Tobias.

[5] All emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

agreement and waiver—along with some limited exceptions—is explained in <u>Section 17</u>, below.

<u>Id.</u> at 2–3. Clicking on the blue hyperlink (or just scrolling down to Section 17), includes the following full arbitration and class action waiver provision:

> 17. Mandatory Arbitration Agreement and Class Action Waiver
>
> YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, <u>ANY</u> DISPUTE, CLAIM, OR CONTROVERSY RELATING IN <u>ANY</u> WAY TO THE TERMS, YOUR USE OF THE SITE, OR <u>PRODUCTS</u> OR <u>SERVICES</u> <u>SOLD</u>, <u>DISTRIBUTED</u>, <u>ISSUED</u>, OR SERVICED <u>BY</u> <u>OR</u> <u>THROUGH</u> <u>US</u>— IRRESPECTIVE OF WHEN THAT DISPUTE, CLAIM, OR CONTROVERSY AROSE—WILL BE RESOLVED SOLELY BY <u>BINDING</u>, <u>INDIVIDUAL</u> <u>ARBITRATION</u> AS SET FORTH IN THE TERMS, RATHER THAN IN COURT. YOU AND WE THEREBY EACH AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL, AND AGREE THAT YOU AND WE MAY BRING CLAIMS AGAINST EACH OTHER ONLY IN AN <u>INDIVIDUAL</u> CAPACITY, AND <u>NOT</u> AS A <u>PLAINTIFF</u> OR <u>CLASS</u> <u>MEMBER</u> IN ANY PURPORTED <u>CLASS</u> OR REPRESENTATIVE PROCEEDING.

<u>Id.</u> at 14-16; <u>See</u> <u>Bogle v. Rausch Strum</u>, 2022 WL 22824882, *4 (S.D. Fla. 2022) (upholding class action waiver under Florida law). As noted, the arbitration provision also includes a mandatory informal dispute resolution process. <u>See</u> TOU at 2-3, 14-19 (requiring the parties to "personally meet and confer"). Only if the parties are unable to resolve the dispute may a purchaser initiate arbitration. <u>Id.</u> at 16.

**C.   To Create A Ticketmaster Account, Sign In, Purchase Tickets Or Accept Transferred Tickets, A Customer Is Required To <u>Affirmatively</u> Agree To Ticketmaster's Terms of Use**

Secondary Market Purchasers like Plaintiff buy tickets from third-party websites such as StubHub or SeatGeek. <u>See</u> Tobias Decl. ¶ 17; Brown Decl. ¶ 10. As the ticketing agent, however, Ticketmaster is responsible for distributing the tickets purchased on the secondary market to users' accounts, managing the digital tickets and barcodes and operating the software used to verify those tickets upon admission to the event. Tobias Decl. ¶¶ 17–19; Brown Decl. ¶¶ 5–7. Accordingly, a person who purchases a resale ticket (or otherwise receives a ticket) to an event ticketed by Ticketmaster must—in order to receive the ticket and attend the event—<u>affirmatively</u> accept an electronic transfer of the ticket from the original purchaser's Ticketmaster account to their own Ticketmaster account. Tobias ¶ 17. This is called a "ticket transfer." <u>Id.</u> To do this, Secondary Market Purchasers must either create a Ticketmaster account or sign in to their existing account to receive the tickets and complete the transfer. <u>Id.</u> ¶ 18. Like Primary Market Purchasers, however, Secondary Market Purchasers must agree to Ticketmaster's Terms of Use at account creation, each

time they sign in to their accounts and again in order to accept the ticket transfer from the Primary Market Purchaser. Id.

### 1.    Signing Up For An Account

In order to sign up for a Ticketmaster account—before users can even access Ticketmaster's desktop or mobile website to purchase tickets or access tickets transferred to them—all users are required to agree to Ticketmaster's Terms of Use. See Tobias Decl. ¶ 5. For example, users must input their name, email address, country of residence and zip code on the current Ticketmaster desktop site. Id. Directly below that and before they can click the "Next" button to process their account, purchasers are notified that: "By continuing past this page, you agree to the **Terms of Use**…" Id. The words "**Terms of Use**" appear above the "Next" button in bold, color-contrasting text, and hyperlink to the full text of the Terms of Use themselves.[6] Id. Similarly, the Ticketmaster mobile site requires users to accept the Terms of Use when creating an account, and the user flow essentially looks the same as it does on the desktop site. Id. ¶ 6.

### 2.    Sign In And Ticket Purchase And/Or Acceptance Of Transfer

Users go through a similar process each time they sign in to their Ticketmaster accounts. To sign into his or her account, a customer inputs an email and password and clicks the "Sign in" button. See Tobias Decl. ¶ 8. Directly above that button, the customer is notified that by proceeding past the sign-in page, he or she is agreeing to the Terms of Use. Id. The words "**Terms of Use**" appear in bold, color-contrasting text and hyperlink to the full text of the Terms. Id. ¶ 9. To purchase a ticket after signing into their Ticketmaster accounts, users are required to affirmatively check a box acknowledging they have "read and agree to the Terms of Use," before they are able to click the "Place Order" button and complete their purchase. Id. ¶ 13.

Just as Primary Market Purchasers must agree to the Terms of Use in order to place an order and purchase tickets, Secondary Market Purchasers are also required to agree to those Terms of Use to complete the transfer of tickets into their Ticketmaster accounts. The process begins after the tickets are sold on the secondary market. See Tobias Decl. ¶ 17. The seller and/or holder of the tickets must initiate the ticket transfer through their Ticketmaster account. Id. Once a ticket transfer is initiated, the recipient receives an email notification containing information about the tickets

---

[6] The relevant portions of Ticketmaster's desktop and mobile website where purchasers are required to agree to the Terms of Use are reproduced in full at Exhibits 1 & 2 to the Tobias Declaration.

being transferred, including the seats and location of the tickets and the name, date and location of
the event. Id. In order to receive those tickets, the recipient must accept transfer of the tickets into
her Ticketmaster account by clicking the "ACCEPT TICKETS" button in the notification email
and again agree to the Terms of Use:



Id. Directly below the button, the user is notified: "By clicking 'ACCEPT TICKETS', you agree
to our Terms of Use and any applicable ticket back terms." Id. The words "Terms of Use" appear
in bright blue, color-contrasting text and hyperlink directly to the full text of the Terms of Use.
Clicking on the "Accept Tickets" button then auto-directs the user to Ticketmaster's sign-in page,
which opens in a new window. Id. At this point, the user is presented with the exact same sign-in
notice discussed above. Id. ¶ 18. The user must sign in to their Ticketmaster account in order to
complete the ticket transfer and accept the tickets. Id.

When the resale tickets were originally purchased directly from SFS via AccountManager,
the recipient is directed to log into AccountManager to accept his or her tickets. See id. ¶ 20.  In
order to receive those tickets via AccountManager, the recipient must use his or her Ticketmaster
account information to log into AccountManager and again agree to Ticketmaster Terms of Use.
Id. Directly below the button, the user is notified: "By continuing past this page, you agree to the
Terms of Use and understand that information will be used as described in our Privacy Policy."
Id. ¶ 21. The words "Terms of Use" appear in bright blue, color-contrasting text and hyperlink
directly to a version of Ticketmaster's Terms of Use. The user must sign in with their Ticketmaster
credentials in order to complete the ticket transfer and accept the tickets via AccountManager. Id.

### D.   Plaintiff Agreed To The Terms Of Use

Plaintiff claims that he bought nine tickets to the Final Match, and attaches those tickets to
the Complaint. Compl. ¶¶ 32–33, Ex. 1. Those nine tickets were originally purchased via
AccountManager and were then resold on the secondary market and ultimately, on July 12, 2024,
were forwarded to the Ticketmaster account associated with the email address
juanfsala@hotmail.com on July 12, 2024 (the "Account"). See Brown Decl. ¶ 13. Plaintiff (or

6

someone acting on his behalf to obtain the tickets he claims he purchased) logged in to the Account no less than five times from July 12, 2024 through July 14, 2024. Moon Dec. ¶ 5; Tobias Dec. ¶ 25. In addition, in order to receive the tickets attached to Plaintiff's Complaint, the Account was used to access AccountManager and effectuate the ticket transfer, which also required acceptance of a version of the Terms. Moon Decl. ¶ 6; Tobias Dec. ¶ 26.

### E.   Plaintiff Files A Class Action Complaint Despite His <u>Express</u> Agreement To Arbitrate Such Claims On An Individual Basis

Notwithstanding the agreement to arbitrate and without even attempting to follow the dispute resolution process in the Terms of Use, Plaintiff filed on July 24, 2024 the instant lawsuit, making various claims on his own behalf but also on behalf of a proposed class, notwithstanding the class waiver. <u>See</u> Compl. ¶¶ 57–79. Plaintiff's negligence claims against the SFS Entities, however, are based on and flow directly from his allegation that he bought tickets to the Final Match and that he presented those tickets but was denied admission to Hard Rock Stadium. <u>Id.</u> ¶¶ 32–33, 51. As such, these claims fall plainly within the scope of the arbitration agreement contained in the Terms of Use. <u>See</u> disc. <u>infra</u> at § IV.C.2. As set forth below, Plaintiff's effort to avoid the arbitration provision in the Terms of Use is meritless and contrary to the express agreement to arbitrate such claims. <u>See</u> disc. <u>infra</u> § IV.C.

### III.   <u>LEGAL STANDARD</u>

Plaintiff's claims are governed by the FAA. <u>See</u> 9 U.S.C. § 2; TOU at 16 ("The arbitration agreement in the Terms is governed by the [FAA]."). Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This policy reflects Congress' clear intent to enforce agreements to arbitrate and affirms the principle that federal law strongly favors arbitration. <u>See</u> <u>AT&T v. Concepcion</u>, 563 U.S. 333, 339 (2011).

As such, the court's role is relatively narrow here. As the Eleventh Circuit has explained, the "strong federal preference for arbitration of disputes… must be enforced where possible." <u>Graulau v. Credit One</u>, 855 F. App'x, 540, 541 (11th Cir. 2021). "Indeed, [the Eleventh Circuit] ha[s] recognized that the FAA creates a <u>presumption</u> of arbitrability, such that <u>any</u> doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." <u>Bazemore v. Jefferson Cap.</u>, 827 F.3d 1325, 1329 (11th Cir. 2016). To that end, "courts must rigorously enforce arbitration agreements according to their terms." <u>Walthour v. Chipio Windshield</u>, 745 F.3d 1326,

1329 (11th Cir. 2014). "In order to determine whether to compel arbitration, a court must analyze whether (1) there is a valid written agreement to arbitrate; (2) the issue is … arbitrable under the agreement; and (3) the party asserting the claims has failed or refused to arbitrate the claims." Akpele v. Pac. Life Ins., 646 Fed. App'x 908, 912 (11th Cir. 2016).

The Court's inquiry is even more limited where (as here) the parties delegate the power to decide arbitrability to the arbitrator. See, e.g., Attix v. Carrington Mortg., 35 F.4th 1284, 1296 (11th Cir. 2022) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."); see also TOU at 18 ("The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement…"). To that end, the Supreme Court has repeatedly made clear that "parties may agree to have an arbitrator decide… 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Henry Schein v. Archer & White, 586 U.S. 63, 67–68 (2019). "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Id. at 69.

## IV.   ARGUMENT

The Court should compel arbitration of this dispute on a non-class basis and stay the case, because Plaintiff unequivocally assented to the Terms of Use and entered into a valid, enforceable agreement to arbitrate. As such, the FAA requires that the action be stayed or dismissed. See, e.g., Lambert v. Austin Ind., 544 F.3d 1192, 1195 (11th Cir. 2008).

### A.   The Terms Of Use Constitute A Valid, Enforceable Agreement To Arbitrate

There should be no dispute that the Terms of Use create a valid and enforceable agreement requiring binding arbitration. To determine whether a valid arbitration agreement exists, federal courts apply state law principles that govern the formation of contracts. See Tuttle v. Credit Accept., 2018 WL 6621374, *1 (M.D. Fla. 2018).[7] The Terms of Use contain an unambiguous agreement to arbitrate. See TOU at 2-3. The arbitration provision is clearly referenced in boldfaced, emphasized font near the top of the Terms of Use, and users are directed where they

---

[7] State law governs whether an enforceable agreement to arbitrate exists, but the federal policy favoring arbitration is "taken into consideration even in applying ordinary state law." Caley v. Gulfstream Aerospace, 428 F.3d 1359, 1368 (11th Cir. 2005). Because Plaintiff alleges that he resides in Florida, Compl. ¶ 1, Florida law applies.

can find the full arbitration provision and class action waiver. Id. at 2. That provision, in turn, is marked with a boldfaced heading in the same font size as the other section headings in the Terms of Use, rendering the provision conspicuous. See, e.g., Burri Law v. Byzantine Cath., 488 F. Supp. 3d 1185, 1191-92 (M.D. Fla. 2020).

    Moreover, Ticketmaster gave conspicuous notice of the Terms of Use. It is impossible for a customer to accept a ticket transfer for an event which Ticketmaster serves as the ticketing agent (as Plaintiff or someone acting on his behalf did on July 12, 2024 to accept the transfer of tickets to the Final Match), without having agreed to a version of the Terms of Use. See disc. supra at § II.D; see Tobias ¶¶ 16–21; Moon Decl. ¶ 6. The Account associated with Plaintiff's tickets has no fewer than five successful logins between July 12, 2024 and July 14, 2024 (the date of the Copa America Final Match), and Plaintiff assented to a version of the Terms on each occasion, including when he (or someone acting on his behalf) signed into AccountManager to accept his transferred tickets for the Final Match. See Tobias Decl. ¶¶ 25, 26; Moon Decl. ¶ 6. In comparable circumstances, courts routinely hold that similar "hybrid browsewrap" agreements are valid and enforceable and compel arbitration based upon such agreements.[8] See, e.g., Falcon, 2024 WL 1492831, *3-*4 (granting motion to compel arbitration under "hybrid browsewrap agreement" when plaintiff clicked "Create account" button directly below the statement, "By clicking 'Create account,' I agree to the **Terms of Use**…"); Calderon v. Sixt, 2021 WL 1325868, *7-*8 (S.D. Fla. 2021) (same); Kravets v. Anthropologie, 2022 WL 1978712, *4 (S.D. Fla. 2022) (same); see also, e.g., Meyer v. Uber, 868 F.3d 66, 75-76 (2d Cir. 2017).

### B.   Plaintiff Agreed To Delegate Arbitrability To The Arbitrator

    As a threshold matter, the Terms of Use delegated to the arbitrator the power to decide the scope and enforceability of the arbitration agreement, so the Court should send this case to arbitration once it determines that Plaintiff agreed to be bound by the Terms of Use. See, e.g., Henry Schein, 586 U.S. at 69 ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."). The arbitration clause in the Terms of Use expressly provides that "[t]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all

---

[8] "Hybrid browsewrap" agreements "require the user to 'affirmatively acknowledge the agreement before proceeding with the use of the website,' often by clicking a button to create an account, sign up for a subscription, or complete an order." Falcon v. Televisaunivision, 2024 WL 1492831, *3 (M.D. Fla. 2024).

disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to, any claim that all or part of this Agreement is void or voidable." <u>See</u> TOU at 18. There are no carve-outs or exceptions to the delegation clause—the parties delegated to the arbitrator authority over "<u>all</u> disputes" relating to the scope and enforceability of the agreement. <u>Id.</u>; <u>see also</u> New Era Rule 2(z)(i) (agreed to by agreeing to the Terms of Use and specifying any question regarding "enforcement of an arbitration clause" will be determined "solely by the Neutral(s)"), available at https://www.neweraadr.com/wp-content/uploads/2024/08/New-Era-ADR-Rules_August-2024.pdf.

Courts routinely find that such language is "clear and unmistakable" evidence of the parties' intent to submit the question of arbitrability to the arbitrator. <u>See</u>, <u>e.g.</u>, <u>JPay v. Kobel</u>, 904 F.3d 923, 939 (11th Cir. 2018) (holding delegation clause stating "[t]he ability to arbitrate the dispute, claim or controversy shall likewise be determined in the arbitration" "evinces the clearest possible intent to delegate questions of arbitrability to the arbitrator") (collecting cases). And because there is a binding contract between Ticketmaster and Plaintiff, the question of whether the SFS Entities can enforce the arbitration agreement is a question of enforcement and thus should be decided by an arbitrator. <u>See</u>, <u>e.g.</u>, <u>Barney v. Grand Caribbean Cruises</u>, 2022 WL 159567, *5 (S.D. Fla. 2022) ("Because the Court finds that Plaintiff agreed to the arbitration provision, the issue of whether Defendant is a party or a third-party beneficiary under the agreement is one for the arbitrator to decide in light of the delegation clause."); <u>Bell v. Royal Seas Cruises</u>, 2020 WL 5742189, *4 (S.D. Fla. 2020) (same), <u>R&R adopted</u>, 2020 WL 5639947, *2 (S.D. Fla. 2020). Since the agreement is valid and the delegation clause clearly delegates questions of arbitrability to the arbitrator, the Court's analysis should end here. <u>See</u>, <u>Henry Schein</u>, 586 U.S. at 71–72 (where there is "clear and unmistakable evidence" that the "contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract").

### C.   The SFS Entities Are Fully Entitled To Compel Arbitration

Even if the Court were to decide the question of whether the SFS Entities are entitled to enforce the arbitration agreement, however, relevant authority demonstrates that they plainly have standing to do so. <u>First</u>, SFS and the Dolphins are independently entitled to compel arbitration of Plaintiff's claims under the doctrine of equitable estoppel. See disc. infra at §§ __ & __. <u>Second</u>, Ticketmaster was SFS's ticketing agent for the Final Match. <u>See</u> Brown Decl. ¶ __; disc. <u>infra</u> at § IV.C.1. Because Plaintiff's claims relate to and depend upon his purchase of nine tickets to the

Final Match, which required acceptance of the transfer of those tickets using a Ticketmaster account and agreement to a version of the Terms of Use, SFS is fully entitled to enforce the arbitration provision therein. Third, SFS is entitled to enforce the arbitration provision as a third-party beneficiary of the Terms of Use. It is thus clear that Plaintiff should be compelled to pursue his claims in arbitration on an individual, non-class basis.

1.    **The SFS Entities Are Entitled To Enforce The Arbitration Clause On Grounds of Equitable Estoppel**

Courts routinely recognize that equitable estoppel allows non-signatories like the SFS Entities to compel arbitration where, as here, the signatory's claims "make reference to or presume the existence of a written agreement." See Armas v. Prudential, 842 So.2d 210, 212 (Fla. Ct. App. 2003); MS Dealer v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999).[9] Plaintiff's claims against the SFS Entities reference or presume the existence of a contract for tickets, which include the Ticketmaster Terms. The crux of Plaintiff's claims against the SFS Entities are that he bought tickets to the Final Match (Compl. ¶¶ 32–33); the tickets entitled him and his family to enter Hard Rock Stadium to attend the Final Match (id. ¶ 51); and the alleged failures of SFS and the Dolphins to provide for the orderly entry of ticketholders to the Final Match prevented Plaintiff and his family from entering the Stadium and exercising their rights under the contract (i.e., the tickets). See Compl. ¶¶ 140-170.

Specifically, Plaintiff alleges that on the day of the Final Match, he and his family approached the gates to Hard Rock Stadium in order to attend the game and that SFS employees prevented them from entering. See Compl. ¶¶ 38-39; id. ¶¶ 46-47 (alleging SFS "blocked entry through the SW gate" and SFS "personnel subsequently denied any further entry to the public"); id. ¶ 51 (alleging SFS "employees at G Gate directly told Pou and his family that [SFS] would not let them inside the stadium, irrespective of whether the family had tickets to the match"). Plaintiff's claims against the SFS Entities are based on his allegation that he has "been damaged by

---

[9] MS Dealer was abrogated by Arthur Andersen v. Carlisle, 556 U.S. 624, 631 (2009) to the extent that MS Dealer did not make clear that state law governs whether an arbitration clause is enforceable against a non-signatory. See Lawson v. Life of the South Ins., 648 F.3d 1166, 1170-71 (11th Cir. 2011). But "MS Dealer has since been relied on by the Eleventh Circuit and Florida state courts when analyzing equitable estoppel." Gunson BMO, 43 F. Supp. 3d 1396, 1400 n.1 (S.D. Fla. 2014); see also, e.g., Marcus v. Fla. Bagels, 112 So.3d 631, 634 (Fla. Ct. App. 2013) (citing MS Dealer); Escobal v. Celebration Cruise Operator, 482 Fed. Appx. 475, 476 (11th Cir. 2012) (same).

Defendants' misconduct because, among other things, he paid for ticket to attend an event, yet he was denied entry to said event—though the event still took place." Compl. ¶ 72.[10]

Plaintiff alleges that because he purchased tickets to the Final Match, the SFS Entities "had a duty to organize Copa America USA 2024's final match in a way that would allow all Class members to attend the match at Hard Rock Stadium." Compl. ¶¶ 143-144; 159-160. The SFS Entities' alleged failure to do so—their alleged interference with his contract rights—is the basis for Plaintiff's claims. See Compl. ¶¶ 146-155; 161-170. Indeed, Plaintiff expressly alleges that the damages he seeks from both SFS and the Dolphins were incurred "in reliance on [his] purchase for tickets." Id. ¶ 155, 170.

Plaintiff clearly relies on contracts for tickets to the Final Match "to make out [his] claims." Gunson, 43 F. Supp. 3d at 1401; see also Armas, 842 So.2d at 212. And although Plaintiff couches his claims against the SFS Entities in negligence,[11] courts have recognized that equitable estoppel is more than broad enough to encompass claims other than breach of contract and have granted motions to compel arbitration based on equitable estoppel where (unlike here) the signatory does not even assert a breach of contract claim at all.[12] See, e.g., Gunson, 43 F. Supp. 3d at 1402 (rejecting a narrow interpretation of equitable estoppel that "would require a breach of contract claim before a non-signatory could ever invoke equitable estoppel"); Agnew v. Honda Motor Co., Ltd., 2009 WL 1813783, *4 (S.D. Ind. 2009) (finding equitable estoppel "is not limited to claims for breach of contract.").

In sum, Plaintiff's claims against the SFS Entities presume a contract for tickets entitling Plaintiff to enter the Stadium and attend the Final Match. Plaintiff cannot have his "cake and eat it too"—he cannot use the existence of a contract "to [his] benefit to help establish [his] claim while also attempting to avoid the burdens of the other provisions." See Gunson, 43 F. Supp. 3d at 1401. Because Plaintiff's "claims depend on his ability to demonstrate the existence of" a contract with

---

[10] In addition, Plaintiff identifies as an issue to be determined in the litigation "whether any or all Defendants"—including SFS and the Dolphins—"entered versions of the same contract with members of the class," (Compl. ¶ 79), a class of which Plaintiff alleges he is a member. See Compl. ¶ 62.

[11] Plaintiff uses the defined term "Hard Rock Stadium" to refer to SFS in his Complaint. See Compl. at 1.

[12] Plaintiff asserts breach of contract claims against CONMEBOL and CONCACAF. See Compl. ¶¶ 80–93.

Ticketmaster, Plaintiff' claims "presume[] the existence of" a contract with Ticketmaster, and he should be "estopped from avoiding arbitration" of claims related to that contract. <u>See</u> <u>id.</u>

### 2.   SFS Is Entitled To Enforce the Arbitration Clause On Agency Principles

It is well established that "[a]n agent can bind a principal to an arbitration agreement just like any other contract." <u>Dye v. Tamko Bldg. Prods.</u>, 908 F.3d 675, 685 (11th Cir. 2018). Courts routinely find an agency relationship where (i) the principal acknowledges the agent will act for him, (ii) the agent accepts the undertaking and (ii) the principal has control over the agent's actions. <u>See</u> <u>Villazon v. Prudential</u>, 843 So. 2d 842, 853 n.10 (Fla. 2003). Here, there should be no dispute that Ticketmaster was acting at SFS's agent when it sold or transferred tickets to the Final Match. <u>See</u> Purchase Policy § 3; TOU at 2 (incorporating Purchase Policy).[13]

<u>First</u>, SFS has acknowledged Ticketmaster acted as its agent. SFS contracted with Ticketmaster to be its ticketing agent for events at Hard Rock Stadium, including the Final Match. <u>See</u> Brown Decl. ¶ 5. The agreement between SFS and Ticketmaster identifies SFS as the principal and creates an agency relationship with Ticketmaster. <u>Id.</u> ¶ 7. In that agreement, SFS granted Ticketmaster the right to be the <u>exclusive</u> primary seller of tickets to events at Hard Rock Stadium with limited exceptions not relevant here. <u>Id.</u> ¶ 7. That right included the right to be the exclusive primary seller of tickets to the Final Match. <u>Id.</u> ¶ 7. <u>Second</u>, in entering the agreement with SFS, Ticketmaster accepted its role as SFS's agent for purposes of selling tickets to events at Hard Rock Stadium—here, the Final Match and for purposes of facilitating direct ticket sales via AccountManager. <u>See</u> <u>id.</u> ¶ 11; Purchase Policy § 3. Ticketmaster sold tickets to the Final Match in accordance with its responsibilities as the agent under the agreement. <u>See</u> Brown Decl. ¶ 9; <u>see also</u> Purchase Policy § 3 ("We act as the agent for those who provide events, such as artists, venues, teams, fan clubs, promoters, and leagues (the 'Event Organizer')."). Ticketmaster also supported direct purchases of tickets for the Final Match from SFS via Ticketmaster's operation of the AccountManager site, through which individuals who bought resale tickets originally sold on AccountManager could access their tickets. <u>See</u> Moon Decl. ¶ 9. <u>Third</u>, SFS had control over Ticketmaster's actions <u>vis-à-vis</u> ticket sales, including when tickets would be available as well as

---

[13] Courts have recognized that Ticketmaster acts as an agent for the venues on whose behalf it sells tickets. <u>See</u>, <u>e.g.</u>, <u>Sands v. Ticketmaster</u>, 1994 WL 662956, *3 (N.Y. Sup. Ct. 1994) (recognizing that Ticketmaster was an agent of venues for which it sold tickets); <u>Bourgeois v. Live Nation</u>, 3 F. Supp. 3d 423, 448 (D. Md. 2014) ("[A]t all times relevant to this case, Ticketmaster was acting as agent for a venue located within Baltimore.").

in what quantity and the price at which tickets would be offered for sale. See Brown Decl. ¶ 8. And the Purchase Policy, expressly incorporated into the Terms of Use and hyperlinked therein, likewise makes clear that Event Organizers, like SFS, "set the ticket prices [and] determine seating locations." Purchase Policy § 4.

Because Ticketmaster was SFS's agent for tickets sales to the Final Match, it had "the authority to do acts that are incidental to [agency authority], usually accompany it, or are reasonably necessary to accomplish it." See Dye, 908 F.3d at 684. That authority included requiring customers who bought tickets or accepted ticket transfers to agree to the Terms of Use. See disc. supra at § II.C. "Purchasing a product necessarily and by definition encompasses accepting the terms of that purchase." Dye, 908 F.3d at 685; see also TOU at 2 (noting the Terms of Use govern "your purchase, possession, or use of any Live Nation or Ticketmaster tickets, products, or services."). Indeed, "accepting purchase terms is incidental to, usually accompany[ing], and reasonably necessary to the act of purchasing." See Dye, 908 F.3d at 685. Further, SFS was openly disclosed as the principal. The name SFS does business under (i.e., Hard Rock Stadium), is clearly noted on the face of the ticket. See Compl. Ex. 1. In addition, Ticketmaster's Purchase Policy, which is expressly incorporated into the Terms of Use, and hyperlinked, states: "We act as agent to those who provide events, such as artists, venues, teams, fan clubs, promoters, and leagues (the 'Event Organizer')." Purchase Policy § 3.

In sum, Ticketmaster was clearly acting as SFS's agent in facilitating ticket transfers to the Final Match. As such, it had authority to bind Plaintiff and SFS to the Terms of Use, and SFS, in turn, is entitled to independently enforce the arbitration clause in those terms whether Ticketmaster is named in this lawsuit or not. See, e.g., NRP v. Hydropress, 2007 WL 201259, *2 (S.D. Fla. 2007) (granting non-signatory principal's motion to compel arbitration where signatory was agent for non-signatory principal); Bolamos v. Globe Airport Sec., 2002 WL 1839210, *2 (S.D. Fla. 2002) (granting non-signatory agent's motion to compel arbitration).

### 3.  SFS Is Entitled To Enforce The Arbitration Clause, Because It Is A Third-Party Beneficiary Of The Terms Of Use

Finally, SFS is also entitled to independently invoke the arbitration clause on a third ground: SFS is a third-party beneficiary of the Terms of Use. See, e.g., Capua v. Air Europa, 2021 WL 965500, *5-6 (S.D. Fla. 2021) (holding non-signatory airline was third-party beneficiary of arbitration provision on online ticketing website). A party is a third-party beneficiary "if the parties

14

to the contract intended to primarily and directly benefit the third party." Smith v. Beverly Hills Club Apts., 2016 WL 344975, *6 (S.D. Fla. 2016). Here, the Terms of Use, including Ticketmaster's Purchase Policy which is incorporated therein, clearly express an intent to benefit SFS. See Bochese v. Town of Ponce Inlet, 405 F.3d 964, 981-82 (11th Cir. 2005); see also TOU at 2 ("Our … Purchase Policy [is] incorporated into the Terms"). The Purchase Policy states that Ticketmaster acts:

> as the agent to those who provide events, such as artists, venues, teams, fan clubs, promoters, and leagues (the "Event Organizer"). We generally sell tickets on behalf of the Event Organizer, though, in some rare instances, we may own a small number of tickets as part of our services contract with the Event Organizer. When you purchase a ticket for an event that is located in the United States, Ticketmaster LLC will be handling the transaction and collecting payment for the Event Organizer.

> Purchase Policy § 3; see also id. § 4 ("We sell tickets on behalf of Event Organizers…").

The Purchase Policy also reflects an intent to benefit SFS, as the Event Organizer, reserving to SFS the exclusive right to (i) determine ticket prices and seating locations; (ii) approve and fund refunds or credits; and (iii) establish the "applicable rules, policies, terms, and conditions" that govern a ticket purchaser's conduct. Id. §§ 4, 8, 11, 18.

The Terms of Use contain other provisions illustrating an intent to benefit "Event Organizers," such as SFS. See TOU at 3 (ticket purchasers "hereby waive any and all claims and potential claims against Ticketmaster, Live Nation, and the Event Organizer (as defined in our Purchase Policy)"); id. at 13-14 ("In no event will we or our Event Organizers … be responsible or liable to you or anyone else…"); id. at 14 ("you agree to indemnify, defend, and hold us and our affiliated companies [and] Event Organizers… harmless from and against any and all claims"). Indeed, the Terms of Use include a Limitation of Liability provision that expressly extends to the "Event Organizers," including SFS. See id. at 13. That provision states as follows:

> IN NO EVENT WILL WE OR OUR EVENT ORGANIZERS, SUPPLIERS, ADVERTISERS, AND SPONSORS, BE RESPONSIBLE OR LIABLE TO YOU OR ANYONE ELSE FOR, AND YOU HEREBY KNOWINGLY AND EXPRESSLY WAIVE ALL RIGHTS TO SEEK, DIRECT, INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY TYPE, AND ANY RIGHTS TO HAVE DAMAGES MULTIPLIED OR OTHERWISE INCREASED, ARISING OUT OF OR IN CONNECTION WITH THE SITE, THE CONTENT, OR ANY PRODUCT OR SERVICE PURCHASED THROUGH THE SITE . . . .

Id.

Courts have held that a non-signatory is a third-party beneficiary with standing to enforce contractual provisions in similar situations. See, e.g. Moretti v. Hertz, 2014 WL 1410432, *4 (N.D.

Cal. 2014) (holding car rental company was third-party beneficiary of online ticketing agent's terms of use where terms indicated the agent's website offered products and services through its "Providers" and the car rental company fit within class of "Providers"). Because the Terms of Use are intended to primarily and directly benefit SFS, SFS is plainly a third-party beneficiary to the arbitration agreement and may independently enforce that agreement whether Ticketmaster is named or not. See Capua, 2021 WL 965500 at *6.

## V.   CONCLUSION

For the foregoing reasons, the SFS Entities respectfully request that the Court compel individual, non-class arbitration and stay this action while that arbitration is pending. The SFS Entities request such other relief as the Court deems appropriate.

## LOCAL RULE 7.1(a)(3) CERTIFICATION OF COUNSEL

Counsel for SFS have conferred by teleconference with counsel for Plaintiff in a good faith effort to resolve the issues raised in this Motion and have been unable to do so.

Dated: October 3, 2024

Respectfully submitted,

*/s/ Melissa C. Pallett-Vasquez*

Melissa C. Pallett-Vasquez (Fla. Bar No. 0715816)
Matthew W. Tieman (Fla. Bar No. 1044909)
BILZIN SUMBERG BAENA PRICE
& AXELROD LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 350-2393
Facsimile: (305) 374-7593
Email:  mpallett@bilzin.com
          mtieman@bilzin.com
          eservice@bilzin.com

Elizabeth A. Parvis (*pro hac vice* **forthcoming**)
of LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-4779
Email:  elizabeth.parvis@lw.com

*Counsel for Defendant South Florida Stadium LLC*
*d/b/a Hard Rock Stadium & Miami Dolphins, Ltd.*