## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| DAS NOBEL, EDUARDO MARTINEZ, DANIEL GRANDE, WILLIAM POU, and DAVID ZIEMEK on behalf of themselves, and on behalf of all other similarly situated, | |
| **Plaintiffs,** | Case No.: 1:24-cv-22751-BB |
| **v.** | **CLASS ACTION** |
| SOUTH FLORIDA STADIUM LLC D/B/A HARD ROCK STADIUM, MIAMI DOLPHINS, LTD; COUNTY LINE SOUTH PROPERTIES, LLC; DOLPHIN CENTER PROPERTIES, LLC; CONFEDERACION SUDAMERICANA DE FUTBOL D/B/A CONMEBOL, CONFEDERATION OF NORTH, CENTRAL AMERICA AND CARIBBEAN ASSOCIATION FOOTBALL D/B/A CONCACAF, AND BEST CROWD MANAGEMENT, INC., | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Das Nobel, Eduardo Martinez, Daniel Grande, William Pou, and David Ziemek (together, "Plaintiffs" or "Nobel"; "Martinez"; "Grande"; "Pou"; and "Ziemek"), individually, and on behalf of all others similarly situated (the "Class" or "Class Members"), files this First Amended Class Action Complaint against Defendants, South Florida Stadium LLC ("SFS"), d/b/a Hard Rock Stadium (the physical stadium will be referred to as "Hard Rock Stadium"), the Miami Dolphins Ltd. (the "Dolphins"), County Line South Properties, LLC ("CLS Properties"), Dolphin Center Properties, LLC ("DC Properties"), Confederacion Sudamericana De Futbol d/b/a CONMEBOL ("CONMEBOL"), Confederation of North, Central America and Caribbean

Association Football d/b/a Concacaf ("CONCACAF"), and BEST Crowd Management, Inc. ("BEST"), (together, "Defendants"), as follows:

## INTRODUCTION

> It was a life-or-death situation. Let the people get crushed or open the gates. Then it became total mayhem in there. It was a calamity of errors on all levels.
>
> — Steadman Stahl, Police Union President of the South Florida Police Benevolent Association.

1.      This Complaint seeks redress for a class of invitee fans who paid money to attend the Copa America Final football match between Argentina and Columbia ("Final Match") at Hard Rock Stadium but were denied entry because of Defendants' failure to implement adequate security protocols that resulted in mass chaos, injuries, and ultimately, the Defendants' decision to open the stadium to thousands of unticketed fans and to exclude ticketed invitee fans like Plaintiffs and the Class Members.

2.      Plaintiffs and the Class Members paid thousands of dollars for tickets and travel accommodations to attend the Final Match.

3.      This class action does not seek damages related to any personal injuries.

4.      Defendants sold over 65,000 tickets to invitees like Plaintiffs to attend the Copa America Final Match, held at Hard Rock Stadium in Miami Gardens, Florida, on July 14, 2024.[1]

5.      Following the Defendants selling out every seat at the Hard Rock Stadium for the Final Match, Defendants' decisions caused or allowed civil unrest through the following actions or inactions: (1) failure to implement an adequate and reasonable security and safety plan; (2)

---

[1] https://www.theguardian.com/football/article/2024/jul/15/fans-receive-medical-treatment-at-copa-america-final-after-issues-outside-ground#:~:text=We%20are%20actively%20working%20with,of%20the%20South%20American%20tournament.

failure to hire an adequate number of security persons; (3) failure to predict and plan for the scope and scale of unticketed attendees present for the Final Match; (4) failure to establish a perimeter; (5) failure to establish ticketed checkpoints, barriers and fences; (6) permitting parking for unticketed invitees around Hard Rock Stadium; (7) permitting watch parties and gatherings for unticketed invitees outside of Hard Rock Stadium; (8) willfully and knowingly permitting unticketed fans to enter Hard Rock Stadium; (9) willfully and knowingly denying ticketed fans entrance to the Hard Rock Stadium; (10) failure to cancel the Final Match to ensure the safety, security, and attendance of ticketed fans; and (11) other security and safety protocol failures that will come to light during discovery.

6.     As a direct result of Defendants' failures to implement appropriate security and safety measures and the decision to open the gates to unticketed fans that invaded the Hard Rock Stadium, Defendants permitted unticketed fans to steal seats that belonged to Plaintiffs and the Class. Specifically, Defendants admitted thousands of unticketed fans and as a result, denied entry to thousands of ticketed fans, including Plaintiffs and the Class.

7.     Plaintiffs seek to represent all ticketed persons to which Defendants denied entry into the Final Match. Plaintiffs and the proposed Class were damaged as a result of Defendants' negligent conduct and seek redress by way of a full refund of their ticket purchases, plus interest, damages incurred as a result of their travel expenses, and damages related to missing the experience of viewing this Copa America Final Match in person. In the alternative, Plaintiffs seek disgorgement of all profits that Defendants generated from the sale of the Class Members' tickets.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d) of the Class Action Fairness Act because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and it is a class action in which the parties are minimally diverse.

9.      Minimal Diversity exists. The Defendants are incorporated in the Bahamas, Paraguay, Missouri, and Florida, and several Defendants maintain their principal place of business in Florida. SFS, the Dolphins, CLS properties, and DC Properties membership is comprised of citizens of Florida and New York for diversity purposes. BEST is a citizen of Missouri. Plaintiffs are citizens of Florida, Colorado, and Texas.

10.     This Court has personal jurisdiction over Defendants. SFS, CLS Properties, DC Properties, the Dolphins, and CONCACAF maintain their principal places of business in this District, conduct substantial business in this District, maintain registered agents in this state, have sufficient contacts with this District, and otherwise avail themselves of the markets in this District. Moreover, this Court has personal jurisdiction over CONMEBOL because it conducts substantial business in this District, has sufficient contacts with this District, and otherwise avails itself of the markets in this District. Furthermore, BEST conducts substantial business in this District, maintains a registered agent in this District, has sufficient contacts with this District, and otherwise avails itself of the markets in this District.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c), specifically, because Hard Rock Stadium and the actions giving rise to this lawsuit occurred in Miami-Dade County, Florida.

## **PARTIES**

12.     Plaintiff Das Nobel is a natural person living in Dallas, Texas. At all times material hereto, Mr. Nobel was a citizen of Texas.

13.     Plaintiff Eduardo Martinez is a natural person living in Miami-Gardens, Florida. At all times material hereto, Mr. Martinez was a citizen of Florida.

14.     Plaintiff Daniel Grande is a natural person living in Miami-Gardens, Florida. At all times material hereto, Mr. Grande was a citizen of Florida.

15.     Plaintiff William Pou is a natural person living in Miami-Gardens, Florida. At all times material hereto, Mr. Pou was a citizen of Florida.

16.     Plaintiff David Ziemek is a natural person living in Wheatridge, Colorado. At all material times hereto, Mr. Ziemek was a citizen of Colorado.

17.     Defendant South Florida Stadium LLC d/b/a Hard Rock Stadium ("SFS" and the physical stadium is referred to as "Hard Rock Stadium") is a Florida Limited Liability Company. Its principal place of business is 347 Don Shula Drive Miami Gardens, Florida 33056. Stephen Ross and the family of Wayne Huizenga are the sole owners and members of SFS. For citizenship purposes, Ross and the Huizenga family are citizens of the State of Florida. At all times material hereto, SFS owned and operated the Hard Rock Stadium located in Miami-Dade County, Florida, availed itself of Florida law, and routinely profited from doing business in Miami-Dade County and under the laws of the State of Florida. Accordingly, SFS is subject to general jurisdiction in this District.

18.     At all times material hereto, the Defendant, Miami Dolphins Ltd. (hereinafter "the Dolphins" or "Dolphins") is and remains a Florida limited partnership with a principal place of business situated at 347 Don Shula Drive, Miami Gardens, FL 33056. Stephen Ross is an owner,

member and chairman of the Dolphins.[2] For citizenship purposes, Ross is a citizen of Florida. At all times material hereto, the Dolphins were located and operated in Miami-Dade County, Florida, availed itself of Florida law, and routinely profited from doing business in Miami-Dade County and under the laws of the State of Florida. Accordingly, the Dolphins are subject to general jurisdiction in this District.

19.     At all times material hereto, the Defendant, County Line South Properties, LLC (hereinafter "CLS Properties"), is and remains a Florida Limited Liability Company, with a principal place of business situated at 347 Don Shula Drive, Miami Gardens, FL 33056. Stephen Ross is an owner and the chairman of the CLS Properties.[3] For citizenship purposes, Stepehen Ross is a citizen of Florida. At all times material hereto, CLS Properties was located and operated in Miami-Dade County, Florida, availed itself of Florida law, and routinely profited from doing business in Miami-Dade County and under the laws of the State of Florida. Accordingly, CLS Properties is subject to general jurisdiction in this District.

20.     At all times material hereto, the Defendant, Dolphin Center Properties, LLC (hereinafter "DC PROPERTIES") is and remains a Florida limited liability company with its principal place of business situated at 347 Don Shula Drive, Miami Gardens, FL 33056. Stephen Ross is an owner and the chairman of the DC Properties.[4] For citizenship purposes, Stephen Ross and DC Properties are citizens of Florida. At all times material hereto, DC Properties was located and operated in Miami-Dade County, Florida, availed itself of Florida law, and routinely profited

---

[2] Although various Limited Liability Companies and natural persons may also be minority members or partners in the Dolphins, upon information and belief, Ross is the majority owner and partner.

[3] Although various Limited Liability Companies may also be members in CLS Properties, upon information and belief, each ultimately leads to Ross as the sole or majority owner and member.

[4] Although various Limited Liability Companies may also be members in DC Properties, upon information and belief, each ultimately leads to Ross as the sole or majority owner and member.

from doing business in Miami-Dade County and under the laws of the State of Florida. Accordingly, DC Properties is subject to general jurisdiction in this District.

21.     Defendant Confederacion Sudamericana De Futbol d/b/a CONMEBOL is an association of ten national soccer associations from Argentina, Brazil, Bolivia, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela. CONMEBOL is organized under the laws of Paraguay as a non-profit and non-governmental entity. At all times material hereto, CONMEBOL conducted business in the State of Florida and Miami-Dade County, availed itself of Florida law, and profited from its business in Miami-Dade County and under the laws of the State of Florida. Because CONMEBOL was doing business in Florida for the specific purpose of presenting the Final Match, it is subject to specific jurisdiction within this District.

22.     Defendant Confederation of North, Central America and Caribbean Association Football d/b/a CONCACAF ("CONCACAF") is an association of forty-one national soccer associations from North America, Central America, and the Caribbean Islands. Specifically, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bonaire, British Virgin Islands, Canada, Caymen Islands Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Puerto Rico, Saint Kitts and Nevis, Saint Lucia, Saint Martin, Saint Vincent and the Grenadines, Sint Maarten, Suriname, Trinidad and Tobago, Turks and Caicos Islands, United States of America and U.S. Virgin Islands. CONCACAF is organized under the laws of the Bahamas as a non-profit and non-governmental entity. At all times material hereto, CONCACAF conducted business in the State of Florida and in Miami-Dade County, maintained a principal place of business and registered agent within the State of Florida, availed itself of Florida law, and profited from its business in Miami-Dade County and

under the laws of the State of Florida. Because CONCACAF was doing business in Florida for the specific purpose of presenting the Final Match, it is subject to specific jurisdiction within this District.

23.     Defendant BEST Crowd Management, Inc. ("BEST") is incorporated in Missouri and maintains its principal place of business in Missouri. At all times material hereto, BEST was hired by the remaining Defendants to secure and protect ticketed fans like Plaintiffs and the Class at Hard Rock Stadium located in the State of Florida and Miami-Dade County, availed itself of Florida law, and profited from doing business in Miami-Dade County and under the laws of the State of Florida. Because BEST was doing business in Florida for the specific purpose of presenting the Final Match, it is subject to specific jurisdiction within this District.

## GENERAL FACTUAL ALLEGATIONS

### I.    FIFA Confederations

24.     Founded in 1904, FIFA is football's world governing body and was created to unite national soccer associations.[5]

25.     Under FIFA's governance, football (soccer) has become the world's most popular sport, with 150 million registered athletes and viewed regularly by billions of fans in stadiums and on televisions worldwide.[6]

26.     As football's administrative authority, FIFA governs all facets of the game: regulating the rules of play, transfers of players internationally, organizing international

---

[5] https://www.ussoccer.com/history/organizational-structure/fifa
[6] *Id.*

competitions such as the FIFA World Cup[7], establishing standards for referees, coaching and sporting medicine, and encouraging soccer's development around the world.[8]

27.     FIFA's members are split geographically into six regional confederations: (1) Africa (CAF), Asia (AFC), Europe (UEFA), South America (CONMEBOL), Oceania (OFC), and North America, Central America and the Caribbean (CONCACAF).

## II.     CONMEBOL

28.     CONMEBOL is the continental governing body of soccer in South America and is the oldest confederation in the world.[9]

29.     CONMEBOL is made up of ten national soccer associations from Argentina, Brazil, Bolivia, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela.

## III.     CONCACAF

30.     CONCACAF formed in 1961 through the merger of the Football Confederation of Central America and the Caribbean and the North American Football Confederation and consists of three sub-regions: North America, Central America, and the Caribbean.

31.     CONCACAF is made up of forty-one national soccer associations from North America, Central America, and the Caribbean Islands. Specifically, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bonaire, British Virgin Islands, Canada, Caymen Islands Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Puerto Rico, Saint Kitts and Nevis, Saint Lucia, Saint

---

[7] Prior to the mayhem that occurred at the Final Match, Hard Rock Stadium was selected to host the FIFA World Cup in 2026.
[8] https://www.ussoccer.com/history/organizational-structure/fifa
[9] https://analyisport.com/insights/what-is-conmebol-south-america/

Martin, Saint Vincent and the Grenadines, Sint Maarten, Suriname, Trinidad and Tobago, Turks and Caicos Islands, United States of America and U.S. Virgin Islands.

## IV.     The Copa America Tournament

32.     The Copa America Tournament is the top football tournament among national teams from South America. The first Copa America Tournament was held in 1916 to honor the 100-year anniversary of Argentina's independence. The tournament took place every one to four years until it adopted its quadrennial format in 2007.

33.     In 2016, the Copa America Tournament was played for the first time in the United States.[10]

34.     The 2016 Copa America Tournament set the benchmark for attendance and revenue, setting new records for total and average attendance, television viewership in the United States and throughout the world, and digital and social media engagement.[11]

35.     In 2016, the Copa America Tournament was structured and run by CONCACAF.

36.     As a result of the revenue and viewership received in 2016, the Copa America Tournament returned to the United States in 2024.[12]

37.     In 2024, the Copa America Tournament was held at various locations across the United States from June 20 to July 14, 2024, bringing together 16 nations – 10 from South America and Six qualifiers from CONCACAF.[13]

---

[10] https://www.prnewswire.com/news-releases/historic-2016-copa-america-centenario-delivers-record-breaking-event-300289950.html
[11] *Id.*
[12] https://copaamerica.com/en/match-schedule
[13] https://www.mlssoccer.com/news/2024-copa-america-host-cities-stadiums-schedule

38.     The Copa America 2024 Tournament was comprised of 32 matches in 14 different cities/stadiums spanning both coasts of the United States.[14]

39.     The Copa America 2024 Final Match was scheduled to be played at the Hard Rock Stadium in Miami, Florida, the same venue that has been chosen to host the 2026 FIFA World Cup.[15]

40.     Notably, instead of CONCACAF hosting the Copa America 2024 Tournament, CONMEBOL, with a fraction of the resources of its U.S.-based counterpart, took over the planning, scheduling, structure, and coordination of the Copa America Tournament in 2024.

## V.     Defendant CONMEBOL's Contract with Defendant CONCACAF

41.     CONMEBOL and CONCACAF executed a strategic collaboration agreement in 2023, in which the United States was selected to host the 2024 Copa America Tournament at Hard Rock Stadium.[16]

42.     The purpose of the collaboration agreement was to strengthen and develop football in both regions.[17]

43.     A significant difference between the 2016 Copa America Tournament and the 2024 Copa America Tournament is that in 2016, CONCACAF hosted and planned the entire tournament. As a result, CONCACAF set new revenue and viewership records. CONMEBOL witnessed the revenue achieved from the 2016 Copa America and decided to seize its opportunity

---

[14] *Id.*
[15] https://www.hardrockstadium.com/events/fifa-world-cup-2026/
[16] https://www.concacaf.com/news/conmebol-and-concacaf-sign-strategic-collaboration-agreement/
[17] https://www.concacaf.com/news/conmebol-and-concacaf-sign-strategic-collaboration-agreement/

in 2024 with a plan to take the Copa America Tournament back in the United States, but this time it would plan and control the event itself and also retain a larger share of the revenue generated.

44.     CONMEBOL and CONCACAF's joint decision to let CONMEBOL host, plan, organize, and control one of the largest football events in world, despite its limited resources and experience, placed profits over the safety and security of its fans.

**VI.     SFS Sought to Capitalize on the Rise of Lionel Messi.**

45.     In 2023, CONMEBOL announced that Miami and the Hard Rock Stadium had been awarded the Copa America Final Match. Hard Rock Stadium was also awarded several qualifying matches.

46.     The awarding of the Copa America Final Match to the Hard Rock was no coincidence, with the surging of Lionel Messi ("Messi") fandom as he joined the Inter Miami football team for the 2023-2024 season. Messi also plays for Argentina, a team competing in the Copa America Tournament. It was thought that Messi may be playing in his final Copa America Tournament on behalf of Argentina in front of his home crowd. Argentina would go on to advance to the Copa America Final Match, attempting to win a record 16th Copa America Title.

47.     Opposite Messi and Argentina in the Copa America Final Match was Columbia who was attempting to secure its first Copa America Title since 2001.

48.     When announcing the Hard Rock Stadium as the site of the Copa America Final Match, CONMEBOL stated that it expected "stadiums filled with the passion of the entire American continent for the inauguration and the final."

49.     Ahead of the Copa America Tournament, Hard Rock Stadium President and Chief Executive Officer, Tom Garfinkel acknowledged the large crowds expected for the Final Match

stating "Obviously, with a large Colombian and Argentinean population here in South Florida, the demand for this event has been huge."

50.     Consistent with this level of excitement, Defendants took the opportunity to increase their profits dramatically. Ticket prices surged to $7,377 for the most expensive ticket, with the least expensive ticket still a whopping $1,995.[18]

51.     Upon information and belief, Defendants had two financial interests in the tickets sold. First, Defendants sold tickets to resellers such as StubHub and SeatGeek in which Defendants made a profit and allowed secondary sellers to set the market. Second, Defendants retained a financial interest in thousands of tickets that were sold by Hard Rock's ticketing partner, Ticketmaster, in the weeks and days leading up to the event at the **dramatically inflated prices** that had been set on the secondary market.

52.     Defendants owed Plaintiffs and the Class certain duties. Each person who had a ticket to the Final Match and showed up to the stadium was a business invitee of the Defendants. Under Florida law, a business owes its invitees a duty of care that includes the duty to maintain the premises in a reasonably safe condition and to protect customers from dangerous conditions that it knew or should have known of that are likely to cause harm to the invitees.

53.     Despite being aware of the momentous occasion of the Final Match taking place at the Hard Rock and despite the record profits derived by Defendants failed to devise an adequate security plan to control the tens of thousands of loyal fans that descended upon the Hard Rock Stadium. In particular, unticketed fans attended in droves.

---

[18] https://www.nbcmiami.com/news/sports/soccer/copa-america-final-times-ticket-prices-halftime-performance-and-more/3358622/

## VII.   Hard Rock Stadium

54.     Some combination of the SFS, CLS Properties, DC Properties, and the Dolphins organized, controlled, owned, maintained, leased and/or was responsible for the various parking lots and properties located at 347 Don Shula Drive, Miami Gardens Florida 33056. The parking lots and land surrounding the Hard Rock Stadium will be referred to as the "Hard Rock Stadium Grounds."

55.     The Hard Rock Stadium is a multi-purpose stadium located in Miami Gardens, Florida with a capacity of 65,326.[19] Hard Rock Stadium is the home stadium for the Miami Dolphins and the Miami Hurricanes and regularly holds sporting events, concerts, racing, and other events.

56.     At all times material hereto, the Dolphins and/or SFS, owned, managed, controlled, maintained, and otherwise coordinated together to operate and operated Hard Rock Stadium that is physically situated at the center of 347 Don Shula Drive, Miami Gardens, FL 33056.

57.     The Hard Rock Stadium is not limited to the stadium building itself. There are surrounding real properties that provide amenities and parking to employees and business invitees upon the property. A map of the Hard Rock Stadium and the surrounding area can be found on the Hard Rock website:[20]

---

[19] http://stadiumdb.com/stadiums/usa/dolphins_stadium
[20] https://www.hardrockstadium.com/lanyard-guide/



58.     The area that is owned by SFS or its affiliates including CLS Properties, and DC Properties extends north to NW 203rd Street and is bordered on the west by NW 27th Avenue and on the east by the Florida Turnpike. A Turnpike Access Road merges into NW 199th Street and is the only perpendicular intersecting road not owned by any Defendants until the western border of NW 27th Street. A large parking lot to the west extends to the edge of the Florida Turnpike and a portion of the land nearest to the Florida Turnpike is owned by the Defendant, SFS.

59.     The records of the Miami-Dade County Property Appraiser reflect that Property Address: 347 Don Shula Drive is 'owned' by "South Florida Stadium LLC."

60.     Upon information and belief, the ownership of the parking lots is as follows:

a.  **County Line South Properties, LLC** owns the land and parking lot to the East of the Hard Rock Stadium closest to the Florida Turnpike. Designated in the Map below as "C;"

b.  **South Florida Stadium, LLC** owns a swathe of land and mixed-use area to the east of this land. Depicted in the Map below as "A;"

c. **Dolphin Center Properties, LLC** owns a parcel of land and parking lots on the south side of NW 199th Street to the North and South of the Florida Turnpike Access Road merging onto NW 199th Street. Designated in the Map below as "D;" and

d. **County Line South Properties, LLC**, owns a parcel of land and parking lots to the west of Hard Rock and including portions of NW 26th Avenue which merges onto NW 199th Street. Designated in the Map below as "E."



61. Upon information and belief, SFS maintains control and supervisory responsibility over the parking lots owned and run by DC Properties and CLS Properties.

## VIII.  The Security Plans and BEST Security

62. Upon information and belief, Defendants CONMEBOL, CONCACAF, SFS, CLS Properties, DC Properties, and/or the Dolphins hired BEST to be the security consultant for the Final Match.

63. BEST touts on its website that it provides security for major sporting leagues, including UFC, MLB, NCAA, NHL, NBA, WWE and the PGA tour, among others. BEST states that its goal is to "ensure a safe and successful guest experience" which starts with "ensuring tight

control of the most sensitive areas of your facility by monitoring credentials and admitting only those verified to enter."[21]

64.     Upon information and belief SFS contracted with BEST to (1) provide a security plan for the Copa America Final Match and (2) provide staffing to supplement the SFS's existing security staff to execute BEST's security plan.

65.     Upon information and belief, CONCACAF, CONMEBOL, DC Properties, CLS Properties, and/or the Dolphins all reviewed, approved, and consented to SFS's hiring of BEST on their behalf.

66.     Upon information and belief, CLS Properties, and DC Properties agreed to implement the security plan developed by BEST and SFS at each of their respective parking lots and/or retained BEST themselves to prepare a security plan for each parking lot.

67.     Upon information and belief, CONMEBOL and CONCACAF were responsible for organizing the 2024 Copa America Tournament, selected Hard Rock Stadium as the site for the final, and approved SFS and BEST's security plan. CONCACAF and CONMEBOL approved of the security plan through their own actions or inactions and knew or should have known that the security plan was inadequate.

68.     Upon information and belief, CONMEBOL did know and stated before the Final Match that SFS and BEST's security plan was inadequate for the crowds that can be expected for a Copa America Final Match. However, CONMEBOL failed to demand that an adequate security plan be made and implemented.

69.     CONMEBOL and CONCACAF entered into a contract with SFS to host the 2024 Copa America Final Match and spent over a year marketing and selling tickets for the events.

---

[21] https://best.garda.com/event-management-services/event-security-services

70.     Upon information and belief, SFS was responsible for implementing the security plans negotiated with CONMEBOL and CONCACAF and implementing protocols designed for fan safety. SFS hired BEST for additional assistance. On information and belief, BEST assisted in the development and implementation of the security plans developed and agreed upon by SFS, CONMEBOL, CONCACAF, DC Properties, CLS Properties, and/or the Dolphins.

71.     Upon information and belief, the security professionals that worked the Final Match were a combination of SFS employees and BEST employees.

72.     Defendants are no strangers to violence at football matches. All are aware of the world-wide history of violence that is possible at football matches when stadiums and tournament organizers fail to provide adequate security. In the 1989 Hillsborough Disaster, 97 Liverpool fans died as the result of a spectator crush. In 1996 more than 80 fans died at a World Cup qualifier between Guatemala and Costa Rica.

73.     Just three days before the chaos at the Hard Rock Stadium during the Final Match, CONMEBOL had opened an investigation into a bleacher brawl involving Uruguayan players and Columbian fans at the Copa America Semi-Final Match ("Semi-Final Match") held at Bank of America Stadium in Charlotte, North Carolina. The Semi-Final brawl involved dozens of fans, players, and security. Following the Semi-Final brawl, CONMEBOL released the following statement:

> On the eve of the final of Copa América, we want to reaffirm and warn that no action will be tolerated that tarnishes this global football celebration, which involves both the players and the fans present in the stadium, and which will be watched by hundreds of millions of viewers worldwide.
>
> It is unacceptable that an incident like this turns passion into violence. Therefore, no behavior that harms the sporting

competition and the most beautiful spectacle in the world, which belongs to the entire football family, will be tolerated.[22]

74.    Defendants recognized the grave danger that would exist if it allowed tens of thousands of unticketed fans onto the Hard Rock Stadium Grounds. SFS' websites stated the following with respect to the Copa America Final Match in the months leading up to the event:[23]

**Fans MUST have game tickets to enter the Hard Rock Stadium parking lots on match day.** There will be no watch parties outside the stadium or in the parking lots. Fans with tickets are encouraged to come early.

75.    Rather than increasing security around the parking lots following the violence at the semi-final match, Defendants opened the Hard Rock Stadium Grounds to the general public and invited them to be part of the Final Match, regardless of whether they had purchased tickets.

76.    Upon information and belief, SFS, CLS Properties, DC Properties, and BEST allowed thousands of unticketed fans to park on Hard Rock Stadium Grounds, dramatically increasing the number of unticketed fans at or near the gates.

77.    Upon information and belief, SFS, CLS Properties, DC Properties, and BEST allowed thousands of unticketed fans to walk onto Hard Rock Stadium Grounds, dramatically increasing the number of unticketed fans at or near the gates.

78.    Upon information and belief, Defendants failed to establish a secure perimeter outside of the stadium parking lots (barricades, fences, metal detectors, ticket scanners, blocked parking lots, security lines to direct fans to checkpoints, etc.) as is typical for major football matches around the world, including the European championship.

---

[22] https://www.nytimes.com/athletic/5632635/2024/07/11/colombia-uruguay-copa-america-nunez-clash/

[23] https://www.hardrockstadium.com/parking/copa-america/

79.     The tens of thousands of unticketed fans that were permitted to enter the Hard Rock Stadium Grounds then were permitted to gather in front of massive screens and televisions, with alcohol vendors and food vendors, just steps from the gates that led into the Hard Rock Stadium itself.

80.     The Final Match Stadium Grounds were filled with unticketed fans whom Defendants permitted to simply walk up to the entrance of the Hard Rock Stadium.

81.     At some point, the ticketed and unticketed fans amassed at the gates to the point where Defendants were concerned that fans would be killed or severely injured. As a result, the Defendants opened the Hard Rock Stadium gates and permitted unticketed fans to avoid metal detectors and to enter without tickets.

82.     The scene that unfolded on television and social media was astonishing, bloodied fans, parents protecting children from criminal acts, and fans assaulting each other, stadium staff, and local police.

83.     Defendants' failure to have a reasonable and adequate security plan allowed unticketed fans to enter the Hard Rock Stadium Grounds and ultimately the Hard Rock Stadium itself.

84.     At some point, in an effort to regain control, Defendants closed all gates and locked thousands of properly ticketed fans out. Amid these thousands of ticketed fans were Plaintiffs.

85.     According to SFS this was done to "avoid a stampede." However, a stampede was only made possible by Defendants' failure to implement reasonable and adequate security measures throughout the day and within the surrounding area of the stadium. The gate closures only led to more problems as some fans began breaking down walls and barricades, and scaling

walls and buildings to gain access to the Hard Rock Stadium. This was exceedingly dangerous to Plaintiffs and the Class.

86.     Although SFS attempted to "strategically" reopen some entrances, it was soon forced to close the entrances again once the Hard Rock Stadium was at capacity due to unticketed individuals being allowed in, leaving thousands of paying customers, including Plaintiffs and the Putative Class, wrongfully excluded from the stadium.

87.     Because of Defendants' failure to implement reasonable and adequate security measures, Defendants were wholly unable to remove the volume of unticketed fans that they allowed to enter the Hard Rock Stadium. As a result of the Defendants acts and omissions, the unticketed fans took the seats of Plaintiffs and the Class.

88.     CONMEBOL officials have stated that it was "subject to the decisions made by the Hard Rock Stadium authorities, according to the contractual responsibilities established for security operations" and that CONMEBOL's recommended security measures "were NOT taken into account" by SFS and BEST.[24] This statement shows that CONMEBOL and CONCACAF were involved in retention, design, and implementation of the security plan which was wholly inadequate and caused the mayhem, violence, and damages to Plaintiffs and the Class.

## IX.     Plaintiff Nobel's Facts

89.     Plaintiff Das Nobel is a football fan living in Dallas, Texas. Plaintiff Nobel, his wife, and his two children are longtime football fans, supporting the Argentinian National Team and the meteoric rise of Messi.

---

[24] https://www.espn.com/soccer/story/_/id/40575434/copa-america-stadium-conmebol-point-blame-chaos

90.     On June 26, 2024, Plaintiff Nobel and his family traveled to New Jersey to see Messi and to support Argentina's sold-out match against Chile. Plaintiff Nobel and his family, like millions of other Messi and Argentina fans, celebrated when Argentina prevailed against Chile, a redemption for Argentina's 2016 loss to Chile in the Copa America Centenario final.

91.     On July 9, 2024, Plaintiff Nobel visited the popular ticketing website SeatGeek, where the prices of tickets for the Copa America Final had soared to almost $2,000 for the least expensive ticket. Plaintiff Nobel purchased four tickets for his family in Section 131, Row 1, Seats 19-22—the perfect seats to enjoy Messi's final Copa America Tournament.

92.     In total, these four tickets cost Plaintiff Nobel $9,948.96. A copy of Plaintiff Nobel's receipt for his July 9, 2024, SeatGeek purchase is attached as **Exhibit 1**.

93.     In order to redeem his tickets, Plaintiff Nobel was forced to accept the electronic tickets through his Ticketmaster account even though he did not pay for the tickets on Ticketmaster's ticket sales platform.

94.     In addition to the cost of the tickets, Plaintiff Nobel, like thousands of other football fans, purchased flights to travel from his home in Dallas, Texas, to Miami, Florida. He paid for hotels, and ground transportation to attend the Copa America Tournament. Plaintiff Nobel's lodging cost $4,587.87 and his flights totaled $10,000.

95.     On July 14, 2024 at 5:30 p.m., Plaintiff Nobel and his entire family put on their Argentina number 10 Messi jerseys and made their way to the Hard Rock Stadium.

96.     When Plaintiff Nobel arrived at Hard Rock Stadium, he was surprised to find that the Hard Rock Stadium Grounds were already in complete mayhem. There was no order to foot traffic or automobile traffic, and the parking lots were scattered with dozens of "vendors" selling alcohol out of rolling coolers and food trucks.

97.     Plaintiff Nobel did not observe any security guards checking tickets at an established point of entry to the Hard Rock Stadium Grounds. No one asked to see Plaintiff Nobel's tickets in order to gain entry to the Hard Rock Stadium Grounds.

98.     Defendants had allowed what appeared to be a complete free-for-all block party on the Hard Rock Stadium Grounds.

99.     As he approached the Hard Rock Stadium entrance, stepping over broken glass bottles with his family in tow, Plaintiff Nobel did not see any security guards or police officers controlling the crowd.

100.    Despite its public statements that there would be no watch parties in the parking lots, as Plaintiff Nobel approached the Southeast gate to enter the Hard Rock, he found a different scene—tens of thousands of fans were gathering, tailgating and preparing watch parties. Defendants had even placed a large screen tv in the parking lot.

101.    At no point during his walk from a nearby fast-food restaurant to the entrance to the Hard Rock Stadium was Plaintiff Nobel asked to show his ticket to enter the Hard Rock Stadium Grounds. Neither was anyone else.

102.    There were no barricades protecting the perimeter surrounding the various entrances to the Hard Rock Stadium.

103.    Plaintiff Nobel and his family approached the Southeast entrance shortly after 7:00 p.m., almost an hour before the game was slated to start.

104.    When Plaintiff Nobel approached the entrance, he did not find Defendants scanning tickets or controlling the crowd of thousands that had gathered at the Southeast entrance. Instead, he found the gates shut and locked.

105.    Plaintiff Nobel received a message stating that the match had been delayed by 45-minutes, which gave him hope that Defendants would quell the crowds and start allowing ticketed fans to enter. So, he waited in the heat with thousands of other frustrated ticket holders, including many families.

106.    Plaintiff Nobel began conversing with other ticketed fans near the gate as he kept his family close. Plaintiff Nobel found that the majority of fans who were being denied entry to the Hard Rock Stadium were families with small children trying to avoid the chaos and stay together.

107.    During his wait, Plaintiff Nobel witnessed dozens of fans climbing onto a store front and breaking into the Hard Rock Stadium, scaling fences, and throwing backpacks over.

108.    Plaintiff Nobel pleaded with Defendants' employees through the locked gates to look at his tickets, but received no response.

109.    As kick-off approached, with temperatures well into the 90's, Plaintiff Nobel purchased waters from "vendors" walking around with coolers for his family and other families around him while he waited to be let into the game.

110.    Plaintiff Nobel was shocked to find that the Defendants, who were locking their paying guests out of the stadium, refused to open the gates to provide water and first-aid to those in need who had not prepared for standing in a massive crowd for hours in the extreme heat.

111.    After kick off, Plaintiff Nobel and his family remained together at the Southeast gate hoping to be let in to see at least the end of the game. Defendants' employees refused to tell them whether they would be let in or not. So, Plaintiff, his family and thousands of other loyal football fans waited.

112.     By 9:50 p.m., Plaintiff Nobel and his family accepted that the Defendants would not ever re-open the gates and made their way back to their ground transportation. At Plaintiff Nobel's request, his driver brought cases of water, which Plaintiff Nobel and his family distributed to other fans in need that continued to wait.

113.     Plaintiff Nobel and his family returned to their hotel where they watched the final minutes of Argentina's victory over Columbia on television.

114.     As a direct result of Defendants negligence, Plaintiff Nobel suffered damages including (1) the amount paid for the ticket in the amount of $9,948.96; (2) travel costs in the amount of $14,587.87; and (3) the damages due to missing the once in a life-time opportunity to witness this Copa America Final Match.

## X.     Plaintiff Martinez's Facts

115.     Plaintiff Martinez lives in Miami-Gardens, Florida, only 15 minutes away from the Hard Rock Stadium.

116.     Plaintiff Martinez hails from Columbia and is a life-time Columbian national team supporter.

117.     On May 17, 2024, Plaintiff Martinez purchased four tickets from Ticketmaster to the Copa America Final for $4,395.59. Plaintiff Martinez's tickets were located in Section 106, Row 14. A copy of the receipt showing Plaintiff Martinez's purchase is attached as **Exhibit 2**.

118.     In addition to the ticket costs, Plaintiff Martinez incurred travel costs in order to travel from his home to the Hard Rock Stadium.

119.     On July 14, 2024 at 6:00 p.m. Plaintiff Martinez and his family traveled to Hard Rock Stadium. When they arrived in the parking lot, Plaintiff Martinez was surprised to find that

no attendee was present requesting to see a copy of their tickets in order to enter the Hard Rock Stadium Grounds.

120.    The parking lot was covered in debris and broken glass.

121.    Defendants had allowed what appeared to be a complete free-for-all block party surrounding the stadium.

122.    At no point in their walk across the Hard Rock Stadium Grounds was Plaintiff Martinez asked for a copy of his ticket. Neither was anyone else.

123.    There were no barricades protecting the perimeter surrounding the entrances to the Hard Rock Stadium.

124.    Plaintiff Martinez arrived at the West entrance at 6:45 p.m., over an hour before the match was set to kick off at 8:00 p.m.

125.    When Plaintiff Martinez approached the entrance, he did not find Defendants scanning tickets or controlling the crowds of thousands that had gathered at the entrance. Instead he found the gates shut and locked. All of Defendants employees had locked themselves in the Hard Rock and refused to engage with those on the outside like Plaintiff Martinez and the Class.

126.    At approximately 7:30 p.m. frustrations boiled over and hundreds of unticketed fans rushed the West entrance where Plaintiff Martinez was waiting to be let in. Fearing for their safety, Plaintiff Martinez and his family held together as the unticketed fans overwhelmed Defendants' non-existent security and made their way into the stadium.

127.    Thereafter, the entrances were again locked and the ticketed fans, such as Plaintiff Martinez and the Class, were left outside the Hard Rock Stadium.

128.    At 9:00 pm, Plaintiff Martinez found a police officer, the first one that he had seen outside of the locked Hard Rock Stadium gates all night. Plaintiff Martinez asked if the officer

could allow them into the Hard Rock Stadium and the police officer responded that it would not be safe to enter the stadium and that unticketed fans would be in their seats already.

129.    Plaintiff Martinez returned home where he watched the final minutes of Columbia's loss to Argentina on television.

130.    As a direct result of Defendants' negligence, Plaintiff Martinez suffered damages including (1) the amount paid for the tickets in the amount of $4,395.59; (2) travel costs in the amount of $50; and (3) the damages due to missing the once in a life-time opportunity to witness this Copa America Final Match.

## XI.    Plaintiff Grande's Facts

131.    Plaintiff Daniel Grande is a life-time fan of football.

132.    Although Plaintiff Grande was not initially planning to attend the Copa America Final Match, on the morning of the game he had the opportunity to purchase last-minute tickets from a ticket broker. In total, Plaintiff Grande paid $9,000 for two tickets located in 72 Club, row 6, seats 5 and 6. In addition, Plaintiff Grande incurred travel related expenses and paid $750 to park at the stadium. A copy of Plaintiff Grande's tickets are attached as **Exhibit 3**.

133.    In order to redeem his tickets, Plaintiff Grande was forced to accept the tickets through his Ticketmaster account.

134.    Plaintiff Grande arrived at the Hard Rock Stadium Grounds and found that there was a 100-foot-tall screen set up for a large watch party in the parking lot. In addition, Plaintiff Grande saw food trucks, vendors selling alcohol, and unticketed people having large parties right next to the entrance.

135. Plaintiff Grande's tickets were inside of the 72 Club, which is premium seating. Typically, the 72 Club has its own entrance, but at the Copa America Final Match there were thousands of unticketed persons gathered in front of the 72 Club entrance.

136. Plaintiff Grande approached the Hard Rock Stadium entrance and found that the gates were locked and no persons were being permitted to enter the stadium.

137. When Plaintiff Grande finally saw a security guard come through the gate, he thought that Defendants were going to start to admit their paid invitees, like Plaintiff Grande and the Class. However, the security guard was removing her BEST-branded polo shirt and stated that she was quitting on the spot.

138. Around 9:45 p.m., Plaintiff Grande accepted that he was not ever going to be let into the Hard Rock Stadium to enjoy the game so he returned home. Plaintiff Grande watched the last moments of the game on his television.

139. As a direct result of Defendants' negligence, Plaintiff Grande suffered damages including (1) the amount paid for the tickets in the amount of $9,000; (2) travel and parking costs in the amount of $750; and (3) the damages due to missing the once in a life-time opportunity to witness this Copa America Final Match.

## XII.   Plaintiff Pou's Facts

140. Plaintiff Pou and his wife, who hails from Columbia, are life-time Columbian national team supporters.

141. When Plaintiff Pou learned that the Columbian team may make the Final Match, he sent money to his brother-in-law, Jaun Salazar in Columbia to acquire tickets to the game. Mr. Salazar's good friend had a connection with the Federation of Columbia Football to acquire tickets to the Final Match.

142.    Plaintiff Pou purchased five tickets to the Final Match. A copy of Pou's tickets are attached as **Exhibit 4**.

143.    In order to receive his tickets, Mr. Salazar simply took a screenshot of the tickets themselves and sent them to Plaintiff Pou.

144.    Plaintiff Pou possessed the right to attend the Final Match, but Plaintiff Pou has never been on the Ticketmaster website and has never agreed to Ticketmaster's terms and conditions.

145.    Plaintiff Pou lives near the Hard Rock Stadium. Plaintiff Pou and his guests from Columbia headed to the Hard Rock Stadium around 3:00 pm in three separate cars, each car having its own parking pass.

146.    When Plaintiff Pou arrived at his designated parking lot for which he had a pass, he was told that it was full and to try to find parking elsewhere.

147.    Shortly after 3:30 pm, Plaintiff Pou found a different parking lot that appeared to have spots. To Plaintiff Pou's shock and dismay, the gates were just opened. Plaintiff Pou did not see any security staff or personnel checking tickets or checking for parking passes. Plaintiff Pou and the two other cars with him parked without having their tickets or parking passes scanned.

148.    As Plaintiff Pou walked from his car towards the Hard Rock Stadium entrance, he saw vendors selling liquor and food, that appeared to have been home-made, out of coolers on the Hard Rock Stadium Grounds.

149.    Plaintiff Pou's tickets required him to walk to the Southwest entrance. At no point during his walk from the parking lot to the Hard Rock Stadium Entrance was Plaintiff Pou asked for a copy of his ticket.

150.    Around 3:45 pm, Plaintiff Pou witnessed the violence between unticketed fans, police officers, security, and ticketed fans. Plaintiff Pou was nearly attacked on two occasions, but managed to diffuse the situation and avoid violence for himself and his family.

151.    Between 4:00 and 5:00 pm, fans scaled the fences near the Southwest entrance and broke the locks that were on the gates. What followed was complete pandemonium, a stampede of unticketed fans rushed into the Hard Rock Stadium. Some time later, BEST and SFS' employees managed to shut the gate and chained it shut.

152.    Plaintiff Pou and his family waited at the Southwest entrance for over 2 hours without seeing any security staff other than those behind the locked gates.

153.     At 8:30 p.m. a security guard told Plaintiff Pou through the gates that he and his family would not be let in and if they wanted to see the game, they should go watch it on one of the big screens that had been set up on the Hard Rock Stadium Grounds.

154.    Plaintiff Pou and his family watched some of the Final Match in the parking lot with other ticketed families that had been excluded. Shortly before the end of the game, Plaintiff Pou and his family returned home.

155.    As a direct result of Defendants' negligence, Plaintiff Pou suffered damages including (1) the amount paid for the tickets in the amount of $1,900; (2) travel and parking costs in the amount of $100; and (3) the damages due to missing the once in a life-time opportunity to witness this Copa America Final Match.

**XIII.  Plaintiff Ziemek's Facts**

156.    Plaintiff Ziemek is a life time fan of football.

157. Plaintiff Ziemek and his brother, Alexander Ziemek, tried on three separate occasions to see Lionel Messi play. However, as a result of injury and time off, Messi did not end up playing in any of those three games.

158. Plaintiff Ziemek's father, Terry Ziemek, purchased three tickets on StubHub to the Copa America Final Match in hopes of taking his sons to see Messi in his final Copa America. One of those three tickets was gifted to Plaintiff Ziemek as his Christmas gift. The other was gifted to Alexander Ziemek. The three planned to attend the game together as a bonding experience.

159. The Final Match ticket that Plaintiff Ziemek received is an item of significant economic and sentimental value.

160. Plaintiff Ziemek possessed the right to attend the Final Match, but Plaintiff Ziemek has never been on the Ticketmaster website and has never agreed to Ticketmaster's terms and conditions.

161. Plaintiff Ziemek traveled from Colorado to Miami for the Final Match and incurred travel expenses.

162. Plaintiff Ziemek arrived at the Hard Rock Stadium Grounds 3 hours before the game started, around 5:00 p.m.

163. When Plaintiff Ziemek got out of the uber and walked onto the Hard Rock Stadium Grounds, no one scanned Plaintiff Ziemek's ticket; nor were there any security professionals maintaining a perimeter.

164. Plaintiff Ziemek discovered that there was a block-party taking place on the Hard Rock Stadium Grounds, complete with a massive screen and projector playing the game. Upon information and belief, Defendants set up or permitted this projector screen to be set up for the block party.

165.    Plaintiff Ziemek thought that he would be permitted to enter the stadium with his family and access the Hard Rock Stadium facilities. However, when he made his way to the southwest entrance, Plaintiff Ziemek found the gates locked.

166.    Alexander Ziemek had been having trouble dealing with the humidity and high temperatures in South Florida. After nearly two hours in the sun, Alexander Ziemek began to show signs of heat stroke. Plaintiff Ziemek desperately attempted to find a medical tent, but he could not locate any security professionals amidst the crowd of thousands.

167.    At the same time Plaintiff Ziemek was attempting to find a medical tent for his brother, he watched as hundreds of fans rushed the stadium entrance, climbed fences, and scaled buildings in order to gain entry to the Hard Rock Stadium.

168.    Plaintiff Ziemek finally found a medical tent where his brother was able to receive treatment and water.

169.    Plaintiff Ziemek and his family approached the southwest entrance again to attempt to make it into the stadium. Plaintiff Ziemek discovered the gates locked and the few employees on the other side of the gate were non-responsive.

170.    Due to the pushing, shoving, and violence near the entrances, Plaintiff Ziemek and his family retreated a few hundred yards from the entrance to get a better view of the Hard Rock Stadium.

171.    Shortly after 9:00 p.m., Plaintiff Ziemek and his family decided that they would not be let in and, even if they were let in, they would have been fearful for their life and safety, so they left. Plaintiff Ziemek and his family watched the final minutes of the Final Match at a bar across the street from the Hard Rock Stadium.

172.     Despite being right outside of the Hard Rock Stadium with a ticket, Plaintiff Ziemek has not achieved his lifelong dream of seeing Messi play in person and he likely never will.

173.     As a direct result of Defendants' negligence, Plaintiff Ziemek suffered damages including (1) the amount paid for the ticket in the amount of $1,650; (2) travel costs in the amount of $10; and (3) the damages due to missing the once in a life-time opportunity to witness this Copa America Final Match.

## CLASS ACTION ALLEGATIONS

174.     Plaintiffs brings this case on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). The proposed Class (the "Class") is defined as follows:

> All natural persons who had a ticket to the Copa America Final Match and were denied entrance to the Hard Rock Stadium.

175.     The class period is four (4) years before the date this Complaint is filed through the date the Court certifies the Class.

176.     Membership in the class can be determined from the electronic scanners used by the SFS and that register which tickets have been scanned in order to prevent fraud. The Class Members did not have their tickets scanned and Defendants records will reflect this, making the Class easily identifiable.

177.     Expressly excluded from the Class are:

(a)   Any Judge or Magistrate Judge presiding over this action and members of their immediate families;

(b)   Defendants and any entities in which Defendants have a controlling interest, or which has a controlling interest in Defendants and its legal representatives,

assigns and successors; and

(c)   All persons who properly execute and file a timely request for exclusion from the Class.

178.   Plaintiffs reserve the right to amend the Class definition at the Class Certification stage of the litigation if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

## Fed. R. Civ. P. 23(a) Criteria

179.   Numerosity. The exact number of Class Members is unknown as such information is in the exclusive control of Defendants. However, due to the nature of the trade and commerce involved, and the number of tickets sold by Defendants, Plaintiffs reasonably believe the Class consists of easily thousands of consumers making joinder of all Class Members impracticable.

180.   Commonality. Common questions of law and fact affect the rights of each Class Member, and common relief by way of damages is sought for Plaintiffs and Class Members. The harm that Defendants have caused by their negligent conduct is substantially uniform with respect to all Class Members. Defendants' negligent conduct in failing to orchestrate an appropriate security plan caused the fans to riot and the gates to eventually be locked which prevented entry into Hard Rock Stadium for Plaintiffs and all Class Members. Common questions of law and fact that affect Plaintiffs and the Class include, but are not limited to:

a.   Whether Plaintiffs and the Putative Class were business invitees of CONMEBOL, CONCACAF, SFS, CLS Properties, DC Properties, the Dolphins, and/or BEST;

b.   Whether CONMEBOL, CONCACAF, SFS, CLS Properties, DC Properties, the Dolphins, and/or BEST owed Plaintiffs and the Putative Class a duty of care;

c.      Whether it was foreseeable that large crowds would gather at the Hard Rock Stadium;

d.      Whether it was foreseeable that the failure to provide adequate security would result in paying fans, including Plaintiffs and the Putative Class not being permitted to enter the Hard Rock Stadium;

e.      Whether CONMEBOL breached its duty of care when it contracted with SFS to host the Copa America Final Match and when SFS failed to provide an adequate security plan;

f.      Whether CONCACAF breached its duty of care when it contracted with SFS to host the Copa America Final Match and when SFS failed to provide an adequate security plan;

g.      Whether DC Properties breached its duty of care when it contracted with SFS to provide it a security plan for the Copa America Final Match and when SFS failed to provide an adequate security plan;

h.      Whether CLS Properties breached its duty of care it when contracted with SFS to provide it a security plan for the Copa America Final Match and when SFS failed to provide an adequate security plan;

i.      Whether Dolphins breached its duty of care when it contracted with SFS to provide it a security plan for the Copa America Final Match and when SFS failed to provide an adequate security plan;

j.      Whether SFS, CLS Properties, DC Properties, the Dolphins, and/or BEST breached its duty of care when it permitted thousands of fans to enter the Hard Rock Stadium Grounds without providing proof of having a ticket;

k.  Whether SFS, together with its employees, and subcontractors, breached the standard of care when it negligently failed to provide adequate and reasonable security and manage the growing crowd to prevent the breach of its entrances;

l.  Whether CLS Properties, together with its employees, and subcontractors, breached the standard of care when it negligently failed to provide adequate and reasonable security and manage the growing crowd to prevent the breach of the Hard Rock Stadium entrances;

m.  Whether DC Properties, together with its employees, and subcontractors, breached the standard of care when it negligently failed to provide adequate and reasonable security and manage the growing crowd to prevent the breach of the Hard Rock Stadium entrances;

n.  Whether the Dolphins, together with its employees, and subcontractors, breached the standard of care when it negligently failed to provide adequate and reasonable security and manage the growing crowd to prevent the breach of the Hard Rock Stadiums entrances;

o.  Whether SFS, together with its employees, and subcontractors, breached the standard of care when it negligently opened the entrances to allow thousands of persons into the Hard Rock Stadium without tickets and prevented paying fans from entering;

p.  Whether SFS, together with its employees, and subcontractors, breached the standard of care when it negligently closed the entrances to the Hard Rock Stadium;

q.  Whether Defendants were unjustly enriched by generating tens of millions of dollars of revenue from Plaintiffs' and the Putative Class's purchase of tickets;

r.     Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class are entitled to damages, restitution, and/or other remedies to which Class and Subclasses Members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief.

s.     Whether Defendants owed a duty to Plaintiffs and Class Members to safeguard their ticketed seats;

t.     Whether Defendants owed a duty to provide reasonable and adequate security protocols for the Copa America Final Match;

u.     Whether Defendants denied ticketed fans like Plaintiffs and the Class Members entry to the Copa America Final Match;

v.     Whether the Defendants were negligent in failing to adequately secure the Hard Rock Stadium;

w.     Whether Defendants breached their duty to Plaintiffs and the Class;

x.     Whether Defendants failed to take reasonable and prudent security measures;

y.     Whether Defendants' security and safety protocols and systems prior to and during the Final Match were consistent with industry standards;

z.     Whether Defendants knew or should have known that its security protocols were deficient;

aa.    Whether Defendants' conduct, including its alleged failure to act, resulted in or was the proximate cause of the monetary harm suffered by Plaintiffs and the Class Members; and

bb.    Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or declaratory relief.

181.    In the alternative, Plaintiffs seek certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

182.    Typicality. The claims and defenses of Plaintiffs are typical of the claims and defenses of the Class because Defendants denied entry of ticketed fans into the Hard Rock Stadium, controlled the gates and seats, permitted unticketed fans to enter the Hard Rock Stadium and surrounding area, and Plaintiffs and the Class Members' tickets were compromised as a result of Defendants' actions or inaction. Plaintiffs sustained damages akin to damages sustained by Class Members arising out of and caused by Defendants' common course of conduct in violation of laws and standards as alleged herein.

183.    Adequacy of Representation. Plaintiffs will fairly and adequately assert and protect the interests of the Class. First, Plaintiffs have hired attorneys who are experienced in prosecuting class action claims within the State of Florida and across the United States, and who will adequately represent the interests of the Class. Second, Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action as their claims are the same as the Class Members they seek to represent. Further, Plaintiffs understand their obligations to the Class, are committed to vigorously litigating this matter, and will fairly and adequately protect and represent the interests of the Class.

### Rule 23(b)(3) Criteria

184.    The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. A class action provides a fair and efficient method for the adjudication of this controversy for these reasons and is superior to the alternative methods involved in individual litigation. The events that took place during the Final Match all occurred on one day and were all caused by the actions or inactions of Defendants. Common

questions predominate regarding the conduct that led up to the Final Match and after.

185.    Although the Class is numerous enough to meet the numerosity requirement, the proposed Class does not create manageability problems because the claims turn on common legal determinations. Either Defendants were negligent or they were not. Either Defendants collected money from Plaintiffs and the Class in exchange for Final Match tickets and then denied entry to the Hard Rock Stadium which resulted in Defendants' unjust enrichment or they did not. There are no unusual legal or factual issues that would create manageability problems as the issues turn on a single interpretation of Defendants' security measures, actions and/or inaction, and its standards and reasonableness of its conduct leading up to the Final Match in relation to others in similar instances.

186.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct.

187.    Despite the sizeable sum of money unlawfully collected and retained by the Defendants, the claims of the individual Class Members are, nevertheless, small in relation to the expenses of individual litigation, making a class action the only procedural method of redress in which Class Members can, as a practical matter, and recover their damages.

188.    Class Members are readily identifiable and ascertainable given the nature of Defendants' business practices and using its business records and ticket technology.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Class against SFS, DOLPHINS,**
**BEST, CONMEBOL, and CONCACAF)**

189.    Plaintiffs repeats and re-alleges the allegations set forth in paragraphs 1-188 as if

set forth fully herein.

190.    Defendants, SFS, Dolphins, BEST, CONMEBOL, and CONCACAF ("Count I Defendants") each owed Plaintiffs and the Class duties under Florida law.

191.    Plaintiffs and the Class were businesses invitees of the Defendants.

192.    SFS owned and/or had possession and control of the Hard Rock Stadium at all relevant times. As such, SFS owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which property owner is reasonably aware.

193.    The Dolphins leased and/or had possession and control of the Hard Rock Stadium at all relevant times. As such, the Dolphins owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which it was reasonably aware of.

194.    CONMEBOL entered a contract with SFS to host the Copa America Final Match at the Hard Rock Stadium. CONMEBOL had possession of and control over the Hard Rock Stadium at all relevant times during the Copa America Final Match. As such, CONMEBOL owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which it was reasonably aware.

195.    CONCACAF entered a contract with SFS to host the Copa America Final Match at the Hard Rock Stadium. CONCACAF had possession of and control over the Hard Rock Stadium at all relevant times during the Copa America Final Match. As such, CONCACAF owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which it was reasonably aware.

196.    BEST contracted with SFS with the approval of the Dolphins, CONCACAF, and

CONMEBOL to (1) develop a security plan for the Copa America Final Match; and (2) take possession of the Hard Rock Stadium during the Copa America Final Match for purposes of executing its security plan. As such, BEST owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which it was reasonably aware.

197.    Count I Defendants jointly and severally owed a duty to invitee Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, and protecting access to the Hard Rock Stadium and protecting their tickets and seating from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

198.    Defendants owed a duty to invitee Plaintiffs and Class Members to provide reasonable security, consistent with industry standards and requirements, and to ensure that its security and safety protocols, and the personnel responsible for them, adequately protected Plaintiffs' and Class Members' tickets and legal right to enter the Hard Rock Stadium and attend the Copa America Final Match.

199.    Count I Defendants also had a special relationship with Plaintiffs and each of the Class Members as ticketed invitees. That special relationship arose because Defendants were entrusted with their safety and security as a necessary part of the services rendered by Count I Defendants. That special relationship provides an additional basis on which Defendants owed a duty to invitee Plaintiffs and each of the Class Members to protect against unauthorized access to, theft of, and/or nullification of their tickets and seating and to protect their right to enter the Hard Rock Stadium and attend the Copa America Final Match.

200.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to design, maintain, train the staff, and test their safety and security systems and protocols to ensure that all

tickets and entry points in their possession or control were adequately secured and protected.

201.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to create and implement reasonable security practices and procedures to protect all ticketed persons in their possession or control, including ensuring that their tickets, seating, or access to the Hard Rock Stadium was not compromised.

202.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to implement and maintain security processes that would immediately detect a breach of their security systems in a timely manner.

203.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to act upon security warnings, prevent them, and/or alert them in a timely fashion of security failings.

204.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to disclose in timely fashion any security breach and security practices that were inadequate in any way to safeguard individuals' persons, tickets, and seating, including from theft from unticketed fans.

205.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to reliably plan and/or implement security standards to keep Plaintiffs and Class Members' safe from unticketed fans.

206.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to monitor fan behavior and activity to identify possible threats to the security and integrity of the Hard Rock Stadium prior to and during the Final Match.

207.    Count I Defendants owed a duty to invitee Plaintiffs and Class Members to promptly and adequately notify Plaintiffs and Class Members of the Breach, and a reasonably prudent company similarly situated would have postponed the event until a later date or time to ensure adequate security and safety of ticketed persons.

208.     Plaintiffs and the Class had tickets to attend the Copa America Final Match and arrived at the Hard Rock Stadium on July 14, 2024 as business invitees.

209.     Plaintiffs and Class Members entrusted Count I Defendants with the understanding that Defendants would permit them to enter the Hard Rock Stadium for the Final Match and that their tickets would be safeguarded.

210.     It was reasonably foreseeable to Count I Defendants that if thousands of unticketed fans were permitted to enter the Hard Rock Stadium Grounds, that harm may be caused to Plaintiffs and the Class, as evidenced by SFS' statement below:

> **Fans MUST have game tickets to enter the Hard Rock Stadium parking lots on match day.** There will be no watch parties outside the stadium or in the parking lots. Fans with tickets are encouraged to come early.

211.     It was reasonably foreseeable to Count I Defendants that Plaintiffs and the Class Members would suffer such harms in light of similar chaos experienced at other similar football events, such as the mayhem experienced at the semi-final match.

212.     Count I Defendants had full knowledge of the expense of the tickets and the types of harm that Plaintiffs and Class Members could and would suffer if their seats were stolen or if they prevented them from using the tickets or accessing the stadium.

213.     Plaintiffs and the Class Members were the foreseeable invitees and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in hosting an event of this magnitude and the critical importance of designing and implementing adequate security to protect Plaintiffs and the Class Members' tickets, seating, and person, and the necessity for safeguarding safe access to the Hard Rock Stadium.

214.     SFS breached its duties to Plaintiffs and the Class by failing to reasonably and adequately secure their premises and systems against unticketed fans.

215.    CONMEBOL breached its duties to Plaintiffs and the Class by failing to reasonably and adequately secure the premises and systems against unticketed fans.

216.    CONCACAF breached its duties to Plaintiffs and the Class by failing to reasonably and adequately secure the premises and systems against unticketed fans.

217.    The Dolphins breached its duties to Plaintiffs and the Class by failing to reasonably and adequately secure the premises and systems against unticketed fans.

218.    BEST breached its duties to Plaintiffs and the Class by failing to reasonably and adequately secure the premises and systems against unticketed fans.

219.    SFS breached its duties to Plaintiffs and the Class by opening the gates to the Hard Rock Stadium and permitting thousands of unticketed fans to enter.

220.    CONMEBOL breached its duties to Plaintiffs and the Class by opening the gates to the Hard Rock Stadium and permitting thousands of unticketed fans to enter.

221.    CONCACAF breached its duties to Plaintiffs and the Class by opening the gates to the Hard Rock Stadium and permitting thousands of unticketed fans to enter.

222.    The Dolphins breached its duties to Plaintiffs and the Class by opening the gates to the Hard Rock Stadium and permitting thousands of unticketed fans to enter.

223.    BEST breached its duties to Plaintiffs and the Class by opening the gates to the Hard Rock Stadium and permitting thousands of unticketed fans to enter.

224.    SFS breached its duties to Plaintiffs and the Class by failing to remove unticketed fans from the Hard Rock Stadium.

225.    CONMEBOL breached its duties to Plaintiffs and the Class by failing to remove unticketed fans from the Hard Rock Stadium.

226.    CONCACAF breached its duties to Plaintiffs and the Class by failing to remove

unticketed fans from the Hard Rock Stadium.

227.    The Dolphins breached its duties to Plaintiffs and the Class by failing to remove unticketed fans from the Hard Rock Stadium.

228.    BEST breached its duties to Plaintiffs and the Class by failing to remove unticketed fans from the Hard Rock Stadium.

229.    SFS breached its duties to Plaintiffs and the Class by refusing to admit Plaintiffs and the Class to the Copa America Final Match and locking them out of the Hard Rock Stadium.

230.    CONMEBOL breached its duties to Plaintiffs and the Class by refusing to admit Plaintiffs and the Class to the Copa America Final Match and locking them out of the Hard Rock Stadium.

231.    CONCACAF breached its duties to Plaintiffs and the Class by refusing to admit Plaintiffs and the Class to the Copa America Final Match and locking them out of the Hard Rock Stadium.

232.    The Dolphins breached its duties to Plaintiffs and the Class by refusing to admit Plaintiffs and the Class to the Copa America Final Match and locking them out of the Hard Rock Stadium.

233.    BEST breached its duties to Plaintiffs and the Class by refusing to admit Plaintiffs and the Class to the Copa America Final Match and locking them out of the Hard Rock Stadium.

234.    But for Count I Defendants' wrongful and negligent breaches of the duties owed to Plaintiffs and the Class Members, Plaintiffs and Class Members would have gained safe access to the Stadium to enjoy the Final Match that they paid to attend.

235.    There is a close causal connection between Count I Defendants' failure to implement security measures to protect Plaintiffs' and Class Members' tickets and the harm

suffered by Plaintiffs and the Class Members.

236.    As a direct and proximate result of Count I Defendants' negligence, Plaintiffs and the Class Members have suffered injury including (1) the cost paid for tickets that could not be used because the actions and/or inactions of Count I Defendants prohibited their use and utility for access to the Copa America Final Match; and (2) the value of their tickets, travel accommodations, and other forms of monetary damages connected to attending the Final Match.

237.    Plaintiffs and Class Members are entitled to actual and liquidated damages suffered as a result of the Count I Defendants' breach of their duty.

238.    Count I Defendants' negligent conduct is ongoing, in that Plaintiffs' and Class Members' have never been fully compensated for the cost of their tickets, parking, travel, and interest.

**COUNT II**
**Negligence**
**(On Behalf of Plaintiffs and the Class against SFS,**
**CLS Properties, DC Properties and BEST)**

239.    Plaintiffs repeats and re-alleges the allegations set forth in paragraphs 1-188, as if set forth fully herein.

240.    Defendants, SFS, CLS Properties, DC Properties and BEST ("Count II Defendants") each owed Plaintiffs and the Class duties under Florida law.

241.    Plaintiffs and the Class were business invitees of the Defendants.

242.    SFS owned and/or had possession and control of one or more parking lots on the Hard Rock Stadium Grounds at all relevant times. As such, SFS owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which the SFS was reasonably aware. SFS also had management and supervisory control over all parking lots on the Hard Rock Stadium Grounds, thus extending its duties to all parking lots.

243.   CLS Properties owned and/or had possession and control of one or more parking lots on the Hard Rock Stadium Grounds at all relevant times. As such, CLS Properties owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which the CLS Properties was reasonably aware.

244.   DC Properties owned and/or had possession and control of one or more parking lots on the Hard Rock Stadium Grounds at all relevant times. As such, DC Properties owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which the DC Properties was reasonably aware.

245.   BEST contracted with SFS with the approval of the CLS Properties and DC Propertioes to (1) develop a security plan for parking during the Copa America Final Match; and (2) take possession of the Hard Rock Stadium Grounds during the Copa America Final Match for purposes of executing its security plan. As such, BEST owed Plaintiffs and the Class the duty to maintain the premises in a safe condition and to protect from dangerous conditions of which it was reasonably aware.

246.   Count II Defendants jointly and severally owed a duty to invitee Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, and protecting access to the Hard Rock Stadium grounds and protecting their tickets and seating from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

247.   Count II Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, consistent with industry standards and requirements, and to ensure that its security and safety protocols, and the personnel responsible for them, adequately protected Plaintiffs' and Class Members' tickets and legal right to enter the Hard Rock Stadium and attend the Copa America Final Match game.

248.     Count II Defendants also had a special relationship with Plaintiffs and each of the Class Members as ticketed invitees. That special relationship arose because Defendants were entrusted with their safety and security as a necessary part of the services rendered by Count II Defendants. That special relationship provides an additional basis on which Count II Defendants owed a duty to invitee Plaintiffs and each of the Class Members to protect against unauthorized access to, theft of, and/or nullification of their tickets and seating and to protect their right to enter the Hard Rock Stadium and attend the Copa America Final Match game.

249.     Count II Defendants owed a duty to invitee Plaintiffs and Class Members to design, train the staff, maintain, and test their safety and security systems and protocols to ensure that all tickets and entry points in their possession or control were adequately secured and protected.

250.     Count II Defendants owed a duty to Plaintiffs and Class Members to create and implement reasonable security practices and procedures to protect all ticketed persons in their possession or control, including ensuring that access to their respective parking lots were not compromised by unticketed fans.

251.     Count II Defendants owed a duty to Plaintiffs and Class Members to implement and maintain security processes that would immediately detect a breach of their security systems in a timely manner.

252.     Count II Defendants owed a duty to Plaintiffs and Class Members to act upon security warnings, prevent them, and/or alert them in a timely fashion of security failings.

253.     Count II Defendants owed a duty to Plaintiffs and Class Members to disclose in timely fashion any security breach and security practices that were inadequate in any way to safeguard individuals' persons, tickets, and seating, including from theft from unticketed fans.

254.     Count II Defendants owed a duty to Plaintiffs and Class Members to reliably plan

and/or implement security standards to keep Plaintiffs and Class Members' safe from unticketed fans.

255.     Count II Defendants owed a duty to Plaintiffs and Class Members to monitor fan behavior and activity to identify possible threats to the security and integrity of the Hard Rock Stadium prior to and during the Final Match.

256.     Count II Defendants owed a duty to Plaintiffs and Class Members to promptly and adequately notify Plaintiffs and Class Members of the Breach, and a reasonably prudent company similarly situated would have postponed the event until a later date or time to ensure adequate security and safety of ticketed persons.

257.     Plaintiffs and the Class had tickets to attend the Copa America Final Match and arrived at the Hard Rock Stadium on July 14, 2024 as business invitees.

258.     Plaintiffs and Class Members entrusted Count II Defendants with the understanding that Defendants would permit them to enter the Hard Rock Stadium Grounds for the Final Match and that their tickets would be safeguarded.

259.     It was reasonably foreseeable to Count II Defendants that if thousands of unticketed fans were permitted to enter the Hard Rock Stadium Grounds, that harm may be caused to Plaintiffs and the Class, as evidenced by SFS' statement below:

> **Fans MUST have game tickets to enter the Hard Rock Stadium parking lots on match day.** There will be no watch parties outside the stadium or in the parking lots. Fans with tickets are encouraged to come early.

260.     It was reasonably foreseeable to Count II Defendants that if they failed to check the tickets of persons entering their respective parking lots by car that thousands unticketed fans would have access to the hard Rock Stadium Grounds and ultimately the Hard Rock Stadium.

261.     It was reasonably foreseeable to Count II Defendants that if they failed to check the

tickets of persons entering their respective parking lots on foot that thousands unticketed fans would have access to the hard Rock Stadium Grounds and ultimately the Hard Rock Stadium.

262.    Count II Defendants collected additional payments from Plaintiff Grande and Plaintiff Pou and many Class Members' in exchange for parking fees and safe access to the Hard Rock Stadium.

263.    Plaintiffs and the Class Members were the foreseeable invitees and probable victims of any inadequate security practices and procedures. Count II Defendants knew or should have known of the inherent risks in hosting an event of this magnitude and the critical importance of designing and implementing adequate security to protect Plaintiffs and the Class Members' tickets, seating, and person, and the necessity for safeguarding safe access to the Hard Rock Stadium Grounds.

264.    SFS breached its duties to invitee Plaintiffs and the Class by failing to reasonably and adequately secure the Hard Rock Stadium Grounds against unticketed fans.

265.    CLS Properties breached its duties to invitee Plaintiffs and the Class by failing to reasonably and adequately secure its portion of the Hard Rock Stadium Grounds against unticketed fans.

266.    DC Properties breached its duties to invitee Plaintiffs and the Class by failing to reasonably and adequately secure its portion of the Hard Rock Stadium Grounds against unticketed fans.

267.    BEST breached its duties to invitee Plaintiffs and the Class by failing to reasonably and adequately secure the Hard Rock Stadium Grounds against unticketed fans.

268.    SFS breached its duties to invitee Plaintiffs and the Class by opening the gates of the Hard Rock Stadium Grounds and allowing unticketed fans to park in and around the Hard Rock

Stadium.

269.    CLS Properties breached its duties to invitee Plaintiffs and the Class by opening the gates of its portion of the Hard Rock Stadium Grounds and allowing unticketed fans to park in and around the Hard Rock Stadium.

270.    DC Properties breached its duties to invitee Plaintiffs and the Class by opening the gates of its portion of the Hard Rock Stadium Grounds and allowing unticketed fans to park in and around the Hard Rock Stadium.

271.    BEST breached its duties to invitee Plaintiffs and the Class by opening the gates of the Hard Rock Stadium Grounds and allowing unticketed fans to park in and around the Hard Rock Stadium.

272.    SFS breached its duties to invitee Plaintiffs and the Class by failing to remove unticketed fans from the parking lots on the Hard Rock Stadium Grounds.

273.    CLS Properties breached its duties to invitee Plaintiffs and the Class by failing to remove unticketed fans from its parking lots on the Hard Rock Stadium Grounds.

274.    DC Properties breached its duties to invitee Plaintiffs and the Class by failing to remove unticketed fans from its parking lots on the Hard Rock Stadium Grounds.

275.    BEST Properties breached its duties to invitee Plaintiffs and the Class by failing to remove unticketed fans from the parking lots on the Hard Rock Stadium Grounds.

276.    But for Count II Defendants' wrongful and negligent breaches of the duties owed to Plaintiffs and the Class Members, Plaintiffs and Class Members would have gained safe access to the Hard Rock Stadium to enjoy the Final Match.

277.    It was reasonably foreseeable to Count II Defendants that Plaintiffs and the Class Members would suffer such harms in light of similar chaos experienced at other similar football

events, such as the mayhem experienced at the semi-final match.

278.    Plaintiffs and the Class Members were the foreseeable invitees and probable victims of any inadequate security practices and procedures at the parking lots surrounding Hard Rock Stadium. Count II Defendants knew or should have known of the critical importance of providing adequate security at each of the parking lots to protect Plaintiffs and the Class Members' tickets, seating, and person.

279.    There is a close causal connection between Count II Defendants' failure to implement security measures to protect Plaintiffs' and Class Members' tickets and the harm suffered by Plaintiffs and the Class Members.

280.    Count II Defendants failed to perform these duties by failing to reasonably and adequately secure their premises and systems against unticketed fans.

281.    As a direct and proximate result of Count II Defendants' negligence, Plaintiffs and the Class Members have suffered injury including 1) the cost paid for tickets that could not be used because the actions and/or inactions of Count II Defendants prohibited their use and utility for access to the Copa America Final Match; and 2) the value of their tickets, travel accommodations, and other forms of monetary damages connected to attending the Final Match.

282.    Plaintiffs and Class Members are entitled to actual and liquidated damages suffered as a result of the Count II Defendants' breach of their duty.

283.    Count II Defendants' negligent conduct is ongoing, in that Plaintiffs' and Class Members' have never been fully compensated for the cost of their tickets, parking, travel, and interest.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiffs Nobel, Martinez, Grande,**
**Pou and the Class against all Defendants)**

284.    Plaintiffs Nobel, Martinez, Grande, and Pou ("Count III Plaintiffs") re-allege and re-incorporate paragraphs 1-155 and 174-188 as if fully set forth herein.

285.    Count III Plaintiffs and Class Members conferred a monetary benefit on Defendants in connection with obtaining their products and services, specifically providing payment to Defendants. In exchange, Count III Plaintiffs and Class Members should have received from Defendants services or products that were the subject of the transaction and should have had their Final Match tickets protected with adequate security.

286.    Defendants knew that Count III Plaintiffs and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining their money for tickets and parking.

287.    Defendants profited from Count III Plaintiffs' and Class Members' money paid in exchange for Final Match tickets and, for some, parking.

288.    Defendants failed to take action and update their security systems and protocols to secure Count III Plaintiffs' and Class Members' tickets, seating, and entry into the Hard Rock Stadium and, therefore, did not fully compensate Count III Plaintiffs or Class Members for the value that their tickets provided when Defendants denied them entry into the Final Match.

289.    Defendants acquired Count III Plaintiffs' and Class Members' money through inequitable means as they failed to disclose the inadequate security practices previously alleged.

290.    Had Count III Plaintiffs and Class Members known that Defendants would not use adequate security practices, procedures, and protocols to adequately monitor, supervise, and secure

their premises, or properly train their employees or third parties in charge of providing security, they would not have given their money to Defendants to attend the Final Match.

291.     Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Count III Plaintiffs and Class Members conferred upon them.

292.     As a direct and proximate result of Defendants' conduct, Count III Plaintiffs and the Class Members have suffered an injury.

293.     Count III Plaintiffs and Class Members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging profits, benefits, and other compensation obtained by Defendants as a result of their wrongful conduct, as well as the return of Count III Plaintiffs' and the Class Members' money related to ticket purchases, interest and related travel costs.

294.     This can be accomplished by establishing a constructive trust from which the Count III Plaintiffs and Class Members may seek restitution or compensation.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and in favor of the Class, and against Defendants for:

a.  an order certifying this case to proceed as a class action, designating Plaintiffs as the Class representative, and designating the undersigned attorneys as Class Counsel;

b.  actual damages;

c.  interest;

d.  liquidated damages related to travel expenses;

e.  alternatively, disgorgement of Defendants' profits; and

    f.  such further relief as this Court may deem appropriate.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 23, 2024       Respectfully submitted,

**VARNELL & WARWICK, P.A.**

/s/ Jeffrey L. Newsome
Jeffrey L. Newsome; FBN: 1018667
Janet R. Varnell; FBN: 0071072
Brian W. Warwick; FBN: 0605573
Christopher J. Brochu; FBN: 1013897
Pamela G. Levinson, FBN: 538345
400 N Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jnewsome@vandwlaw.com
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
cbrochu@vandwlaw.com
plevinson@vandwlaw.com
ckoerner@vandwlaw.com

*Attorneys for Plaintiffs and the Proposed Class*