## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-22751-BLOOM/Elfenbein

**DAS NOBEL**,
*Individually and on behalf of all others similarly situated*,

      Plaintiff,

v.

**SOUTH FLORIDA STADIUM LLC**, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court upon Plaintiff Das Nobel's ("Nobel") Motion for Protective Order Limiting Communications with Putative Class Members (the "Motion"), ECF No. [10]. Defendant South Florida Stadium LLC ("Defendant") filed a Response in Opposition to the Motion (the "Response"), ECF No. [20], to which Plaintiff filed a Reply (the "Reply"), ECF No. [30], and to which Defendant filed a Surreply (the "Surreply"), ECF No. [33-1]. The Honorable Beth Bloom referred the Motion to the Undersigned for a report and recommendation. *See* ECF No. [38]. Having considered the Parties' filings and the relevant law, the Undersigned respectfully recommends that the Motion be **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

On July 19, 2024, Nobel filed the instant class-action lawsuit on behalf of himself and others similarly situated against Defendants (1) South Florida Stadium LLC, (2) the Miami Dolphins Ltd., (3) County Line South Properties, LLC, (4) Dolphin Center Properties, LLC, (5) Confederacion Sudamericana De Futbol, (5) Confederation of North, Central America and

Caribbean Association Footbal, and (6) BEST Crowd Management, Incorporated[1] for their alleged acts and omissions that led to his and others' inability to attend the Copa America Final soccer match on July 14, 2024 (the "Final Match") between Argentina and Colombia.  *See* ECF No. [83] at ¶ 1.  Nobel and the putative class members "paid thousands of dollars for tickets and travel accommodations to attend the Final Match" on July 14, 2024.[2]  *Id.* at ¶¶ 2, 4.  "As a direct result of Defendants' failures to implement appropriate security and safety measures and the decision to open the gates to unticketed fans that invaded the Hard Rock Stadium, Defendants permitted unticketed fans to steal the seats paid for by" Nobel and the putative class members.  *Id.* at ¶ 6. Nobel and the putative class "seek redress by way of a full refund of their ticket purchases, plus interest, and damages incurred as a result of their corresponding travel expenses." *Id.* at 7.

Many of the putative class members purchased tickets to the Final Match through Ticketmaster ("Primary Market Purchasers"), "which served as [Defendant]'s ticketing agent for all tickets for the Final Match."  ECF No. [20] at 7.  Nobel and other putative class members purchased their tickets for the Final Match on the secondary market from Primary Market Purchasers, who sought to resell their tickets.  *See id.* at 7 n. 2; *see also* ECF No. [10] at 12 ("Plaintiff Nobel paid $9,948.86 for 4 tickets through ticket reseller SeatGeek.").

On August 5, 2024, Defendant "sent an email (the 'August 5 Email') to fewer than 150 Primary Market Purchasers who had requested a refund from Ticketmaster or [Defendant] and whose tickets to the Final Match had not been scanned." ECF No. [20] at 10 (footnote call numbers omitted).  The August 5 Email stated the following in pertinent part:

---

[1] The Court hereinafter refers to BEST Crowd Management, Incorporated as Defendant BEST Security.

[2] It is well-settled law in this Circuit that courts "must accept as true all factual allegations in [a] complaint[.]" *Bailey v. Wheeler*, 843 F.3d 473, 478 n.3 (11th Cir. 2016).  With that context, the Court lays out the facts without repeating the "Nobel alleges" lead-in language.

You are receiving this email because you requested a refund of your tickets to the CONMEBOL Copa America USA 2024 Final Match on July 14, 2024 (the "Event").

This refund offer is being made consistent with the spirit and purpose of the Informal Dispute Resolution provision included in Ticketmaster's Terms of Use, which you agreed to when purchasing your tickets to the Event. In making this offer, we reserve all rights under the applicable terms and conditions that you agreed to when purchasing your tickets to the Event, including but not limited to Ticketmaster's Terms of Use.

If you choose to obtain a refund for your purchase of tickets on the primary market (i.e., the face value of the ticket) through this process, you will be asked to submit a declaration under penalty of perjury and you will be asked to release and waive any claims that you may have arising out of or relating in any way to claims for a refund, payment, or other compensation for or in connection with the costs and expenses of the Tickets and the costs and expenses of traveling to and/or attending the Event (the "Released Claims").

A Declaration and Release of Claims form has been sent to you in a separate email from Adobe Sign via Adobe Acrobat Sign echosign@echosign.com. In order to continue with this refund process, please carefully review the entire release included in the Declaration and Release of Claims form, complete, electronically sign and submit it within 45 calendar days.

If you sign the release and submit the Declaration and Release of Claims form, you will not be able to pursue any claims, demands, causes of action, damages, or rights to compensation against us, including the claims at issue in any putative class actions.

Take your time to make sure you fully understand the terms to which you are agreeing and if you wish, consult with a lawyer of your choice before signing the Declaration and Release of Claims form.

Click here[3] for a link to frequently asked questions about the refund process. . . .

You should know that putative class action lawsuits have been filed concerning the CONMEBOL Copa America USA 2024 Final Match.

Copies of the putative class action lawsuits that have been filed as of August 5, 2024 are available to you by simply clicking on the links below. Should you wish to contact counsel who filed these lawsuits, their contact information is provided at

---

[3]   The hyperlink embedded in the email brings the recipient to the following address: https://www.hardrockstadium.com/copa-refund-process/?msdynttrid=tkfopIsDddRdKYYhJTj9ChTSLpsqQkvAnLKkB7WmExY.

the end of the complaints. There may also be additional putative class action lawsuits that were filed after August 5, 2024.

- Garn v. South Florida Stadium, LLC et al.[4]
- Manco v. South Florida Stadium, LLC.[5]
- Martinez et al. v. South Florida Stadium, LLC.[6]
- Pou v. CONMEBOL et al.[7]
- Valdarrama et al. c. CONMEBOL et al.[8]
- Nobel v. South Florida Stadium, LLC et al.[9]

ECF No. [10] at 8-9.

After Nobel filed the Motion, Defendant sent an email on August 30, 2024 (the "August 30 Email"), addressed to putative class members who purchased their tickets on the secondary market through Ticketmaster's resale platform, TM+.  *See* ECF No. [30-1] at 2-4.  The August 30 Email is identical to the August 5 Email, except as italicized below:

*If you choose to obtain a refund of the amount you paid for your purchase of tickets*

---

[4]   The hyperlink embedded in the email brings the recipient to the following address: https://www.hardrockstadium.com/wp-content/uploads/2024/07/2024-013999-CA-01-Garn-v-South-Florida-Stadium-LLC-et-al-Complaint.pdf?msdynttrid=OMW_H7sJC65Cicb4D_9hKNlxCCyBrbanjnFnhEB6nKg.

[5]   The hyperlink embedded in the email brings the recipient to the following address: https://www.hardrockstadium.com/wp-content/uploads/2024/07/2024-013421-CA-01-Manco-v.-South-Florida-Stadium-LLC-et-al-Complaint.pdf?msdynttrid=3l20g-BbvgxOfJp3J84G0OiTvp74kiuzOA_el7v0rkE.

[6]   The hyperlink embedded in the email brings the recipient to the following address: https://www.hardrockstadium.com/wp-content/uploads/2024/07/2024-013325-CA-01-Martinez-formerly-Pintos-v.-South-Florida-Stadium-LLC-et-al-First-Amended-Complaint.pdf?msdynttrid=ASjKzBgXAR9mA1ad1M9n95FV_Fo2yvoQxoeCzJcdAjg.

[7]   The hyperlink embedded in the email brings the recipient to the following address: https://www.hardrockstadium.com/wp-content/uploads/2024/07/24-cv-22828-Pou-v-Conmebol-et-al-Complaint.pdf?msdynttrid=VSSjPMrWAopXW8cjW3w4p6dCy8hUvBZlTVWviOdWMKw.

[8] The hyperlink embedded in the email brings the recipient to the following address: https://www.hardrockstadium.com/wp-content/uploads/2024/07/24-cv-22772-Valderrama-v.-South-Florida-Stadium-LLC-et-al-Class-Action-Complaint.pdf?msdynttrid=tppiMMiaGVg7Jr-az0XhKz2Cj5Sq2oT5adKiIUM6Rwc.

[9] The hyperlink embedded in the email brings the recipient to a copy of the Complaint that is available at ECF No. [1].

to the Event on Ticketmaster's re-sale platform (TM+) through this process, you will be asked to submit a declaration under penalty of perjury and you will be asked to release and waive any claims . . . .

Copies of the putative class action lawsuits that have been filed as of *August 30, 2024* are available to you by simply clicking on the links below. Should you wish to contact counsel who filed these lawsuits, their contact information is provided at the end of the complaints. There may also be additional putative class action lawsuits that were filed after *August 30, 2024*.

- Garn v. South Florida Stadium, LLC et al.
- Manco v. South Florida Stadium, LLC.
- Martinez et al. v. South Florida Stadium, LLC.
- Pou v. CONMEBOL et al.
- Valdarrama et al. c. CONMEBOL et al.
- Nobel v. South Florida Stadium, LLC et al.

*Id.* at 2, 4 (emphasis added).  Defendant sent the August 30 Email to 913 putative class members.

*See id.* at 3 n.2.

Eligible putative class members who accepted Defendant's settlement offer agreed to the

following release (the "Release Language"):

I acknowledge and agree that the refund of the face value of the Tickets constitutes full, final and adequate consideration for the Released Claims (as defined below). I understand and acknowledge that by signing and submitting this Declaration and Release of Claims and receiving the requested refund of the face value of the Tickets that were not scanned for entry to the Event, I, on behalf of myself and the Related Persons (collectively, the "Releasors"), am hereby agreeing to immediately, irrevocably, unconditionally, fully and finally, without further word, deed, action, execution, or documentation, release and waive any and all past, present, and future claims, demands, actions, causes of action, rights of action, controversies, damages, penalties, interest, fees, expenses, judgments, payments, losses, debts, contracts, promises, agreements, duties, obligations, costs, remedies, reckonings, responsibilities, liabilities, suits and proceedings of any nature whatsoever, direct or indirect, vested or contingent, known or unknown, suspected or unsuspected, in contract, tort, law, equity, or otherwise, and regardless of legal theory, under the laws of any jurisdiction, that the Releasors ever had, now have, or hereafter can, shall, or may have, against South Florida Stadium LLC, Miami Dolphins, Ltd., Concacaf, LLC, The South American Football Confederation ("CONMEBOL"), Ticketmaster, L.L.C., and any and all of, their past, present, and future representatives, predecessors, successors, present and former subsidiaries, parents, affiliates, agents, officers, directors, members, employees, representatives, insurers, contractors, shareholders, investors, attorneys, lenders, reinsurers,

servants, shareholders, partners, investors, divisions, joint ventures, licensees, franchisees, advisors, administrators, heirs, executors, beneficiaries, estates, or assigns (collectively, the "Releasees") arising out of or relating in any way to claims for a refund, payment, or other compensation for or in connection with the costs and expenses of the Tickets and the costs and expenses of traveling to and/or attending the Event (the "Released Claims").

ECF No. [20-4] at 2-3.

In the Motion, Nobel seeks to limit communications between Defendant and the putative class because the August 5 Email contains several issues, making it, as he claims, abusively misleading and coercive. *See* ECF No. [10] at 9. First, Nobel argues that the invocation of Ticketmaster's Terms of Use in the August 5 Email could reasonably lead consumers to believe they are obligated to comply with the refund process detailed in the Email. *See id.* Second, Nobel claims that requiring a "putative Class Member [to] list all other 'Related Persons' that the Responding Putative Class Member may have purchased tickets for so that they can be included in the Release" is deceptive and does not release the claims of the related persons. *See id.* at 10. Third, Nobel asserts that the Release Language is misleading and coercive because Defendant failed to specifically identify Defendant BEST Security by name in the release. *See id.* at 11. Fourth, Nobel suggests that, by informing certain Primary Market Purchasers of the six pending class-action lawsuits concerning the events of July 14, 2024, Defendant rendered the August 5 Email misleading because Defendant failed to explain the technical requirements for joining a class action and what relief is potentially available through them. *See id.* at 13-14. Fifth, Nobel adds a line stating, "[t]he fact that such offers are written only in English, (despite teams from Columbia [sic] and Argentina competing in the Final Match), only adds to the potential for confusion and abuse." *Id.* at 18. Finally, Nobel posits that the Release Language is improper because it fails to define the phrase "face value" but conditions the release on Primary Market Purchasers' agreement to a refund of their ticket's "face value." *See id.* at 11. In furtherance of

6

the Motion, Nobel seeks an evidentiary hearing but does not explain why such a hearing is necessary. *See id.* at 2.

Defendant argues, in response, that their communications with putative class members have been entirely proper.  In support of this position, Defendant asserts that the August 5 Email:

> (i) openly disclosed the existence of the pending class actions, including this one, (ii) advised Primary Market Purchasers that they would be giving up their claims in this lawsuit and others by accepting the refund, (iii) provided links to copies of the complaints in this case and the other pending putative class action lawsuits, (iv) informed Primary Market Purchasers how they could contact Plaintiff's counsel and the other attorneys of record who filed the five other pending putative class actions, (v) cautioned Primary Market Purchasers that they should take time to make sure "you fully understand the terms to which you are agreeing and if you wish, consult with a lawyer of your choice," and (vi) provided an ample 45-day period for Primary Market Purchasers to consider the offers.

ECF No. [20] at 13 (citation omitted). Additionally, Defendant raises a passing argument that Nobel lacks standing to file the instant Motion because he purchased his ticket on the secondary market, and Defendant addressed the August 5 Email only to Primary Market Purchasers.

Those two arguments aside, Defendant responds to several of the arguments Nobel advanced in support of the Motion.  First, Defendant argues that its reference to Ticketmaster's Terms of Use is neither misleading nor coercive because all Primary Market Purchasers agreed to the Terms, and Defendant has the right to enforce the Terms under the law of third-party beneficiary, agency, and estoppel. *See id.*  at 15-16.  Second, Defendant argues that requiring Primary Market Purchasers requesting a refund to list Related Persons is not improper because the Release Language expressly states why Defendant is making that request and exists to ensure that Defendant does not issue multiple refunds for the same ticket. *See id.* at 19.  Third, Defendant argues that the Release Language stating that "any and all of, [Defendant's] . . . agents, . . . representatives, . . . [or] contractors that arise out of or relate to claims for a refund, payment, or other compensation for or in connection with the costs and expenses of the Tickets and other costs

and expenses of traveling to and/or attending the [Final Match]" is broad enough to include Defendant BEST Security.  *Id.* (quotation omitted).  Fourth, Defendant cites several cases to support its position that it is not obligated to provide summaries of or legal advice concerning the several pending class actions listed in the August 5 Email.  *See id.* at 19-21.  Lastly, Defendant argues that the phrase "face value" is commonly understood to mean the amount paid for an item. *See id.* at 17-18.

In his Reply, Nobel asserts that Defendant misled the Court when it stated it only communicated settlement offers to 150 putative class members who purchased their tickets on the primary market because Defendant sent the August 30 Email to putative class members who purchased their tickets on the secondary market.  *See* ECF No. [30] at 2.  Nobel then reargues his position that Defendant's failure to define the phrase "face value" in the August 5 Email or provide legal summaries of the pending class actions listed in the August 5 and August 30 Emails renders the communications abusive.  *See id.* at 5-8.  Moreover, Nobel again voices his concerns relating to the requirement for putative class members seeking a refund to list related persons in order to get their refund, likening it to "virtual representation for claim preclusion[.]"  *See id.* at 8-10 (quotation marks omitted).  Nobel claims that "this extended release is just a litigation tactic to solicit more releases and class action waivers based on an already misleading communication." *Id.* at 8.

Defendant then filed its Surreply, rejecting Nobel's accusation that Defendant misled to the Court.  *See* ECF No. [33-1] at 3-5.  Defendant argues that nothing in its Response indicated to either Nobel or the Court that it would stop communicating settlement offers to members of the putative class, nor did it render its statements concerning the August 5 Email untrue.  *See id.* Defendant then challenges Nobel's claim that requiring putative class members to list "Related

Persons" can be likened to virtual representation on the grounds that (1) Nobel raised this argument for the first time in his Reply, thus waiving it, and (2) the case Nobel cites to support this claim is factually dissimilar and involved an entirely different legal issue. *See id.* at 5-6.

   With the Motion being fully briefed, this matter is now ripe for review.

## II.   LEGAL STANDARDS

   "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).  This broad discretion includes prohibiting communications between parties and putative class members.  *See Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1226 (S.D. Ala. 2008).  However, the court's discretion is not unlimited, and a two-pronged test must be met before the court can restrict such communications.  *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 561 (S.D. Fla. 2008).  "First, a communication must have occurred or be threatened to occur.  Next, the form of communication at issue must be abusive in that it threatens the proper functioning of the litigation."  *Id.* (internal citations and quotations omitted).  "Abusive" communications include "misleading communications to class members regarding the litigation, communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from litigation, and communications that undermine cooperation with or confidence in class counsel."  *Id.*

   Even if the two prongs of this test are met, "limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."  *Gulf Oil*, 452 U.S. at 101.  Thus, any order that restricts communications between parties and

potential class members "must be carefully drawn so that it interferes with free speech as little as possible." *Jones*, 250 F.R.D. at 561 (citing *Gulf Oil*, 452 U.S. at 102).

## III.   DISCUSSION

### A.   <u>Standing</u>

The Court begins its discussion with Defendant's standing argument.  In the Response, Defendant claims that "[i]t is [] not at all clear that as a Secondary Market Purchaser, [Nobel] has standing to seek relief for Primary Market Purchasers (as he otherwise purports to do in the instant motion)[.]"  ECF No. [20] at 11.  To support this claim, Defendant cites Rule 23 of the Federal Rules of Civil Procedure and *TransUnion v. Ramirez*, 594 U.S. 413 (2021), but does not explain how the cited authority supports its position.  *See* ECF No. [20] at 11.  "[A]rguments not supported and properly developed are deemed waived."  *Beres v. Daily Journal Corp.*, 22-CV-60123, 2022 WL 805733, at *6 n.6 (S.D. Fla. Mar. 8, 2022) (citations omitted).  Because Defendant made no effort to fully develop this argument, the Court will not waste precious judicial resources scouring pages of case law to determine whether this argument is meritorious and will instead focus its efforts on those issues that were substantively developed.  *See Hardin v. Cruz*, No. 17-CV-1299-, 2020 WL 13827624, at *4 (M.D. Fla. Oct. 16, 2020) ("The Court will not waste any further precious judicial resources on motions that . . . are not properly-supported.").

### B.   <u>References to Ticketmaster's Terms of Use</u>

The Court next turns to Nobel's arguments that purportedly warrant the issuance of a protective order.  First, Defendant's mere reference to Ticketmaster's Terms of Use does not render the August 5 or August 30 Emails misleading or coercive.  Specifically, Nobel takes issue with the portion of the August 5 and August 30 Emails that state the "refund offer is being made consistent with the spirit and purpose of the Informal Dispute Resolution provision included in

Ticketmaster's Terms of Use . . . ."  ECF No. [10] at 8; ECF No. [30-1] at 2.  It appears to the Court that, in making this statement, Defendant is merely stating its reason for offering the refund, and not attempting to trick the eligible putative class members into accepting the refund. Defendant's intention becomes all the clearer when one reads Ticketmaster's Terms of Use, which specifically acknowledge that attempts at informal dispute resolutions may be unsuccessful; this acknowledgment was sufficient to indicate to the eligible putative class members that they were not obligated to agree to the refund Defendant was offering them.  *See* ECF No. [20-1] at 17 ("If, after participating in that conference, you and we have been unable to resolve the dispute, the claimant may commence an arbitration or assert a claim in small claims court in accordance with this arbitration agreement.").

And even if there were eligible putative class members who did not refer back to Ticketmaster's Terms of Use, the language of the August 5 and August 30 Emails makes clear they are free to accept or reject Defendant's settlement offer.  *See* ECF No. [10] at 8 ("*If you choose* to obtain a refund for your purchase of tickets on the primary market . . . through this process" (emphasis added)); see ECF No. [30-1] at 2 ("*If you choose* to obtain a refund of the amount you paid for your purchase of tickets to the Event on Ticketmaster's re-sale platform (TM+) through this process" (emphasis added)).

Finally, many of the putative class members who received Defendant's August 5 or August 30 Email approached Ticketmaster in the first place for a refund.  *See* ECF No. [10] at 8-9 ("You are receiving this email because you requested a refund of your tickets to the CONMEBOL Copa America USA 2024 Final Match on July 14, 2024"); ECF No. [30-1] at 2 (same); ECF No. [20] at 17 n. 13 ("[T]he majority of the requests for refunds that were made by Primary Market Purchasers were directed to Ticketmaster and not [Defendant], only reinforcing the fact that purchasers

understood and recognized the role of Ticketmaster in the process.").  It is, therefore, reasonable for Defendant to reference Ticketmaster's Terms of Use when offering a refund that would be processed by Ticketmaster even if they cannot enforce the Terms.[10]  *See generally* ECF No. [10]; ECF No. [30].

### C.    <u>Failure to Explicitly Identify Defendant BEST Security in Release</u>

Next, Nobel claims that Defendant's failure to identify Defendant BEST security in the Release Language renders it abusively misleading because the eligible putative class members agreeing to the Release are left guessing whether their claim against Defendant BEST Security survives the Release.  *See* ECF No. [10] at 11.  Should any eligible putative class members be unsure what claims they retain and against which Defendants after agreeing to the Release Language, all they need to do is refer to the language of the Release.  The Release plainly states, by agreeing to the Release Language, eligible putative class members are releasing all claims against "South Florida Stadium LLC, Miami Dolphins, Ltd., Concacaf, LLC, The South American Football Confederation ("CONMEBOL"), Ticketmaster, L.L.C., and any and all of, their past, . . . agents, . . . representatives, [or] contractors[.]"  ECF No. [20-4] at 3.  Defendant BEST Security contracted with Defendant to provide security for the Final Match, so it is fair to assume that the Release Language covers Defendant BEST Security.  *See id.* at 19.

### D.    <u>Explanation Concerning Pending Class Action Summaries</u>

Nobel asserts that, when communicating with putative class members, Defendant should have explained "how class actions work generally[,]" or what the pending class actions seek to

---

[10] While Defendant is correct in stating that Nobel failed to cite legal authority to support his position that Defendant does not have the right to enforce Ticketmaster's Terms of Use, the Undersigned need not address that merits-based argument in the context of a motion for protective order and will defer on that issue to Judge Bloom, if the Parties raise it in the future.

recover on behalf of their respective putative classes.  *See* ECF No. [10] at 13-14.  Nobel makes this argument without legal support, thus rendering it unconvincing.  *See generally id.*; ECF No. [30] at 5-7.  To rebut this argument, Defendant cites a series of contextually similar cases to support its position that naming the pertinent class actions and providing links to each of the pending class action's operative complaint was sufficient to safeguard the interests of the eligible putative class members and the proper functioning of the instant litigation.  *See, e.g.*, *Eshelman v. OrthoClear Holdings, Inc.*, No. 07-CV-01429, 2007 WL 2572349, at *3 (N.D. Cal. Sept. 4, 2007) (finding that communications with putative class members were proper in part because "the potential class members [had] a written settlement offer, [had] been advised that th[e] litigation [in question was] pending and that it may affect their rights, and [had] the contact information for [the p]laintiffs' counsel"); *Doty v. ADT, LLC*, No. 20-CV-60972, 2020 WL 9071424, at *3 (S.D. Fla. June 22, 2020) ("[The p]laintiff's requests that any notice include a copy of [the p]laintiff's complaint, identify [the p]laintiff's counsel and provide their contact information, include a neutral description of the claims, and provide notice of [the p]laintiff's evaluation of the claims, [was addressed because] all such information [was] contained within the linked complaint."); *Tolmasoff v. Gen. Motors, LLC*, No. 16-CV-11747, 2016 WL 3548219, at *13 (E.D. Mich. June 30, 2016) ("[The defendant] linked to copies of the complaints and advised the potential members to contact the class actions' counsel, and therefore it was not necessary for [the defendant] to provide summaries of the lawsuits.").  Having reviewed the case law, the Court finds that Defendant has fulfilled its responsibility by informing the eligible putative class members of the pending class actions and providing links to their respective complaints.

Concerning this position, Nobel also argues that the communication is misleading because Defendant failed to provide the contact information for class counsel in each of the pending class

actions.  *See* ECF No. [10] at 14.  However, the August 5 and August 30 Emails state that the contact information of class counsel can be found "at the end of the [hyperlinked] complaints." *Id.*; ECF No. [30-1] at 3.  The Court has reviewed each hyperlinked complaint and concludes this statement is accurate.  Accordingly, failure to provide the contact information of class counsel cannot serve as a basis on which to limit Defendant's communications with the putative class members.

### E.   <u>Failure to Communicate in Multiple Languages</u>

Nobel also argues that the August 5 and August 30 Email communications are abusive because Defendant only communicated them in English.  *See id.* at 18; ECF No. [30] at 6-7.  This argument in its entirety appears in the Motion as a single sentence stating as follows: "The fact that such offers are written only in English, (despite teams from Columbia [sic] and Argentina competing in the Final Match), only adds to the potential for confusion and abuse."  ECF No. [10] at 18.  This one line, buried at the end of the Motion within another freestanding argument, was insufficient to put Defendant on notice of the fact that Nobel intended this argument to form a basis for the Motion.  *See Benessere Inv. Grp., LLC v. Swider*, No. 24-CV-21104, 2024 WL 4652090, at *12 (S.D. Fla. Oct. 31, 2024) ("And there is no need for this Court to address arguments made in a footnote 'in a perfunctory manner without supporting arguments and authority.'" (quoting *U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 812 (11th Cir. 2015))); *see also Dvoinik v. Rolff*, No. 23-14147, 2024 WL 2974475, at *4 (11th Cir. June 13, 2024) ("Abandonment can also occur when arguments are buried within other arguments, or when a brief makes only passing references to it in the statement of the case or summary of the argument." (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681-82 (11th Cir. 2014))).

Even if Nobel properly argued this point in the Motion, the argument still would not

support his request for a protective order for two reasons: First, Nobel has not demonstrated that there is an actual need for such a translation among the putative class members.  Anecdotally, Miami is well-known for its substantial Spanish-speaking population, but it is also home to significant Creole-speaking and Portuguese-speaking populations.  Nobel has offered no factual support, showing that the putative class is comprised of individuals — to any degree — who exclusively speak Spanish, leaving the Court without a factual basis on which to grant the relief he seeks.

But assuming what Nobel claims is true, that there are eligible putative class members who do not understand English, the world finds itself in a digital age where free online translators are readily available.  To be certain, any translation produced by an online translator may be imperfect, but it would nonetheless be sufficient to convey to the reader the purpose of the communication.

The last point the Court will make concerning this argument is that a message cannot be coercive or misleading if the listener does not understand it.  The entire purpose of the Motion is to limit Defendant's communications with eligible putative class members to prevent Defendant from purportedly pressuring eligible putative class members into releasing all their claims in exchange for an "extremely limited refund[.]"  ECF No. [10] at 1-2.  If eligible putative class members cannot understand the communication in question, the communication cannot mislead them into a settlement Nobel characterizes as unfair.  In short, the Court will not issue a protective order that would necessarily infringe on the First Amendment rights of Defendant by compelling it to issue communications in a language other than English based on conjecture.

Secondly, Nobel has not cited a case where a court found that a defendant's failure to communicate in multiple languages provided sufficient grounds to limit a defendant's right to communicate settlement offers to members of a putative class.  As Nobel did not substantiate this

argument factually or legally, the Court declines to limit Defendant's First Amendment rights on this basis.

>    **F.    Cases Cited by Nobel in Support of the Motion**

The Court has reviewed the cases on which Nobel relies most heavily in support of the Motion and finds they generally fail to support his request for relief.  Those cases are (1) *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir.1985); (2) *Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc.*, 214 F.R.D. 696 (S.D. Ala. 2003); and (3) *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554 (S.D. Fla. 2008).

The Court begins its discussion in this subsection with *Kleiner*, as Nobel describes it as being the "most instructive case that is binding on this Court[.]"  ECF No. [10] at 15.  Two significant factual distinctions in *Kleiner* render its fact-specific holdings inapplicable to the instant case.  First, the class in *Kleiner* had already been certified when the defendants in that case communicated with class members.  *See Kleiner*, 751 F.2d at 1196 ("The tripartite plaintiff class, certified under Fed. R. Civ. P. 23(b)(3), numbered approximately 8,600 potential members." (footnote call number omitted)).  Second, there were orders entered at the trial court level specifically prohibiting the defendants in *Kleiner* from communicating with class members.  *Id.* at 1200 ("Because we conclude that the defense campaign violated the protective and class notice orders, we do not reach the question of the constitutional validity of Local Rule 221.2." (footnote call number omitted)).  Here, the Court has not certified the class and has entered no prior orders limiting communications with the putative class.

Next, the Court in *Cox*, while refusing to enter a protective order limiting communications between the defendant and the putative class, found that "[t]he failure to recognize the existence of a putative class action [] could be abusive only if the class action sought recovery in excess of

16

that proposed by the defendant, because only then could the class action vehicle offer the possibility of a more favorable result than the proposed settlement." *Cox*, 214 F.R.D. at 699. However, that is not the case here, as Defendant hyperlinked copies of the complaint in the six pending class actions originating in the events of July 14, 2024. *See* ECF No. [10] at 8-9.

Last, in *Jones*, the defendant there sent letters to putative class members, informing them that it would postpone replacing defective glass in the windows of their home until the resolution of the class action pending in that case. *See* 250 F.R.D. at 562. The *Jones* court found that the communication between the defendant and the putative class members "appear[ed] to create a potentially coercive relationship or situation." *Id.* at 563. Comparing the communication with the ones made to the eligible putative class members in this case, the Court declines to find that the communication was coercive like the communication in *Jones* because the August 5 and August 30 Emails make clear that the putative class members are free to accept or reject the settlement offer Defendant made.

### G.   Use of the Phrase "Face Value"

Despite Nobel's other unsuccessful arguments supporting the Motion, his point concerning Defendant's failure to define the phrase "face value" persuades the Court to, in part, limit communications between Defendant and the eligible putative class members. Specifically, the Undersigned recommends that Defendant should send clarifying communications to any eligible putative class members who received a settlement offer for their ticket's "face value" in return for their release of claims against Defendants, clarifying whether the phrase "face value" includes a ticketing company's service fees. And, if the affected former class members wish to revoke their release of claims after receiving that clarifying supplemental communication, the Undersigned further recommends that those former class members be allowed to do so and rejoin the putative

class.

The Court appreciates Defendant's need to employ a generally applicable phrase that would apply to all putative class members who purchased their tickets to the Final Match at varying price points.  But Nobel's point concerning service fees gives the Court pause for several reasons.  First, the Court's own research revealed that service fees, on average, account for 27% of a ticket's purchase price when purchased on the primary market.  *See* U.S. Gov't Accountability Off., GAO-18-347, Event Ticket Sales: Market Characteristics and Consumer Protection Issues 6 (2018), https://www.gao.gov/assets/gao-18-347.pdf ("Among a nongeneralizable sample of events we reviewed, [the United States Government Accountability Office] observed that primary and secondary market ticketing companies charged total fees averaging 27 percent and 31 percent, respectively, of the ticket's price.").  A review of the August 5 Email, the Frequently Asked Questions page hyperlinked to the August 5 and 30 Emails, and the Release Language reveals that these sources did not specify whether the "face value" of the ticket included Ticketmaster's fees.  *See* ECF No. [10] at 8-9; ECF No. [20-4] at 2-3.[11]  And Defendant's Response, which stated that the "face value is the amount [the eligible putative class member] actually paid and the only amount they paid," ECF No. [20] at 18, still did not explain whether the "face value" includes the ticket's service fees.

What's more, a comparison of the language used in the August 5 Email versus the August 30 Email suggests that the phrase "face value" may not, in fact, include its service fees.  This is because the August 5 email offered a refund for the "face value" of the ticket in return for a release of claims, ECF No. [10] at 8, but the August 30 Email offered eligible putative class members a

---

[11] Hard Rock Stadium, *Copa-America Refund Process*, https://www.hardrockstadium.com/copa-refund-process/?msdynttrid=tnyZLDCLERWKrhNrVDdD-9KAeQ15s2DS2Z3OL--J41Y (last visited Dec. 18, 2024).

"refund of the amount [he or she] paid for [his or her] purchase of tickets to the" Final Match, ECF No. [30-1] at 2.  In response to Nobel's argument questioning whether the "face value" of a ticket included service fees, Defendant gave the vague, non-answer referenced above, *see* ECF No. [20] at 18, but when responding to whether the settlement offer Defendant made in the August 30 Email included a ticket's services fees, Defendant stated it "obviously" did, ECF No. [33-3].  These facts lead the Court to believe that if the phrase "face value" clearly included service fees, Defendant would have said so *and* there would have been no need for Defendant to reword the August 30 Email to explain that the eligible putative class member would receive a "refund of the amount [he or she] paid for [his or her] purchase of tickets."

Based on the foregoing, the Court finds the phrase "face value" is ambiguous; and it is unjust to require the putative class members to bear the burden of that ambiguity when deciding whether to accept Defendant's settlement offer.  *See also Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1247-48 (11th Cir. 2002) ("When 'ambiguity in meaning remains after resort to the ordinary rules of construction,' an ambiguous term is to be construed against the drafter." (quoting *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So.2d 938, 942 (Fla.1979); citation omitted)).

Accordingly, the Undersigned recommends limiting communications between Defendant and putative class members.  *See Gulf Oil Co*, 452 U.S. at 101 ("[A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." (footnote omitted)).  The Court is mindful that defendants generally have a right to communicate settlement offers to putative class members prior to class certification.  *See Noel*, 2022 WL 18023536, at *3 ("Defendants ordinarily are not

19

precluded from communications with putative class members, including discussions of settlement offers with individual class members before certification, but may not give false or misleading information or attempt to influence class members in making their decision whether to remain in the class." (citing Manual for Complex Litigation, Third § 30.21 at 233 (1995))).  A defendant's right to communicate with putative class members, however, is not unfettered, and courts can impose reasonable limitations on a defendant's communications with class members. *Jones*, 250 F.R.D. at 563 (finding that "a defendant may not abuse" the right to communicate settlement offers to putative class members (citation omitted)).  Still, an order limiting communications between a defendant and a putative class must be carefully tailored to infringe on a defendant's First Amendment right to communicate settlement offers to members of the putative class as little as possible while protecting the putative class from abusive communications. *See Gulf Oil Co.*, 452 U.S. at 102 ("[S]uch a weighing — identifying the potential abuses being addressed — should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances[.]").

Here, following the lead of other federal trial courts, the Undersigned recommends ordering Defendant to transmit clarifying communications to the putative class members who received the August 5 Email and other putative class members who received communications offering a refund of a ticket's "face value" in return for a release of claims that explains whether the phrase "face value" includes a ticket's service fees. *See, e.g.*, *Noel*, 2022 WL 18023536, at *4 (ordering the defendant to provide clarifying information); *Jones*, 250 F.R.D. at 564 (same).  As the opportunity to accept the settlement offer has since passed, and so the potential damage from which Nobel has sought protection has already been inflicted, the Undersigned recommends allowing the affected former class members 30 days to revoke their release after receiving the

clarifying communication and allowing them to rejoin the class, so long as they return the funds they received from Defendant in exchange for their release. *See Bublitz v. E.I. duPont de Nemours & Co.*, 196 F.R.D. 545, 549 (S.D. Iowa 2000) ("In *Woods v. Rhodes*, 994 F.2d 494, 502 (8th Cir.1993), the 8th Circuit acknowledged the power to invalidate a release of civil claims where the release was not knowing and voluntary. Therefore, the Court is confident that it is not powerless to cure an unknowing or involuntary waiver of rights under the CIC Plan by a putative class member.").

In sum, the Court finds that the phrase "face value" is sufficiently ambiguous to warrant a protective order, requiring a supplemental communication clarifying the phrase's meaning and creating a remedial process to address any harm inflicted upon the affected former class members due to the phrase's ambiguous meaning.

## H.   Release of "Related Persons"

Likewise, the Court finds that the release of claims that Defendant secured in exchange for the settlement offer it made to the eligible putative class members and intends to hold against the "Related Persons" is abusive and unsupported by law.

To recap, in the Response, Defendant claims without legal support that conditioning its settlement offer on the listing of "Related Persons'" is proper because (1) it clearly states its purpose, to secure a release of claims from the "Related Persons," and (2) to ensure that multiple refunds are not issued for the same ticket.  Nobel replied that the release of claims Defendant attempts to secure against the "Related Persons" through its settlement offers "can be likened to 'virtual representation' for claim preclusion, which the Supreme Court has disapproved."  ECF No. [30] at 9 (citing *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008)).  Then, in its Surreply, Defendant argued that Nobel waived his "virtual representation" argument because he raised it for

the first time in his Reply and that the holding in *Taylor v. Sturgell* is factually and legally distinguishable, making its holding inapplicable to the instant case. *See* ECF No. [33-1] at 6 (*Taylor*, 553 U.S. at 888, 893).

First, the Court disagrees with Defendant that Nobel waived his "virtual representation" argument. Nobel has argued since the Motion that conditioning a settlement on the release of a "Related Person's" claims is improper. *See* ECF No. [10] at 6 ("In addition to releasing their own claims the refund process requires each purchaser to also release the claims of any and all 'related persons.'"). Nobel's citation to new case law for the first time in the Reply to support this position does not mean he waived the argument. *See Overstreet v. Worth Cnty., Georgia*, No. 20-CV-95, 2021 WL 6143569, at *10 (M.D. Ga. Mar. 10, 2021) ("While Defendants cite to additional case law supporting their argument in their Reply, the underlying argument was raised in the motion and is, therefore, not new."), *aff'd*, No. 21-14391, 2022 WL 4007460 (11th Cir. Sept. 2, 2022). And, in any event, Defendant was allowed to file a Sur-reply to that argument and address such case law, eliminating any potential prejudice to Defendant,

Second, while the Court agrees that *Taylor* contains significant factual distinctions that would render its fact-specific holdings inapplicable here, those factual distinctions do not prevent the Court from applying *Taylor*'s general principles of law to the instant case. Namely, the "principle . . . that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process[,]" otherwise known as the rule against nonparty exclusion. *Taylor*, 553 U.S. at 884 (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). Turning to Nobel's "virtual representation" argument, the Court will not expend judicial resources attempting to determine whether the general release of claims Defendant intends to hold against the "Related Persons" falls within the principle of "virtual representation"

because the Supreme Court has held that no such principle exists. *See id.* at 904 ("For the foregoing reasons, we disapprove the theory of virtual representation . . . . The preclusive effects of a judgment in a federal-question case decided by a federal court should instead be determined according to the established grounds for nonparty preclusion described in this opinion."). Rather, the question is whether one of the six well-established exceptions to the rule against nonparty exclusion applies here. *See id.* at 893-95 (identifying six exceptions to the rule against nonparty preclusion).[12]   The Court's inquiry, however, is short as Defendant offers neither factual nor legal support to establish that the Release it secured against the "Related Persons" falls within one of the six exceptions to the rule against nonparty exclusion. *See generally* ECF No. [20]; ECF No. [33].  And, based on the Court's review of the six exceptions on this factual record, it concludes that none of them appear to apply, and as a result, the Release Language runs afoul of the rule against nonparty exclusion expressed in *Taylor*.

These findings are not to say that the Court does not appreciate Defendant's interest in ensuring that it does not issue multiple refunds for the same ticket, but Defendant's interest in this regard does not permit them to secure a general release of claims indirectly through the listing of "Related Persons."  Such a practice is manifestly unjust.  To illustrate the Court's conclusion, take,

---

[12] The Supreme Court explained the six exceptions as follows: (1) "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement;" (2) "nonparty preclusion may be justified based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment", such as "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor"; (3) in certain circumstances, "a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit", such as a class representative; (4) "a nonparty is bound by a judgment if she 'assume[d] control' over the litigation in which that judgment was rendered"; (5) "[p]reclusion is . . . in order when a person who did not participate in a litigation later brings suit as the designated representative of a person who was a party to the prior adjudication"; and (6) "in certain circumstances a special statutory scheme may 'expressly foreclos[e] successive litigation by nonlitigants . . . if the scheme is otherwise consistent with due process," such as bankruptcy and probate proceedings. *Taylor*, 553 U.S. at 893-95.

for example, the following scenario involving two friends. For the purposes of this example, "Friend 1" lives in Seattle, Washington, while "Friend 2" lives in Aventura, Florida. Hoping to buy a ticket to the Final Match on the primary market at a lower price, Friend 1 agrees to let Friend 2 purchase the tickets as soon as the tickets become available for purchase. Friend 2 successfully secures the tickets, and Friend 1 makes costly travel arrangements to attend the Final Match. However, Friend 1 and Friend 2 were denied access to the match due to the chaos on the night of the Final Match. At some point in the weeks after the Final Match, Friend 2 went to Ticketmaster for a refund, resulting in Friend 2 receiving the August 5 Email. Friend 2 agreed to the settlement offer and listed Friend 1 on the Release as a "Related Person", figuring he could return the portion of the refund that covered the cost of the ticket to Friend 1. When Friend 1 learned of the Release, she was furious because unlike Friend 2, who lived only a few miles from the Final Match's stadium, Friend 1 in addition to her $200 ticket, spent $2,000 for her plane ticket and accommodation in Miami. And, by virtue of her listing as a "Related Person" on the Release that Friend 2 signed, Friend 1 can no longer seek reimbursement for other expenses, such as her travel costs.

In conclusion, Defendant fails to articulate a legal basis on which it could condition its settlement offer to eligible putative class members on their general release of claims against "Related Persons" for whom they purchased their tickets. Consequently, the Undersigned recommends that Defendant be required to send clarifying communications to all putative class members who received settlement offers and be prohibited from conditioning future settlement offers on a general release of claims against "Related Persons."

## I.   **Evidentiary Hearing**

Nobel requests an evidentiary hearing in his Motion but fails to explain why an evidentiary

hearing is necessary in this case.  *See* ECF No. [10] at 2.  Although he explains in his Reply that an evidentiary hearing is necessary to determine the extent to which Defendant has communicated settlement offers to the members of the putative class, he does not provide any supporting legal authority for such a request.  *See* ECF No. [30] at 2.  Nobel's conclusory and barebones request for an evidentiary hearing fails to establish grounds for an evidentiary hearing.  Furthermore, the Court finds that it can decide the Motion based on the factual record before it.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned **RESPECTFULLY RECOMMENDS** that Plaintiff Das Nobel's ("Nobel") Motion for Protective Order Limiting Communications with Putative Class Members, **ECF No. [10]**, be **GRANTED in part** and **DENIED in part** as follows:

a.      **Within ten (10) days** of the Court's Order, Defendant South Florida Stadiums LLC shall send supplemental communication to all putative class members to whom they offered a refund of their ticket's "face value" that clarifies whether the phrase "face value" includes a ticket's service fees.  After Defendant sends the supplemental communication to the affected former class members, any former class member who wishes to revoke their release may do so for a period of **30 days** starting from the date Defendant sends the supplemental communication, but only if the affected class member returns the full monetary amount Defendant exchanged for their release.  After Defendant sends the supplemental communication, it **SHALL** file a Notice of Compliance on the docket in this case.

b.      In future settlement offers with putative class members, Defendant **SHALL** not condition any such offer on the listing of "Related Persons" to secure a release of claims from said related person without direct engagement with the related person.  After

Defendant sends the supplemental communication, it **SHALL** file a Notice of Compliance on the docket in this case.

c.      Nobel's other requests for relief — namely his request that the Court (1) require supplemental communications that explain the class action claims that have been advanced in the pending class actions and the damages sought, how class actions work in the United States generally, and provide information on where legal questions can be asked; (2) require all settlement offers be communicated in English and Spanish; and (3) preclude Defendant South Florida Stadium from communicating additional settlement offers with the putative class be **DENIED** because Nobel failed either to provide factual or legal support for the relief he seeks.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on December 27, 2024.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record